IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| SILVER SPRING JEWISH CENTER, INC. et al. | : | |
| v. | : | Civil Action No. DKC 26-2963 |
| MONTGOMERY COUNTY, MARYLAND, et al. | : | |

**MEMORANDUM OPINION**

Plaintiffs Silver Spring Jewish Center, Inc. ("SSJC") and Rabbi J. Menashe Shapiro (collectively, "Plaintiffs") filed a complaint against Defendants Montgomery County, Maryland ("County"), Marc Elrich, and Marc R. Yamada[1] (collectively, "Defendants") challenging portions of the Montgomery County law on weapons, purportedly focused on recent amendments in "Expedited Bill No. 23-26" ("EB23-26").[2] (ECF No. 1 ¶¶ 17–22). Presently pending and ready for resolution is the motion for temporary restraining order ("TRO") or preliminary injunction filed by Plaintiffs. (ECF No. 5). On September 3, 2026, a hearing on the

[1] Mr. Elrich is sued in his official capacity as County Executive of Montgomery County; and Mr. Yamada is sued in his official capacity as Chief of Police of Montgomery County. John McCarthy was also sued in his official capacity as State's Attorney for Montgomery County, (ECF No. 1, at 1); on August 24, 2026, Plaintiffs filed a notice of voluntary dismissal of Mr. McCarthy without prejudice. (ECF No. 25).

[2] The dispute is not just about the amendments enacted in EB23-26. Rather, the underlying County regulation of firearm possession by persons holding a permit to carry, wear, or transport a handgun ("Permit") must be addressed.

motion in coordination with another case challenging the same provisions of the County Code was held.[3] For the following reasons, the motion for a preliminary injunction will be granted in part.

## I. Background

### A. The Challenged Provisions of the Montgomery County Code

Section 57-11 of the Montgomery County Code prohibits the sale, transfer, possession, or transport of firearms, ammunition, or major component for firearms "in or within 100 yards of a place of public assembly." Montgomery Cnty., Md., Code ("Code") Section 57-11(a). "A place of public assembly" is defined currently as follows:

> **57-1 Definitions – place of public assembly.**
> (1) a publicly or privately owned:
> (A) park;
> (B) place of worship;
> (C) school;
> (D) library;
> (E) recreational facility; or
> (F) multipurpose exhibition facility, such as a fairgrounds or conference center;
> (2) government building open to the public for the business of government or community use;
> (3) polling place;
> (4) courthouse; or
> (5) legislative assembly.

---

[3] The other case is *Barreto v. Montgomery Cnty.*, No. 26-cv-2912-DKC (D.Md. 2026). (*See* ECF No. 21, at 1). "[F]or now, the cases [are] coordinated, but not consolidated." (*Id.*).

> A "place of public assembly" includes all property associated with the place, such as a parking lot or grounds of a building.

*Id.* Section 57-1. The prohibition in Section 57-11 does not extend to security guards licensed to carry the firearm and contains other exceptions not relevant here. *Id.* Section 57-11(b). Section 57-10 provides:

> **57-10 Keeping guns on person or in vehicles.** It shall be unlawful for any person to have upon his person, concealed or exposed, or in a motor vehicle where it is readily available for use, any gun designed to use explosive ammunition unless:
>
> (a) *Lawful mission.* Such person is then engaged upon a lawful mission for which it is necessary to carry a gun upon his person; or
>
> (b) *Special guard, special police, etc.* Such person is employed as a special guard, special police officer or special detective and has been lawfully deputized by the sheriff for the county, or has been appointed a constable in the county, or has been licensed under the laws of the state, should such a law be enacted, to carry such gun and then is on or in the immediate vicinity of the premises of any employer whose occupation lawfully requires the employment of a person carrying a gun while in the discharge of the duties of such employment; or
>
> (c) *Military service.* Such person is then lawfully engaged in military service or as a duly authorized peace officer; or
>
> (d) *Hunting, target practice, etc.* Such person is engaged in lawful hunting, drill, training or target practice on property of which he is the owner or

lessee or on property with the prior permission of the owner or lessee thereof; or

(e) *Going to or returning from from hunting, target practice, etc.* Such person is engaged in going to or from lawful hunting, drill training or target practice, or in delivering such gun to or carrying it from a gunsmith or repairman, or is engaged in any other lawful transfer of possession; provided, that such person shall be on or traveling upon a public highway or property of which he is the owner or lessee or on property with the prior permission of the owner or lessee thereof; provided further, that such gun shall not be loaded with explosive ammunition.

This section is not to be interpreted to prohibit a firearm that is carried or transported on person or in a motor vehicle, as defined under the Maryland Transportation Article, as amended, if the firearm is:

(1) In a motor vehicle, locked in a container; or

(2) A handgun worn, carried, or transported in compliance with any limitations imposed under Section 5-307 of the Public Safety Article of the Maryland Code, as amended, by a person to whom a permit to wear, carry, or transport the handgun has been issued under the Public Safety Article of the Maryland Code, as amended.

A violation of Section 57-10 or -11 is a "Class A violation to which the maximum penalties for a Class A violation apply." Code Section 57-15. A criminal Class A violation is punishable by a maximum of a $1000 fine or 6 months in jail, and a civil violation

is punishable by a maximum fine of $500 for a first offense, and $750 for repeat offenses. *Id.* Section 1-19. Civil and criminal citations may be issued by any "enforcement officer," which includes County police officers and State officers "whose job includes the issuance of a citation." *Id.* Sections 1-18(a)(3), (b)(1).

**B. Status of Enforcement**

The timeline of the County's firearm laws, prior litigation, and developing Second Amendment law merits brief recitation. Chapter 57 was enacted in 1981. (ECF No. 26-1, at 7). By 1997, that law prohibited the sale, transfer, possession, or transport of a firearm "in or within 100 yards of a place of public assembly." A place of worship was included in the list. Prior to 2022, Section 57-11 contained an exemption for "the possession of a handgun by a person who has received a permit to carry the handgun under State law." That subsection was deleted by EB 21-22 (ECF No. 17-7 in *Barreto v. Montgomery Cnty.*, No. 26-cv-2912-DKC (D.Md. 2026)), after the Supreme Court's decision in *New York Rifle & Pistol Assn v. Bruen,* 597 U.S. 1 (2022). Receiving a Permit under Maryland law, prior to *Bruen*, required good and substantial reason. After *Bruen*, that standard was no longer enforced and the number of Permits increased.

In 2021, multiple provisions of Chapter 57 were challenged on both state law and federal constitutional grounds, and, eventually, cases in both the Circuit Court for Montgomery County and this court proceeded. *See Maryland Shall Issue, Inc. v. Montgomery County*, 680 F.Supp.3d 567 (D.Md. 2023), and *Engage Armament LLC v. Montgomery County*, 494 Md. 1 (2026). The state trial court stayed enforcement pending that litigation. In *Engage Armament*, the Supreme Court of Maryland held that several provisions of the prior iteration of Chapter 57 violated state law, including that some locations listed in § 57-1 as places of public assembly were preempted by state law, and that Section 57-11(a) was not a "local law" within the authority of the County to enact. *Engage Armament*, 494 Md. at 48, 71. After that case was decided by the Supreme Court of Maryland earlier this year, the stay apparently was lifted.

Then, on July 27, 2026, the County enacted EB23–26, narrowing firearm prohibitions slightly—to allow firearms in vehicles in certain circumstances, even if within 100 yards of a place of public assembly, and to alter the list of places of public assembly. Its stated rationale was to address the defects in its prior law recognized in *Engage Armament*.

Thus, while the precise provisions at issue here may have been in force for some time, the practical reality is that, not until *Bruen* was a Permit available to a large number of individuals, and until very recently, the threat of enforcement of the Montgomery County law as to permitted gun owners was remote, if not non-existent. This challenge is timely.

Plaintiffs challenge two discrete aspects of the current law: (1) the provisions prohibiting firearm possession in a place of worship (and within 100 yards of that place of public assembly) by a licensed gun owner and (2) assuming those restrictions are invalidated, the provisions prohibiting possession of a firearm by a licensed gun owner while walking within 100 yards of any other place of public assembly.

As noted in footnote 1, Plaintiffs dismissed the claims against the State's Attorney for Montgomery County. The notice indicated that the State's Attorney had "agreed to defer any criminal prosecutions for alleged violations of Montgomery County Expedited Bill 23-26 until the constitutionality of that legislation has been finally resolved in this litigation." (ECF No. 25, at 1). Defendants confirmed that until the resolution of this litigation, the Maryland State's Attorney will defer criminal prosecutions of Section 57-10 or -11, and represent that County

police officers will not issue criminal citations under Section 57-10 or -11. (ECF No. 32, ¶¶ 1–3). However, Defendants acknowledged at the September 3 hearing that its police force could still issue civil citations for violations of the Sections.

**C. Factual Background**

SSJC is a Maryland religious corporation and a Jewish synagogue in Montgomery County, Maryland. It brings this action on its own behalf and on behalf of its members, seeking declaratory and injunctive relief. Rabbi J. Menashe Shapiro is an ordained, Orthodox Jewish rabbi who resides in Montgomery County. These Plaintiffs contend that the County's prohibition on carrying firearms in places of worship and within 100 yards of places of public assembly violate their constitutional rights.

According to the complaint, SSJC has implemented a comprehensive security plan, including upgrades to its infrastructure and security protocol training for members of the synagogue. "A central feature of this plan is the synagogue's armed security team." (ECF No. 1 ¶ 26). The SSJC relies primarily on volunteer members for this team, as they are familiar with the layout of the synagogue and are known to other members. This team is "highly qualified" and "trains extensively." Many of them are former members of the military, and all have gone through the

process required by Maryland to be licensed to carry a firearm. Rabbi Yaakov Greiniman, the Senior Rabbi of SSJC, attests to these facts, (ECF No. 5-3), and reports that SSJC hires a single armed guard for part of the day as a supplement to the volunteer team. It would be prohibitively expensive to hire an armed guard for the entirety of operations, which run from 6:00 am to 11:00 pm each day.

Rabbi Shapiro has been issued a Permit by the Maryland State Police. He has a sincerely held religious belief that Jewish law requires him to carry a firearm for personal, family, and communal protection, and that this requirement is to be performed by himself personally. (ECF No. 5-2, at 2). He regularly attends communal prayer at synagogues in Montgomery County and serves on the security committee of one synagogue. On certain days, his sincerely held religious beliefs require that he walk between his house and his synagogue, and that route takes him within 100 yards of two public schools, two private schools, two parks, and three other houses of worship.

**D. Procedural Background**

On July 30, 2026, SSJC and Rabbi Shapiro filed their complaint—a handful of days after Montgomery County Expedited Bill No. 23-26 became effective. (*See* ECF No. 1). In a four-count

complaint asserting claims under 42 U.S.C. § 1983, they "seek a declaration that EB23-26 is unconstitutional and an injunction preventing Defendants and their employees from enforcing its prohibition of firearms in places of worship and within 100 yards of places of assembly." (ECF No. 1 ¶ 7). On the same day as they filed their complaint (July 30, 2026), these plaintiffs filed their motion for a temporary restraining order or preliminary injunction. (ECF No. 5). On August 24, 2026, Defendants filed their opposition. (ECF No. 26). SSJC and Rabbi Shapiro replied on August 31, 2026. (ECF No. 29). Defendants answered the complaint on August 24, 2026. (ECF No. 23).

## II. Standard of Review

> A preliminary injunction is an extraordinary remedy afforded prior to trial at the discretion of the district court that grants relief *pendente lite* of the type available after the trial. *See In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 524–26 (4th Cir. 2003); *see also* [*De Beers Consol. Mines, Ltd. v. United States*, 325 U.S. 212, 220–21 (1945)]. Because a preliminary injunction affords, on a temporary basis, the relief that can be granted permanently after trial, the party seeking the preliminary injunction must demonstrate by "a clear showing" that, among other things, it is likely to succeed on the merits at trial. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *see also Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam).

*Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 346 (4th Cir. 2009), *vacated on other grounds by* 559 U.S. 1029 (2010) *and reissued in part*, 607 F.3d 355 (4th Cir. 2010).

To be entitled to a TRO or preliminary injunction, plaintiffs must clearly show that "(1) they are likely to succeed on the merits; (2) they will suffer irreparable harm; (3) the balance of the equities favors their position; and (4) the relief they seek is in the public interest." *Bauer v. Elrich*, 463 F.Supp.3d 606, 610 (D.Md. 2020) (citing *Winter*, 555 U.S. at 20); *see also N. Va. Hemp & Agric., LLC v. Virginia*, 125 F.4th 472, 492 (4th Cir. 2025). When a government entity is an opposing party, the third and fourth factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Each of these requirements must be fulfilled. *See Mountain Valley Pipeline, LLC v. W. Pocahontas Props. Ltd. P'ship*, 918 F.3d 353, 366 (4th Cir. 2019). In other words, failure to satisfy any one of the four factors is dispositive and motions for preliminary injunctive relief should be denied.

**III. Analysis**

**A. Standing**

To establish Article III standing a plaintiff must satisfy three elements:

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally

> protected interest which is (a) concrete and particularized, [] and (b) "actual or imminent, not 'conjectural' or 'hypothetical,'" []. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly . . . traceable to the challenged action of the defendant, and not . . . the result of the independent action of some third party not before the court." [] Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560(1992) (citation modified) (citations omitted); *see also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014); *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 284 (4th Cir. 2018).

Two types of injury-in-fact are relevant here. First, "a plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Susan B. Anthony List*, 573 U.S. at 159 (quoting *Babbitt v. Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979)). The party does not need to "first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of his constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974) (citation omitted). Second,

monetary costs are "a concrete injury in fact under Article III." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021).

Plaintiffs have alleged that Sections of Chapter 57 deter the exercise of their constitutional rights under the First, Second, and Fourteenth Amendments. Defendants' representations at the hearing on September 3, 2026, suggest that there is a credible threat of enforcement: civil enforcement during the pendency of litigation and criminal enforcement after litigation has concluded.[4]

Furthermore, SSJC has alleged a monetary injury from having to hire a professional security guard at times it would prefer to use its member-based Security Team. (*See* ECF. No. 1 ¶¶ 35–36).

Defendants only challenge standing as to SSJC. (ECF No. 26-1, at 15-17). They first argue that SSJC lacks associational standing because "the interests at stake here are not germane to its [religious] purpose." (*Id.* at 15 ("SSJC is not seeking to protect an interest central to the reason it exists—as a house of worship.")). This contention relates to the County's insistence

[4] The State's Attorney's promise to defer criminal prosecutions of violations of EB23-26 until final resolution may not be relevant to the standing analysis. Indeed, the promise may be ephemeral. "Defer" means to delay or postpone. At the conclusion of the litigation, should Plaintiffs lose, then criminal prosecution based on conduct during this litigation could occur, assuming the statute of limitations has not run.

that, contrary to SSJC's assertions, Section 57-11 imposes no burden on religious practice. (*See id.*, at 18–20). This argument fails because SSJC has alleged in good faith that Section 57-11 prevents members "from fulfilling their religious obligations with respect to self-defense." (ECF No. 1 ¶ 23). Thus, SSJC has an interest at stake directly related to its religious purpose.

Defendants also argue that SSJC lacks organizational standing because SSJC alleges "no organizational objective supposedly frustrated, institutional program supposedly disrupted, or resource supposedly diverted." (ECF No. 26-1, at 16). This assertion does not comport with a fair reading of the complaint, which alleges a disruption to SSJC's preferred defense program and monetary injury from hiring a private security guard. (*See* ECF No. 1 ¶¶ 23; 35–36).

**B. Likelihood of Success on the Merits**

All of Plaintiffs' claims are asserted under 42 U.S.C. § 1983, for which they must establish that a defendant was acting under color of state law and that the defendant caused plaintiff to suffer a loss of a constitutional right due to unlawful action.

"To state a claim under § 1983, a plaintiff must allege that a person acting under color of state law deprived him of a constitutional right or a right conferred by a law of the United

States." *Lilly v. Baltimore Police Dep't*, 694 F. Supp. 3d 569, 584 (D.Md. 2023) (first citing *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); then citing *Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017)). There is no dispute that Defendants were acting under color of state law.

Plaintiffs challenge the constitutionality of the County Code on four different bases. For the Second Amendment claims, they purport to mount both facial and as-applied challenges. For the First Amendment claims, they are not precise but appear to be mounting as-applied challenges. For purposes of their requests for preliminary injunctive relief, inasmuch as they seek relief only for themselves, they would only need to succeed on an as-applied challenge. "The line between facial and as-applied challenges goes to 'the breadth of the remedy employed by the [c]ourt,' but the line has not been particularly 'well defined.'" *White Coat Waste Project v. Greater Richmond Transit Co.*, 35 F.4th 179, 203–04 (4th Cir. 2022) (quoting *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010)). "An as-applied challenge is one which depends on the identity or circumstances of the plaintiff." *Id.* at 204 (citing *See Richmond Med. Ctr. for Women v. Herring*, 570 F.3d 165, 172–73 (4th Cir. 2009) (en banc)). "An 'as applied' challenge contends that a law's application to a

particular person under particular circumstances deprives that person of a constitutional right. Thus, a successful 'as applied' challenge precludes the enforcement of a statute against a plaintiff alone." *Marcellus v. Virginia State Bd. of Elections*, 168 F. Supp. 3d 865, 872 n.8 (E.D. Va. 2016), *aff'd*, 849 F.3d 169 (4th Cir. 2017) (citing *Fed. Election Comm'n v. Wisc. Right to Life, Inc.*, 551 U.S. 449, 481 (2007)).

> "An as-applied challenge asks the reviewing court to declare the disputed statute unconstitutional 'on the facts of the particular case.'" *United States v. Adams*, 914 F.3d 602, 605 (8th Cir. 2019) (quoting *Sanjour v. EPA*, 56 F.3d 85, 92 n.10 (D.C. Cir. 1995)). The challenge is not "that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right." *Id.* (quoting *United States v. Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010)). Accordingly, "to succeed on an as-applied challenge, a defendant must establish (1) that the Second Amendment protects his particular conduct, and (2) that his particular prohibitor is insufficient to justify the challenged regulation of Second Amendment rights." *Id.*

*United States v. Lehman*, 8 F.4th 754, 757 (8th Cir. 2021).

To prevail on a facial challenge, a plaintiff must show that there is no set of circumstances in which the law can be applied constitutionally. "The Supreme Court has instructed that facial challenges are 'disfavored' because they 'often rest on

speculation,' 'short circuit the democratic process,' and 'run contrary to the fundamental principle of judicial restraint.'" *Bianchi v. Brown*, 111 F.4th 438, 452 (4th Cir. 2024), *cert. denied sub nom. Snope v. Brown*, 145 S. Ct. 1534, 222 L. Ed. 2d 1059 (2025) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450–51 (2008)).

1. **Second and Fourteenth Amendments – Right to Bear Arms**

The Second Amendment states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. "[T]he Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right recognized in *Heller*" against the states. *McDonald v. Chicago*, 561 U.S. 742, 791 (2010); *see D.C. v. Heller*, 554 U.S. 570, 595 (2008).

To determine whether a violation of one's rights under the Second Amendment has occurred,

> [f]irst, a court must determine whether the law before it clashes with the "plain text" of the Amendment's language. [*Bruen*, 597 U.S. at 24]. This inquiry entails three subsidiary questions. First, does the law apply to "the people"—which is to say, to "all members of the political community"? *Heller*, 554 U.S. at 580. Second, does it concern any form of "Arms," *i.e.*, any weapon customarily used for offensive or defensive purposes? *See id.*, at 584. Third, does the law place any restrictions on either the "keep[ing]" (*i.e.*,

> possession) or the "bear[ing]" (*i.e.*, carrying) of arms? *See Bruen*, 597 U.S. at 32–33.

*Wolford v. Lopez*, 609 U.S. ----, 146 S.Ct. 2032, 2043-44 (2026). "If a challenged law falls within the plain text of the Second Amendment, it is presumptively unconstitutional, [*Bruen*, 597 U.S. at 24]—which means that it *may* violate the preexisting right that the Amendment codified." *Id.* at 2044.

Then, the relevant government may attempt to show that "its challenged law did not infringe the historical understanding of the codified right." *Id.* (citing *Bruen*, 597 U.S. at 24). At this second step of the analysis, "[a] variety of sources, including scholarship, may aid this inquiry." *Id.* (citing *Bruen*, 597 U.S. at 34–60).

In its recent opinion in *Wolford*, the Supreme Court of the United States offered additional specificity as to how courts should approach this second step of the inquiry block-quoted above. First, when assessing "proffered" historical analogues, courts should consider "the number of jurisdictions in which [the analogue(s)] were adopted." *Id.* (citing *Bruen*, 597 U.S. at 67). At this stage, where a historical analogue was "neither widespread nor widely adopted, it carries no weight." *Id.* at 2053. Second, courts must query "the extent to which [the analogue(s)] were well-

accepted." *Id.* at 2044. As part of this inquiry, courts should consider whether acceptance of the analogue(s) is "express" or "tacit," *id.*, "as when a restriction on the keeping or carrying of arms was 'open, widespread, and unchallenged.'" *Id.* (quoting *Bruen*, 597 U.S. at 36). Third, courts need to determine "whether any analogue or collection of analogues is 'relevantly similar' to the modern law." *Id.* (quoting *Bruen*, 597 U.S. at 29). Such a finding requires courts to consider:

> "how" the analogue restricted the keeping or bearing of arms—that is, whether it imposed a restriction similar to that imposed by the challenged law. [*Bruen*, 597 U.S. at 29]. And a court must also consider "why" the analogue restricted the keeping or bearing of arms—that is, whether its rationale was similar to that of the new law. [*Id.*]. In order to be sufficiently similar to the modern law being challenged, a putative analogue need not be a "dead ringer" or "historical *twin*." *Id.* at 30.

*Id.*. Finally, the Court instructs that while this inquiry "undeniably necessitates an exercise of judgment," *id.*, "it is not mechanical." *Id.*

In another opinion of the Court this June, *Hemani*—which was issued a week or so before *Wolford*—the Court supplied additional context for this third and final sub-part of *Bruen* step two. *United States v. Hemani*, 608 U.S. ----, 146 S. Ct. 1677 (2026). In *Hemani*, the Court considered the government's "habitual

drunkard law[]" historical analogues alongside the modern-day "§ 922(g)(3)'s unlawful user provision." *Id.* at 1687. The Court determined that the historical analogues "differ[ed] dramatically" from § 922(g)(3) "on every single metric the government invit[ed]" the Court to consider. *Id.* The Court found that the habitual drunkard laws "targeted different kinds of people, did so for different purposes, and operated in different ways." *Id.* The Court, however, declined to decide whether "any one of these problems taken in isolation would prove fatal to the government's cause[.]" *Id.*

It remains somewhat an open question whether historical analogues need be clustered around 1776 (the founding era), 1791 (ratification of the Second Amendment), 1868 (ratification of the Fourteenth Amendment), or otherwise. *See Bruen*, 597 U.S. at 34; *Kipke v. Moore*, 165 F.4th 194, 225 n.5 (4th Cir. 2026)[5] (Agee, J., concurring in part and dissenting in part); *see also Wolford*, 146 S.Ct. at 2067 n.5 (Kagan, J., dissenting) (stating that the Court

[5] The *Kipke* plaintiffs and defendants both initially filed petitions for writ of certiorari with the Court, challenging different parts of the Fourth Circuit's ruling. Following the Court's ruling in *Wolford*, defendants moved to dismiss their petition, and the Court dismissed the petition on August 13, 2026. *Moore v. Kipke*, No. 25-1206 (Aug. 13, 2026). Plaintiffs' petition, *Novotny v. Moore*, No. 25-1324, is still pending before the Court. In early September, the case was distributed for the Court's September 28, 2026, conference.

"has declined to decide the relevance of Reconstruction-era laws to the *Bruen* inquiry."). The United States Court of Appeals for the Fourth Circuit supplies some guidance on this score, which is binding: at the first step, the historical sources courts can look to are limited to the Founding Era, and at the second, sources "can come [from] throughout American history." *Id.* at 207. Indeed, "[t]he Court has made clear that the Second Amendment does not impose 'a law trapped in amber' and allows for regulations beyond 'ones that could be found in 1791.'" *Id.* (quoting *United States v. Rahimi*, 602 U.S. 680, 691–92 (2024)).

As the party seeking preliminary relief, SSJC and Rabbi Shapiro bear the burden of showing they are entitled to the as-applied relief they seek. *See Nat'l Ass'n for Gun Rts. v. Lamont*, 153 F.4th 213, 229 (2d Cir. 2025), *cert. granted sub nom. Grant v. Higgins*, No. 25-566, 2026 WL 1871312 (U.S. June 30, 2026) (citing *Nken*, 556 U.S. at 433-34). To prevail, SSJC and Rabbi Shapiro must show that (1) the challenged sections of the Code clash with the plain text of the Second Amendment and fall within it; and (2) that Defendants cannot carry their burden of justifying the challenged sections by showing they did not infringe on the historical understanding of the codified Second Amendment right.

*See Wolford*, 146 S.Ct. at 2044 (quoting *Bruen*, 597 U.S. at 24);; *see also Lamont*, 153 F.4th at 229.

**a. Places of Worship (Code §§ 57-1(1)(B) & 57-11(a)(1))**

Montgomery County bans, among other things, the possession of firearms, Code Section 57-11(a)(1), in a "place of worship," Code Section 57-1(1)(B). Under Section 57-1, a place of worship includes "all property associated with the place [of public assembly], such as a parking lot or grounds of a building." *Id.* § 57-1. SSJC and Rabbi Shapiro seek preliminary relief from these portions of the Code "to the extent those provisions [Section 57-1 and Section 57-11(a)(1)] prohibit Plaintiffs from selling, transferring, possessing, or transporting a handgun, rifle, or shotgun, or ammunition or a major component of any such firearm, in a place of worship[.]" (ECF No. 5-5, at 1–2).

SSJC and Rabbi Shapiro's as-applied Second Amendment challenge to these sections easily satisfies *Bruen* step one. This initial inquiry probes whether the "Second Amendment's plain text covers" an individual's conduct under the challenged law. *Bruen*, 597 U.S. at 24. The Fourth Circuit has held that a law which "'bar[s] an individual who is otherwise law-abiding from possessing a weapon in common use for a common purpose'" amounts to regulating conduct that is "'covered by the Second Amendment's

plain text' at step one." *Kipke*, 165 F.4th at 207 (quoting *United States v. Gould*, 146 F.4th 421, 427 (4th Cir. 2025), *opinion superseded on reh'g*, 163 F.4th 795 (4th Cir. 2026), *cert. denied*, No. 25-7330, 2026 WL 1780101 (U.S. June 22, 2026)).

At step two,[6] it must be assessed whether historical analogues and other sources show that the challenged provisions did "not infringe the historical understanding of the codified right." *Wolford*, 14 S.Ct. at 2044.

First, the number of jurisdictions in which the historical analogues were adopted must be evaluated. *Id.* Defendants supply fifteen laws[7] that were adopted as early as 1870 and as recently as 1901 in four states and two territories (listed as follows in ascending chronological order by year of first law enacted): Georgia, Texas, Missouri, and Virginia (states); and Arizona and

---

[6] As noted above, ultimately it will be Defendants' burden to demonstrate the adequacy of historical analogues. At the preliminary injunction stage, however, it is Plaintiffs' burden to show that Defendants cannot do that. This is not the first case to challenge the County's inclusion of places of worship in the list of places of public assembly and the County has had ample opportunity to identify the basis on which it contends this prohibition is constitutional.

[7] On September 8, 2026, Defendants filed a letter citing four Maryland local laws that purport to "restrict firearms in or around places of worship." (ECF No. 31, at 1). The same day, Plaintiffs filed a letter in response. (ECF No. 33). It is unclear whether the parties believe these laws are relevant to the historical analysis.

Oklahoma (territories). The Georgia laws[8] Defendants cite are from 1870 and 1882; Defendants also cite a judicial decision from Georgia in 1874 which, along with other judicial decisions from Texas and Tennessee, will be relevant to whether the analogues were "well-accepted." *Id.* Defendants cite three Texas laws—one also from 1870, another from the following year (1871), and the third from 1879.[9] From Missouri, Defendants appear to cite three state laws (from 1875, 1879, and 1883), and two local government laws—one from a town dated 1890, and the other from a city in

[8] For readability, footnotes are used to cite these and other historical analogues. All of the following citations to Defendants' historical analogues use Defendants' formatting. Here, the Georgia laws Defendants cite are: ECF Nos. 26-16, (Ex. 14, An Act to Preserve the Peace and Harmony of the People of this State, and for Other Purposes, Penal Code, Title 16, No. 285, Acts and Resolutions of the General Assembly of the State of Georgia 421 (1870)); 26-17 (Ex. 15, Georgia Code, Part IV, Title I, Division IX, § 4528, The Code of the State of Georgia (1882))).

[9] (ECF Nos. 26-18 (Ex. 16, An Act Regulating the Right to Keep and Bear Arms, Ch. 46, § 1, General Laws of the Twelfth Legislature, of the State of Texas 63 (1870)); 26-19 (Ex. 17, An Act Regulating the Right to Keep and Bear Arms, Art. 6511 (1870) and An Act to Regulate the Keeping and Bearing of Deadly Weapons, Crim. Code Art. 6514 (1871), A Digest of the Laws of Texas 1322, 1323 (1875)); 26-20 (Ex. 18, Texas Code, Tit. 9, Ch. 4, Art. 320, Carrying Arms in Church or Other Assembly, The Revised Statutes of Texas 43 (1879))).

1894.[10] Defendants cite a single 1878 law from Virginia.[11] The two laws from the Territory of Arizona are dated 1889 and 1901.[12] The final two historical analogues Defendants cite are from the Territory of Oklahoma in 1890 and 1893.[13]

---

[10] (ECF Nos. 26-21 (Ex. 19, An Act to Prevent the Carrying of Weapons in Public Assemblies of the People, § 1, Laws of Missouri, General and Local Laws Passed at the Regular Session of the Twenty-Eighth General Assembly 50-51 (1875)); 26-22 (Ex. 20, Revised Statutes of the State of Missouri (1879)); 26-24 (Ex. 21, An Act to Amend Section 1274, Article 2, Chapter 24 of the Revised Statutes of Missouri, Entitled "Of Crimes and Criminal Procedure," § 1, Laws of Missouri Passed at the Session of the Thirty-Second General Assembly 76 (1883)); 23-24 (Ex. 22, Chapter XVII: Carrying Concealed Weapons—Firing Guns, Pistols, Fire Crackers, Etc., May 22, 1890, General Ordinances of the Town of Columbia, in Boone County, Mo. 34, 35 (1890)); 23-25 (Ex. 23, Huntsville, Missouri, Ordinance in Relation to Carrying Deadly Weapons, § 1 The Revised Ordinances of the City of Huntsville, Missouri of 1894 58 (1894))).

[11] (ECF No. 26-26 (Ex. 24, Acts of Virginia Assembly, Ch. 7, of Offen[s]es Against Morality and Decency – Protection of Religious Meetings § 21, Acts and Joint Resolutions of the General Assembly of the State of Virginia 305 (1878))).

[12] (ECF Nos. 26-27 (Ex. 25, An Act Defining and Punishing Certain Offenses Against Public Peace, § 3, Session Laws of the Fifteenth Legislative Assembly of the Territory of Arizona 17 (1889)); 26-28 (Ex. 26, Arizona Territory Statutes, Crimes and Punishments § 387, The Revised Statutes of the Arizona Territory 1252 (1901))).

[13] (ECF Nos. 26-29 (Ex. 27, Territory of Oklahoma Statutes, Crimes and Punishment, Art. 47, § 7, The Statutes of Oklahoma 1890, Laws Passed by the First Legislative Assembly of the Territory 496 (1890)); 26-30 (Ex. 28, Oklahoma Territory Statutes, Art. 45, § 7, Statutes of Territory of Oklahoma, 1893 504 (1893))).

These are some of the very same analogues provided to Judge Chuang in *Maryland Shall Issue*. 680 F.Supp.3d 567. He, however, relied on the now vacated decision of the United States Court of Appeals for the Eleventh Circuit in *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1322 (11th Cir. 2023) *reh'g en banc granted, opinion vacated*, 72 F.4th 1346 (11th Cir. 2023), *and on reh'g en banc*, 133 F.4th 1108 (11th Cir. 2025), to conclude that reliance on historical sources from the time period of the ratification of the Fourteenth Amendment are "equally if not more probative of the scope of the Second Amendment[]." 680 F.Supp.3d at 582. The Eleventh Circuit, *en banc*, later came to a different understanding:

> The Supreme Court has warned against the overuse of history from Reconstruction. Although the Supreme Court looked to sources from Reconstruction in *Heller*, it cautioned that because those sources come "75 years after the ratification of the Second Amendment, they do not provide as much insight into its original meaning as earlier sources." [*Heller*, 554 U.S. at 614]. And, in *Bruen*, the Court explained that "when it comes to interpreting the Constitution, not all history is created equal" because "'[c]onstitutional rights are enshrined with the scope they were understood to have *when the people adopted them*.'" 597 U.S. at 34 (quoting *Heller*, 554 U.S. at 634–35). The Second Amendment was ratified, and its meaning fixed, in 1791.
>
> Our conclusion that we first look to the Founding understanding finds additional support in the Supreme Court's repeated interpretations of other amendments based on

> their public meaning at the Founding. For example, in *Crawford v. Washington*, the Court explained that the "founding generation's" understanding of the "right to confront one's accusers" derived from the "common law." 541 U.S. 36, 43 (2004). *Crawford* canvassed English legal history, colonial practice, state law contemporary to the ratification of the Sixth Amendment, ratification debates, and early state practice to ascertain the scope of the right. *Id.* at 42–50. Likewise, in *Virginia v. Moore*, the Court explained that it "look[s] to the statutes and common law of the founding era to determine the norms that the Fourth Amendment was meant to preserve." 553 U.S. 164, 168 (2008). And, in *Nevada Commission on Ethics v. Carrigan*, the Court considered legislative enactments, treatises, and conflict-of-interest rules contemporaneous to the ratification of the First Amendment to determine whether legislative recusal rules violate the First Amendment. 564 U.S. 117, 122–25 (2011). These precedents reflect the preeminence of Founding-era sources to the meaning of the Bill of Rights. Because the Supreme Court relies on sources from the Founding era to interpret the Bill of Rights, including the Second Amendment, we do too.

*Nat'l Rifle Ass'n v. Bondi*, 133 F.4th 1108, 1116 (11th Cir. 2025), *cert. denied sub nom. NRA, Inc. v. Glass*, No. 24-1185, 2026 WL 1871313 (U.S. June 30, 2026).

Even if laws enacted at (or after) the time of the ratification of the Fourteenth Amendment (1868) can alone supply the necessary validation, the effort fails here. At the time of ratification, there were thirty-seven states in the Union and eleven territories. Andrew Willinger, *The Territories under Text,*

*History, and Tradition*, 101 Wash. U. L. Rev. 1, 61 (2023). By 1901, the time of the most recent historical analogue Defendants provide, there were forty-five states; Arizona and Oklahoma were still territories. *See U.S. Territory and Statehood Status by Decade, 1790–1960*, U.S. Census Bureau (Feb. 21, 2013), https://www.census.gov/dataviz/visualizations/048/508.php [https://perma.cc/MD57-D4EG].

While the earliest three laws Defendants cite were enacted within three years of the ratification of the Fourteenth Amendment, that timing still places these historical analogues at about eighty years (or three or so generations) after the ratification of the Second Amendment. Just shy of a third of the laws Defendants cite fall during Reconstruction (Georgia (1870); Texas (1870); Texas (1871); and Missouri (1875)), and just over a third are territorial or local government laws (Territory of Arizona (1889); Town of Columbia, Missouri (1890); Territory of Oklahoma (1890); Territory of Oklahoma (1893); City of Huntsville, Missouri (1894); and Territory of Arizona (1901)). Many of the laws are merely extensions of or amendments to the original enactments, and do not reflect widening application.

As for this latter group of laws, the Court has noted that "the bare existence of . . . localized restrictions cannot

overcome the overwhelming evidence of an otherwise enduring American tradition permitting public carry." *Bruen*, 597 U.S. at 67. Moreover, the Court has impugned the reliability of territorial restrictions due to the "'very transitional and temporary character of the American territorial system' [that] often 'permitted legislative improvisations which might not have been tolerated in a permanent setup.'" *Id.* (quoting Earl S. Pomeroy, *Territories and the United States, 1861–1890: Studies in Colonial Administration* 4 (1947)).

Territorial laws are likewise not necessarily "'instructive'" due to the size of the populations they affected. *Id.* For instance, in 1890, within a year of when two of the four territorial laws that Defendants cite were enacted, the Territory of Arizona and the Territory Oklahoma, as well as three other territories made up about "two-thirds of 1% of the population." *Id.* Taking this sliver of the Nation's population into account, the Court cautioned that it would "not stake [its] interpretation on a handful of temporary territorial laws that were enacted nearly a century after the Second Amendment's adoption, governed less than 1% of the American population, and also 'contradic[t] the overwhelming weight' of other, more contemporaneous historical

evidence." *Id.* (quoting *Heller*, 554 U.S. at 632)). This reasoning enfeebles Defendants' showing.

The United States Court of Appeals for the Ninth Circuit examined what appear to be some of the very same historical analogues as those provided by Defendants.[14] It remarked that,

> From the colonial times through the ratification of the Second Amendment and continuing through the ratification of the Fourteenth Amendment, Defendant has not pointed to a single regulation banning firearms at places of worship or at any analogous place. The lack of any regulation is especially probative given the prevalence of places of worship during that period.

*Wolford*, 116 F.4th at 996. The Ninth Circuit found it significant that "places of worship have been prevalent throughout our Nation's history, but no colony, state, or territory banned firearms at places of worship until after the ratification of the Fourteenth Amendment." *Id.*, at 997. This portion of the Ninth Circuit's *Wolford* opinion was unaffected by the later review of a Hawaii private-property rule. *Id.*; *Wolford v. Lopez*, 184 F.4th 1167, 1170 (9th Cir. 2026).

---

[14] The Ninth Circuit considered laws from the states of Georgia (1870), Texas (1870), Missouri (1875), and Virginia (1878), and from the territories of Arizona (1889) and Oklahoma (1890). *Wolford v. Lopez*, 116 F.4th 959, 996 (9th Cir. 2024), *cert. granted in part*, 146 S. Ct. 79, 222 L. Ed. 2d 1241 (2025), *and rev'd and remanded*, 146 S. Ct. 2032, 225 L. Ed. 2d 494 (2026).

Defendants argue in their opposition that SSJC and Rabbi Shapiro "ignore the Fourth Circuit's acceptance of historical analogues that transcend the time period of the ratification of the Second Amendment." (ECF No. 26-1, 27). But this misses the point of the Ninth Circuit's reasoning. It rested its determination not on the dates of the materials themselves, but on the complete absence of a single anchor to the time before ratification of the Fourteenth Amendment. *Wolford*, 116 F.4th at 997.

Further, in a recent opinion evaluating the validity of firearms restrictions in nine categories of sensitive places (not including places of worship), the Fourth Circuit does not appear to have anchored its reasoning solely to sources that post-date the ratification of the Fourteenth Amendment. *See Kipke*, 165 F.4th at 208–. Thus, Defendants' argument that the Fourth Circuit has "expressly . . . rejected the approach taken by the authority from other Circuits upon which Plaintiffs misplace their reliance"—like the Ninth Circuit's opinion in *Wolford*—rings hollow. (ECF No. 26, at 31).

The Fourth Circuit, in *Kipke*, applied the logic of the Ninth Circuit and that of the United States Court of Appeals for the Second Circuit regarding types of places that did not exist at the

time of the founding, looking to laws enacted at the time the place first came into existence, and then looking backwards to potentially analogous places at the founding:

> As parks did not appear in their modern form until the middle of the nineteenth century, "one way that Defendants can show a historical tradition is by establishing that, when parks . . . first arose in modern form, states and municipalities began to regulate the possession of firearms in parks, the regulations were considered constitutional at the time, and the regulations were comparable to a tradition of regulating a similar place or places in the earlier years of the Nation."

*Kipke*, 165 F.4th at 215 (quoting *Wolford*, 116 F.4th at 981) (citation modified). Places of worship are not modern institutions, being present before and at the founding.

Therefore, the limited number of jurisdictions and absence of the historical analogues until after the ratification of the Fourteenth Amendment casts doubt on strength of Defendants' showing to rebut the presumption of unconstitutionality of the challenged provisions of Chapter 57.

Second, the extent to which the supplied historical analogues were "well-accepted" must be determined. *Wolford*, 146 S.Ct. at 2044. Defendants present three judicial decisions in an apparent attempt to demonstrate express acceptance of the fifteen proffered historical analogues ranging from 1870 through 1901 in four states

and two territories. *See id.*; (*see* ECF No. 62, at 29-30). All three fall in quick succession after only a handful of the historical analogues were adopted: the 1870 Georgia law, the Texas law that same year, and another Texas law the next year (1871); the earliest judicial decision Defendants cite is from Tennessee in 1871, the next from Texas dated 1872, and the last from Georgia two years later (1874). (*See* ECF No. 26-1, at 29–30 (discussing *Andrews v. State*, 50 Tenn. 165 (Tenn. 1871); *English v. State*, 35 Tex. 473 (Tex. 1872); and *Hill v. State*, 53 Ga. 472, 475 (Ga. 1874)).

The Tennessee decision, *Andrews v. State*, does not expressly recognize the legality of an analogous historical rule restricting firearms in places of worship like the current challenged provisions. In *Heller*, the Court cited this case multiple times, including for the premise that it "equate[d the] state provision with the Second Amendment." *Heller*, 554 U.S. at 614. Still, the decision itself struck down a *state* constitutional provision that prohibited the open carry of a revolver "publicly or privately, without regard to time or place, or circumstances." *See Andrews*, 50 Tenn. at 187. The section on which Defendants rely for their argument that judicial decisions about historical analogues evince express acceptance does not support that view. Properly read, the

section is a hypothetical instead of a square consideration of bearing arms in places of worship. The passage reads, "a man may well be prohibited from carrying his arms to church, or other public assemblage, as the carrying them to such places is not an appropriate use of them[.]" *Id.* at 182; (*see* ECF No. 26-1, at 29–30). As Plaintiffs point out, *Andrews* did not present the issue of firearm regulation in places of worship. (*See* ECF No. 29, at 8). This judicial decision merits little weight.

Both of the remaining two judicial decisions offered by Defendants are dispensed with easily. The Texas decision, *English v. State*, was deemed by the Court in *Bruen* to be an "outlier[]," 597 U.S. at 65; also, *English*'s holding abridged the scope of the Second Amendment right articulated in *Heller* itself, cabining arms to those "as are useful and proper to an armed militia," *English*, 35 Tex. at 474. Because of this unsuitability recognized by the Court, *English*'s commentary labelling carrying a firearm into a church as "little short of ridiculous" does not convert this case into a potent example. *Id.* at 478–79; *see also Young v. Hawaii*, 896 F.3d 1044, 1057 (9th Cir. 2018) (reasoning, in light of *Heller*, that cases like *English* "furnish . . . little instructive value"), *on reh'g en banc*, 992 F.3d 765 (9th Cir. 2021), *cert. granted,*

*judgment vacated*, 142 S. Ct. 2895, 213 L. Ed. 2d 1108 (2022) (remanded for further consideration in light of *Bruen*).

Finally, the Georgia decision, *Hill v. State* also is inapposite because it, like *English*, "only approved broad limitations on the public carry of weapons *because* such limitations in no way detracted from the common defense of the state." *Id.* at 1085 (collecting cases). The *Hill* reasoning is bound up with the need to "encourage or secure the existence of a militia, and especially of a well-regulated militia[.]" 53 Ga. at 475. *Hill*'s soaring language regarding firearm regulation in places of worship that Defendants invoke, (ECF No. 26-1, at 29), runs counter to the charge of *Heller* which unyokes the right to bear arms from the militia context. *Compare Hill*, 53 Ga. at 475 *with Heller*, 554 U.S. at 582 (describing sources suggesting "the right to 'keep Arms' [is] an individual right unconnected with militia service."). *Hill*'s militia-centered reasoning amounts to the type of "foundation" of which *Heller* "knock[ed] out the load-bearing bricks." *Young*, 896 F.3d at 1057-58; *see also Heller*, 554 U.S. at 559 ("The prefatory clause does not suggest that preserving the milita was the only reason Americans valued the ancient right; most undoubtedly thought it even more important for self-defense

and hunting.”); *id.* at 592, 595, 616, 628. This judicial decision lacks weight, too.

All of Defendants’ judicial decisions do little to show “express” acceptance under Second Amendment precedent of historical analogues restricting firearms in places of worship.[15] Tacit acceptance is elusive, too, as the restrictions on keeping or carrying of arms in places of worship do not appear “open, widespread, and unchallenged.” *Wolford*, 146 S.Ct. at 2044 (citing *Bruen*, 597 U.S. at 36).

Therefore, the sources on which Defendants rely do not demonstrate that the historical analogues for firearm restrictions in places of worship were well-accepted.

Third, whether Defendants’ supplied analogues are “relevantly similar” to the modern law must be considered. *Wolford*, 146 S.Ct. at 2044. The “how”—along which lines the “analogue restrict[ed] the keeping or bearing of arms”; and the “why” behind them animate

[15] While the judicial decisions Defendants cite do not persuasively demonstrate express acceptance of historical analogues regarding firearm regulation in places of worship, they have been used to show that historical analogues of firearm regulation in other locations was well-accepted. See *Wolford*, 116 F.4th at 987–89 (citing *Andrews*, *English*, and *Hill* as three of eight state court decisions suggesting that “courts were in agreement” that “prohibitions on firearms at places of amusement” were constitutional and “rejected arguments that the provisions conflicted with the Second Amendment”).

this analysis, too. *See id.* Defendants represent that the recent changes to the challenged provisions of the Montgomery Code were enacted in an effort to bring them into compliance with a recent Maryland Supreme Court decision, as discussed elsewhere in this opinion. There is little in the record about the avowed purpose, however, of the sections germane to the present challenge. In the "Racial Equity and Social Justice (RESJ) Impact Statement" for Bill 4-21, the direct precursor to EB23-26, it states that "Bill 4-21 aims to reduce firearm violence in the County, focusing on increasing public safety." (ECF No. 26-5, at 17 (footnote omitted)). Judge Chuang identified the purpose of Section 57-11 as "address[ing] possible gun violence in or near places of public assembly" *See Maryland Shall Issue*, 680 F.Supp.3d at 587 (citing "Legislative Request Report" on the case's docket at ECF No. 59-6). A detailed examination of the purported analogues is unnecessary. Even if all of them serve the same general purpose of "public safety" in sensitive places, the temporal remoteness from the founding, the meagre number of jurisdictions, and the lack of evidence of wide-spread acceptance, combine to doom Defendants' efforts to salvage this provision.

Therefore, SSJC and Rabbi Shapiro, at this preliminary stage, have demonstrated a likelihood of success on the merits as to their

as-applied Second Amendment claim of the Code's firearm restrictions as to places of worship. However, in light of the plethora of related litigation in this court and pending appeals (and potentially more to come), the note of caution the Ninth Circuit expressed after reaching the same conclusion as to likelihood of success on the merits at this early juncture deserves to be echoed: beyond this preliminary stage, "[f]urther Supreme Court and circuit-court guidance may affect the ultimate resolution of" this and other issues. *Wolford*, 116 F.4th at 997.

**b. 100-Yards Within Places of Public Assembly (§ 57-11(a))**

Plaintiffs separately challenge the 100-yard buffer zones around other places of public assembly, but they do so in a cursory and conclusory fashion. Indeed, they only argue that it is like Hawaii's "unjustified" obstruction struck down in *Wolford*. (ECF No. 5-1, at 15). As a facial challenge, though, they must do more than they have. They must show that no set of circumstances exists under which any buffer zone would be valid. *Rahimi*, 602 U.S. at 693 (2024) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). Accordingly, the facial challenge fails at this stage.

The *Bruen* step one analysis performed above regarding places of public assembly applies to the 100-yard buffer zones too, because they both operate through the same Code provision: Section

57-11(a). In this circuit "[s]ensitive-place laws 'directly impact the right to bear' arms and are therefore . . . 'subject to *Bruen*'s historical analysis' at step two." *Kipke*, 165 F.4th at 207 (quoting *McRorey v. Garland*, 99 F.4th 831, 838 (5th Cir. 2024)). Furthermore, *Bruen* itself engaged in an analysis of sensitive place regulations to model the "'analogical approach it envisioned'"—in doing so, the Court "'impl[ied] that sensitive-place regulations are justified by historical tradition at step two, not by plain text at step one.'" *Id.* (quoting *United States v. Price*, 111 F.4th 392, 417 n.2 (4th Cir. 2024) (en banc) (Quattlebaum, J., concurring)).

Roughly half of the places of public assembly as defined by Section 57-1—from which 100-yard buffers extend under Section 57-11(a)—likely are constitutional under the sensitive place doctrine (*i.e.*¸ schools; government buildings open to the public for the business of government or community use; polling places; courthouses; and legislative assemblies). The Court has suggested that schools, government buildings, polling places, courthouses, and legislative assemblies were "sensitive places" where firearms could be banned. *See, e.g.*, *Wolford*, 116 F.4th at 979 (; *Heller*, 554 U.S. at 626–27 ("[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on . . . laws forbidding

the carrying of firearms in sensitive places such as schools and government buildings[.]"). The Fourth Circuit has "adopted the Supreme Court's dicta as to schools" and determined that schools are sensitive places. *Kipke*, 165 F.4th at 212 n.3 (citing *LaFave v. Cnty. of Fairfax*, 149 F.4th 476 (4th Cir. 2025)). From that premise, the Fourth Circuit evaluated the propriety of a firearms restriction on school grounds by analogizing to the constitutionality of the restrictions within the schools themselves and found that firearm restrictions on school grounds are constitutional. *Id.* at 212 (citing *Bruen*, 597 U.S. at 31).

In light of that background, SSJC and Rabbi Shapiro's facial challenge to the 100-yard buffers around places of public assembly fails. Only one constitutional application need exist for Plaintiffs' facial challenge to falter at the preliminary injunction stage. One likely constitutional application under Section 57-11(a) is the 100-yard buffer around schools.

Interestingly, the issue has arisen in the criminal law context most directly. Title 18 U.S.C. § 922 (q)(2) makes it unlawful, under some circumstances, for an individual to possess a firearm in a "school zone." "School zone" is defined in § 921(a)(26) as "in, or on the grounds of" a public, private, or parochial school, or "within a distance of 1,000 feet from the

grounds" of those types of schools. Different defendants have moved to dismiss charges alleging a violation of that statute on Second Amendment grounds, prompting courts to conduct the *Bruen* analysis. In doing so, one court recently observed that "courts across the country have found that there is a history and tradition of placing restrictions on firearm possession in the area surrounding schools and other sensitive places." *United States v. Taras*, No. 25-cr-00262-DAD, 2026 WL 2364515, at *6 (E.D.Cal. Aug. 14, 2026) (collecting cases, including *Maryland Shall Issue*, 680 F.Supp.3d at 589). In their opposition, Defendants quote Judge Chuang's opinion in the earlier Second Amendment challenge to the previous iteration of the challenged law here. (ECF No. 26-1, at 30). They argue that Defendants had been credited for supplying "'numerous examples of laws prohibiting firearms in buffer zones of a certain distance around a 'sensitive place[.]'" (*Id.*). Furthermore, Defendants claim that the "buffer zone was untouched by the new Bill." (*Id.*). In this regard, Judge Chuang concluded that "where numerous examples of buffer zone statutes exist, and where they impose the same burden on Second Amendment rights and are comparably justified," a plaintiff's likelihood of success on the merits dwindles. *Maryland Shall Issue*, 680 F.Supp.3d. at 590.

Therefore, SSJC and Rabbi Shapiro's facial challenge—what has been deemed the "'most difficult challenge to mount successfully'"—does not succeed at the preliminary injunction stage because they failed to "'establish that no set of circumstances exists under which the [challenged sections] would be valid.'" *Rahimi*, 602 U.S. at 693 (2024) (quoting *Salerno*, 481 U.S. at 745). SSJC and Rabbi Shapiro have not established that, as to the 100-yard buffer zones around each type of place of public assembly, the challenged provisions "lack[] any 'plainly legitimate sweep.'" *Bianchi*, 111 F.4th at 452 (4th Cir. 2024) (quoting *United States v. Stevens*, 559 U.S. 460, 472 (2010)).

Even looking at Rabbi Shapiro's challenge, as applied, and limited to the places of public assembly along his walk to the synagogue, the challenge fails. First, it is not clear that he has properly asserted an as-applied challenge. As noted above, he must establish that the Second Amendment protects his particular conduct, and that the reason he is prohibited is insufficient to justify the challenged regulation of Second Amendment rights. Here, his particular conduct is, as a licensed firearm carrier, to travel by foot through an area in which it is presumptively constitutional to ban firearms altogether (the buffer around a school, for example). Even if he satisfies the first step, he

must identify the particular reason he is prohibited that he claims is insufficient. He has not done so—he is like any other licensed gun carrier. To set out the question, then, reveals that Rabbi Shapiro's current as-applied challenge fails, as did the facial challenge.

2. **First and Fourteenth Amendments – Free Exercise Clause**

The First Amendment to the United States Constitution provides that "Congress shall make no law...prohibiting the free exercise" of religion. U.S. Const. amend. I. This prohibition is incorporated against the states via the Fourteenth Amendment. *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940).

"To implicate the Free Exercise Clause, state action must burden religious exercise." *Kim v. Bd. of Educ. of Howard Cnty.*, 93 F.4th 733, 747 (4th Cir. 2024) (citing *Fulton v. City of Phila.*, 593 U.S. 522, 532 (2021)). Ordinarily, "the government is generally free to place incidental burdens on religious exercise so long as it does so pursuant to a neutral policy that is generally applicable." *Mahmoud v. Taylor*, 606 U.S. 522, 564 (2025) (citing *Emp. Div. v. Smith*, 494 U.S. 872, 878-79 (1990)). If a court finds such a burden, it must then "ask if the burdensome policy is neutral and generally applicable." *Id.* If it is, rational basis review applies. *Jesus Christ Is the Answer Ministries, Inc. v.*

*Balt. Cnty.*, 915 F.3d 256, 265 (4th Cir. 2019) (citing *Smith*, 494 U.S. at 879). If it is not, the policy triggers strict scrutiny. *Mahmoud*, 606 U.S. at 564; *see Gottesman v. Bd. of Educ. of Montgomery Cnty.*, No. 25-cv-1682-DKC, 2026 WL 574975, at *12 (D.Md. Mar. 2, 2026), *reconsideration denied*, No. 25-cv-1682-DKC, 2026 WL 1346173 (D.Md. May 14, 2026).

Thus, Plaintiffs may carry their burden of proving a free exercise violation "by showing that a government entity has burdened [their] sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'" *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 525 (2022) (quoting *Smith*, 494 U.S. at 879).

**a. As-Applied Challenge to Places of Worship Under 57-1(1)(B) and 57-11(a)**

SSJC and Rabbi Shapiro allege that "[*h*]*alachically*, reliance on volunteer members of the community, rather than outsourcing the religious obligation to others, is preferred under Jewish Law" and cite the following sources in support: Babylonian Talmud, Tractate Kiddushin 41a; Shulchan Aruch, Orach Chayim 250:1. (ECF No. 1 ¶ 30). Additionally, they contend that "Talmudic and later religious sources command Jews to proactively provide their own security and the security of other Jews" and cite to "Shulchan Aruch, Choshen Mishpat 425:1." (*Id.* ¶ 31). SSJC and Rabbi Shapiro also state

that "[i]t is the belief of observant Jews generally, and Plaintiffs' sincerely held religious beliefs specifically, that the entire corpus of Jewish law is binding." (*Id.* ¶ 32 (citing "Maimonides*,* The Thirteen Principles of Jewish Faith (c. 1168)").

And in their motion, SSJC and Rabbi Shapiro assert that they

> sincerely believe that Jewish law commands them to defend themselves and their fellow Jews, and the Jewish law generally requires them to fulfill this and other commandments personally, rather than by hiring others to do it for them. The Ban prevents Plaintiffs from fulfilling these religious obligations: SSJC's volunteer Security Team and Plaintiff Shapiro may not carry firearms to defend themselves and others at the synagogue, and they must hire others to provide armed defense if the synagogue is to be defended at all. . . . . [T]he Ban even prevents Plaintiff Shapiro from being armed while walking to the synagogue, as Jewish law obligates him to do on many occasions.

(ECF No. 5-1, at 17). Also, "[o]n the Sabbath and Jewish holidays, Rabbi Shapiro's sincerely held religious beliefs require that he walk to the synagogue for communal prayer"—a walk that requires him to pass through an area where under County law, he would not be permitted to carry a firearm. (*Id.* at 9).

Moreover, SSJC and Rabbi Shapiro contend that for "both practical and *halachic* (Jewish Law) reasons, SSJC relies primarily on volunteer members of the synagogue for its Security Team." (ECF No. 1 ¶ 27). In Rabbi Greiniman's declaration in support of

Plaintiffs' motion for preliminary relief, he contends that this "Security Team" referenced above was organized "in the wake of the October 7 attacks in the Middle East" and that "for practical and *halachic* reasons, we rely primarily on volunteer members of the synagogue." (ECF No. 5-3 ¶ 4).

In their opposition, Defendants assert that Chapter 57"prevents no one from praying, attending synagogue, or observing any particular tenant of Jewish law or religious practice, including an obligation to defend oneself and one's community." (ECF No. 26-1, at 20). Defendants insist that the challenged provisions under Chapter 57 of the Code "regulate[] only the instrumentality Plaintiffs wish to use for [self-defense]." (*Id.*). They assert that the "Free Exercise Clause does not ensure any particular method of self-defense that Plaintiffs have failed to tether to any religious command—and what it does not shield, the County may lawfully regulate." (*Id.* (citations omitted)). Furthermore, Defendants argue that the challenged provisions of the Code cannot burden SSJC and Rabbi Shapiro when Section 57-11(b) provides "lawful alternatives that SSJC actively employs" and that the Code cannot be understood to force SSJC to "outsource" when the synagogue is already doing so. (ECF No. 26, at 20 n.5).

Along these lines, Defendants cite to a case before the United States District Court for the Southern District of New York with similar facts: *Goldstein v. Hochul*, 680 F.Supp.3d 370 (S.D.N.Y. 2023). (*See* ECF No. 26-1, at 19). Reasoning that "[c]arrying a gun is not a religious act and cannot be analogized to praying or being able to enter one's house of worship," the Southern District of New York held that the *Goldstein* plaintiffs failed to allege a burden on their religious practice and did not issue preliminary injunctive relief on Free Exercise Clause grounds. *Goldstein*, 680 F.Supp.3d at 398. In contrast to the *Goldstein* plaintiffs' fact pattern, however, SSJC and Rabbi Shapiro tether carrying firearms to their religious beliefs and specified *halachic* tenets recited above. *See id.* ("At no point do [plaintiffs] argue that the Challenged Provision . . . actually burdens their religious practices or beliefs.").

In their reply, Plaintiffs point to a case decided by the Second Circuit shortly after *Goldstein*. (ECF No. 29, at 10). Plaintiffs argue that in that case, *Antonyuk v. Chuimento*, "the Second Circuit held that the same law *did* unconstitutionally burden [different] plaintiffs' religious practice." (ECF No. 29, at 10 (citing *Antonyuk v. Chiumento*, 89 F.4th 271, 347–51 (2[d] Cir. 2023), *vacated sub nom.*, *Antonyuk v. James*, 144 S. Ct. 2709 (2024) (mem.),

*amended and reinstated in part by* 120 F.4th 941 (2d Cir. 2024)). The Second Circuit's analysis in *Antonyuk* is more compelling.

Furthermore, Defendants do not challenge the sincerity of SSJC and Rabbi Shapiro's beliefs regarding armed worship but their truth. But a challenge of the truth of a religious belief is impermissible. *See, e.g.*, *United States v. Ballard*, 322 U.S. 78, 86 (1944). The beliefs of SSJC and Rabbi Shapiro are sincere.

Accordingly, at this stage, SSJC and Rabbi Shapiro have demonstrated a burden on their sincere religious practice. Because SSJC and Rabbi Shapiro have shown a burden on their religious exercise, the next step is to evaluate whether the law is neutral and generally applicable. A regulation is not neutral and generally applicable when it treats "*any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021) (citing *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 17 (2020)). In other words, a regulation is not neutral and generally applicable if it "single[s] out houses of worship for especially harsh treatment." *Roman Cath. Diocese of Brooklyn*, 592 U.S. at 17.

As part of this analysis, a court must evaluate whether the challenged provision "prohibits religious conduct while permitting secular conduct that undermines the government's asserted

interests in a similar way." *Fulton*, 593 U.S. at 534 (citations omitted). Put differently, "whether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Tandon*, 593 U.S. at 62 (citing *Roman Cath. Diocese of Brooklyn*, 592 U.S. at 18).

Defendants argue that the government interest justifying the regulation is "aligning County firearms law with the Maryland Supreme Court's decision in *Engage Armament . . .* and preserving longstanding, enforceable restrictions on firearms in broadly defined public gathering places." (ECF Nos. 26-1, at 20–21; 26-11 (Ex. 9), at 3 ("The purpose of Expedited Bill 23-26 is to bring the County law into alignment with the Supreme Court's opinion in *Engage Armament* so that the County law is valid and enforceable under Maryland law.")). Defendants further argue that "[n]ot a single document mentions religion, houses of worship, or faith-based practice as a motivating concern." (ECF No. 26-1, at 23).

Although Defendants provide this purpose, it is not a *justification* for the amendments to the challenged provisions under Chapter 57 of the Code and does not address at all a justification for including places of worship specifically. Other

than this threadbare statement of purpose in its opposition, Defendants do not supply justifications for the law.

After sifting through Defendants' exhibits, however, the "Anticipated Racial Equity and Social Justice (RESJ) Impact Statement" for the amendments to Chapter 57 of the Code ("RESJ Statement") alludes to a motivating concern beyond those stated above. (ECF No. 26-14, at 3). Regarding the proposed amendments to Section 57-1, which defines places of public assembly, the statement contends that "[a]dvocates generally recommend restrictions on guns in public places as a solution to prevent gun violence." (ECF No. 26-14, at 3). The latter half of this statement arguably frames the amendments to Section 57-1 as "a solution to prevent gun violence." Almost inviting juxtaposition with a comparable secular activity beyond the list of locales enumerated in Section 57-1, the next line says, "[t]his includes in some locations that would be removed through this Bill." (*Id.*) And those very places that were "removed" through EB23-26 can be secular. (ECF No. 26-11, at 4–5).[16]

---

[16] The sites that EB23-26 removed from the Section 57-1(1) list of places of public assembly—which in which "place[s] of worship" is nested—are: public or privately owned hospitals, community health centers, long-term facilities, and childcare facilities; as well as "gathering[s] of individuals to collectively express their constitutional right to protest or assemble." (ECF No. 26-11, at 4–5).

In light of the absence of asserted justification by Defendants, SSJC and Rabbi Shapiro do not identify a discrete comparable secular activity—instead, they point to "a wide range of secular activities" and "private property owners generally, including but not limited to secular clubs and the proprietors of secular businesses[.]" (ECF No. 5-1, at 19). In their reply, they argue that the challenged provisions of Chapter 57 of the Code "treat[] most comparable secular entities—e.g., restaurants, fraternal lodges, and stores—better than houses of worship," thus rendering Section 57-1 and Section 57-11 of the Code neither generally applicable nor neutral. (ECF No. 29, at 11). For their part, Defendants do not clearly point to a comparable secular activity, instead cabining the analysis to the list of other places of public assembly in Section 57-1(1). (*See* ECF No. 26-1, at 23).

Plaintiffs' example of a fraternal lodge—a location not included in Section 57-1's definition of places of public assembly-seemingly is a fitting comparable secular activity to probe the potential justification of Chapter 57's firearm restrictions as a "solution to prevent gun violence." (ECF No. 26-14, at 3); *see also Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1231 (11th Cir. 2004) (finding that "private clubs and lodges are

similarly situated to churches and synagogues" in Religious Land Use and Institutionalized Persons Act action).

First, a fraternal lodge, like a place of worship, is open to the public, but sometimes may be accessible only to its members. Like places of worship, fraternal lodges are sites for gathering for common purpose, including entertainment or recreation—and a place where the County may have an interest in preventing gun violence. Second, fraternal lodges' memberships mirror that of congregations—both types of locations foster a sense of belonging among the people who frequent them. Third, fraternal lodges hold regular meetings—similar to how places of worship hold services. Fourth, fraternal lodges are mission-driven and community-oriented; like places of worship, they sometimes sponsor civic events, join parades, and conduct community outreach. However, under the challenged provisions of Chapter 57, private property owners, including those of fraternal lodges, have the latitude to "to decide for themselves whether to allow firearms on the premises while denying the same autonomy to places of worship." *Antonyuk*, 89 F.4th at 350; *see also Tandon*, 593 U.S. at 62. Therefore, because the challenged provisions of Chapter 57 apply differently as to places of worship in comparison to not only fraternal lodges, but numerous other privately owned businesses and properties,

these portions of the Code are not neutral and generally applicable.

The next and final step of the Free Exercise analysis calls for review of Section 57-1 and Section 57-11 under strict scrutiny. Plaintiffs argue that "Defendants have made no attempt to meet their burden under strict scrutiny." (ECF No. 29, at 11). Indeed, Defendants have not made any showing as to whether the law's application to places of worship is the "least restrictive means of achieving some compelling state interest." *Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.*, 450 U.S. 707, 718 (1981). Furthermore, where a government "permits other activities to proceed with precautions," like self-regulation of firearms within privately operated places as opposed to places of worship, the government "must show that the religious exercise at issue is more dangerous than those activities even when the same precautions are applied." *Tandon*, 593 U.S. at 63.

In support of Plaintiffs' motion, Rabbi Greiniman declares that Silver Spring Jewish Center's Security Team

> is highly qualified and trains extensively. Many of the members are former members of the military and every member has undergone the extensive process required by the State of Maryland to be licensed to carry a firearm. As a group, the [S]ecurity [T]eam trains together at least quarterly. It is my

> understanding that the members of the group individually train on a biweekly basis.

(ECF No. 5-3 ¶ 6). Additionally, Rabbi Greiniman declares that SSJC has "never had, and I consider it unlikely that we ever would have, a security or safety risk because of an armed member of the synagogue." (*Id.* ¶ 10).

In their opposition, the County and other Defendants have done nothing to counter these assertions or otherwise show that allowing SSJC to regulate their members' own firearms is "more dangerous than allowing other property owners to do the same." *Antonyuk*, 89 F.4th at 351; (*see also* ECF No. 29, at 11). Defendants also have not engaged with what distinguishes SSJC's Security Team—which includes "person[s] who are presumably bound by the firearm restrictions of Section 57-11(a)(1)—from the exempted "security guard[s] licensed to carry" firearms under the Section 57-11(b)(2) carve out. (*See* ECF No. 29, at 11). Without more, Plaintiffs make a showing that the law is not the most narrowly tailored means to address the County's compelling interest—an interest which remains unarticulated by Defendants beyond citation to the Maryland Supreme Court's opinion in *Engage Armament*. (ECF No 26-11 (Ex. 9), at 3 ("The purpose of Expedited Bill 23-26 is to bring the County law into alignment with the Supreme Court's opinion in

*Engage Armament* so that the County law is valid and enforceable under Maryland law.”)).

Overall, Plaintiffs demonstrate a likelihood of success on the merits as to their as-applied Free Exercise challenge to Section 57-1(1)(B) and Section 57-11(a) regarding the restriction of firearms in their respective place of worship.

**b. As-Applied Challenge to Firearm Restrictions Within 100 Yards of Places of Public Assembly Under 57-11(a)**

The claim regarding all buffer zones, however, fails at this stage. Because Rabbi Shapiro must walk to the synagogue on certain days, and thus cannot avail himself of the provisions in Section 57-10—which allows vehicle transportation of firearms even within 100 yards of a place of assembly and is a part of the Code that Plaintiffs do not challenge—he contends that the buffer zones for other places of public assembly suffer from the same constitutional infirmities as the ban on firearm possession within a place of worship. That does not necessarily follow. A different provision is at work—one that applies to all designated places of public assembly. The 100-yard restriction is a neutral and generally applied provision and only a rational basis must be shown.

> On that score, our Court has recognized that a policy is neutral when it “has no object that infringes upon or restricts practices because of their religious motivation.” *See Alive Church of the Nazarene v. Prince William*

> *Cnty.*, 59 F.4th 92, 108 (4th Cir. 2023) (citation modified). The starting point of the neutrality inquiry is the text of the challenged law or policy itself. *See* [*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993)]. And "the minimum requirement of neutrality is that a law not discriminate on its face." *Id.*

*Polk v. Montgomery Cnty. Pub. Schs*., 166 F.4th 400, 413 (4th Cir. 2026). Unlike the explicit prohibition on firearms in places of worship, a blatant reference to religion, the 100-yard provision is generally applicable and facially neutral. Nor is there any suggestion that hostility to religion motivated its adoption.

"Under rational basis review, a challenged policy will survive constitutional muster so long as it is 'rationally related to a legitimate government purpose.'" *See Polk v. Montgomery Cnty. Pub. Schs*., 166 F.4th 400, 413 (4th Cir. 2026) (quoting *Bethel World Outreach Ministries v. Montgomery Cnty. Couns*., 706 F.3d 548, 561 (4th Cir. 2013) (citation modified)). Rabbi Shapiro has not even attempted to show that rational basis is lacking. (*See* ECF No. 5, at 20 (stating that "Defendants presumably will assert a compelling interest in protecting people from violence—and Plaintiffs do not dispute that this is a compelling interest."). Thus, Rabbi Shapiro has not shown, at this stage, that he is likely to succeed on his claim that the 100-yard buffer around other places of public assembly violates his free exercise right.

3. **First and Fourteenth Amendments – Establishment Clause**

SSJC and Rabbi Shapiro allege that the prohibition on carrying firearms at houses of worship violates the Establishment Clause of the First Amendment by "telling religious institutions what items worshippers may 'possess' in places of worship and how religious institutions may (and may not) protect worshippers during their worship." (ECF No. 1 ¶ 63). Plaintiffs also challenge the prohibition on carrying firearms within 100 yards of a place of worship under the Establishment Clause, "at least to the extent that it tells religious institutions what can and cannot be possessed on peripheral property owned by the house of worship." (ECF No. 1 ¶ 64). Plaintiffs argue that the choice of how a religious institution protects itself is an internal management matter that is "essential to [its] central mission." (*Id.* ¶ 66 (quoting *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 737 (2020))).

In their motion for a preliminary injunction, Plaintiffs contend that they are likely to succeed on this claim because the challenged law intrudes on matters closely linked with SSJC's right to determine how best to conduct its affairs. Defendants resist that conclusion, arguing that the "church autonomy doctrine" is not implicated in this case. Defendants claim that "[t]he Church

Autonomy Doctrine does not constitutionalize every internal management preference merely because the institution invoking it is a place of worship. SSJC's volunteer security team may be motivated by *halachic* values, but its function—armed physical protection of the premises—is something that can be done by professional security as permitted by the Bill, already in practice by SSJC, and indistinguishable from the security arrangements of any school, office building, or community center." (ECF No. 26-1, at 26). In reply, Plaintiffs continue to argue that the ban does involve government inserting itself into religious doctrine, religious leadership, and religious governance. They assert that it is up to Plaintiffs, and not Defendants, to label a task as secular or religious and that security is a crucial fulfillment of SSJC's religious. (ECF No. 29 at 12).

The Establishment Clause of the First Amendment provides that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. The First Amendment "protects the right of religious institutions to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine."[17] *Our Lady of Guadalupe*, 591 U.S.

[17] The Court in *Our Lady of Guadalupe* based its analysis on the "Religion Clauses" working in tandem to protect church

at 736 (citations omitted). Thus, governments cannot attempt "to dictate or even to influence such matters." *Id.* at 746.

This principle, known as the church autonomy doctrine, arose from the application of employment discrimination laws to the employees of religious institutions. In *Hosanna-Tabor Evangelical Lutheran Church and Sch. v. EEOC*, a former teacher and commissioned minister at a religious school alleged that she was fired based on a disability in violation of the ADA. 565 U.S. 171, 179 (2012). The Court held that the First Amendment requires a "ministerial exception" to employment discrimination laws, which exempts application of such laws to "the employment relationship between a religious institution and its ministers." *Id.* at 188. The Court reasoned that:

> Requiring a church to accept or retain an unwanted minister, or punishing a church for failing to do so, intrudes upon more than a mere employment decision. Such action interferes with the internal governance of the church, depriving the church of control over the selection of those who will personify its beliefs.

*Id.* at 188. Thus, the teacher's ADA claims were barred by the First Amendment. *Id.* at 196.

---

autonomy, as opposed to the Establishment Clause alone. 591 U.S. at 746.

In *Our Lady of Guadalupe*, the Court applied the same principle to two Catholic school teachers, even though the teachers did not have a formal title as minister, because they were involved in instructing students in the faith. 591 U.S. at 757. The Court emphasized that "educating young people in their faith, inculcating its teachings, and training them to live their faith are responsibilities that lie at the very core of the mission of a private religious school." *Id.* at 753–54.

Both *Hosanna-Tabor* and *Our Lady of Guadalupe* are based on the premise that the government should not dictate to a religious institution who should serve as its leaders or spiritual guides. Plaintiffs further cite *Billard v. Charlotte Cath. High Sch.*, 101 F.4th 316 (4th Cir. 2024), applying the ministerial exception to a Catholic school English and drama teacher, and *McRaney v. N. Am. Mission Bd.*, applying the church autonomy doctrine to tort claims arising from the firing of an employee of the Southern Baptist Convention. 157 F.4th 627, 631, 633 (5th Cir. 2025).

The church autonomy doctrine also applies to the internal disputes of religious institutions over governance. For example, *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N. Am.*, the Court held that a New York court could not intervene in a property suit rooted in a dispute over who was properly the

"ruling hierarch for the American churches" of the Russian Orthodox Church. 344 U.S. 94, 97 (1952). In a later case, the Court held that an Illinois state court could not intervene in the defrocking of a Serbian Orthodox Bishop or in the reorganization of the church into three Diocese. *Serbian Orthodox Diocese for U.S. of Am. and Can. v. Milivojevich*, 426 U.S. 696, 698 (1976).

Both the employment and internal governance cases involve fundamental questions about who should lead a religious institution, and according to what doctrines. As the Court explained in *Our Lady of Guadalupe*,

> it is instructive to consider why a church's independence on matters of 'faith and doctrine' requires the authority to select, supervise, and if necessary, remove a minister without interference by secular authorities. Without that power, a wayward minister's preaching, teaching, and counseling could contradict the church's tenets and lead the congregation away from the faith.[] The ministerial exception was recognized to preserve a church's independent authority in such matters.

591 U.S. at 747.

It is not as clear as Plaintiffs assert that their decision to employ civilian members of the congregation as a security force is a matter of governance, leadership or doctrine that triggers the protection of the First Amendment. The sole case they were able to cite is *Spencer v. Nigrelli*, 648 F.Supp.3d 451, 466

(W.D.N.Y. 2022), *aff'd sub nom. Antonyuk v. Chiumento*, 89 F.4th 271 (2d Cir. 2023), *cert. granted, judgment vacated sub nom. Antonyuk v. James*, 144 S. Ct. 2709, 219 L. Ed. 2d 1315 (2024), *and reinstated in part by Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024). The trial court held:

> Pastor Spencer and members of the Church's security team provide armed security to the congregation because they sincerely believe that God has called them to do so. The new law, in effect, forces them to disregard this spiritual calling and, notably, dictates that protection of the Church may only be provided by a different group of people—i.e., individuals fitting into a statutory exemption. The Supreme Court instructs that "a component" of a church's "autonomy is the selection of the individuals who play certain key roles." *Our Lady of Guadalupe Sch.*, 140 S.Ct. at 2060 (emphasis added). The Establishment Clause protects Plaintiffs' conduct. Indeed, the place of worship exclusion encroaches on matters "closely linked" with the Church's right to determine how best to conduct its own affairs. *Our Lady of Guadalupe*, 140 S.Ct. at 2061.

*Spencer*, 648 F.Supp.3d at 465. That ruling was neither upheld nor reversed by the appellate courts.

This single trial court decision is an insufficient basis on which to conclude that a religious organization's need to provide security translates into the absolute right to provide that security through an armed volunteer group. In any event, at this early stage, with the likelihood of success findings on the other

First Amendment claim and the Second Amendment claim as to houses of worship, it is not necessary to proceed further on this claim. Nor would it provide a basis for invalidating the 100-yard buffer zones around other places of public assembly.

4. **Fourteenth Amendment – Equal Protection**

SSJC and Rabbi Shapiro allege that the County's firearm prohibition violates the Equal Protection Clause of the Fourteenth Amendment by discriminating on the basis of religion. (ECF No. 1 ¶¶ 79–84). Plaintiffs argue that "singling out religious institutions and their attendees like Plaintiffs, and not similarly treating secular groups in similar numbers and similar circumstances, [the firearm prohibition] discriminates against Plaintiffs on the basis of their religious belief and practice." (*Id.* ¶ 82). Accordingly, Plaintiffs argue that the prohibition is subject to strict scrutiny, which Defendants fail to satisfy. (*Id.* ¶ 83).

At the hearing, counsel acknowledged that, while this claim is in the complaint and mentioned in the motion for a preliminary injunction, it need not be addressed at this time.

**C. Other Factors**

1. **Irreparable Harm**

Plaintiffs cite to the general principle that "the denial of a constitutional right, if denial is established, constitutes irreparable harm for purposes of equitable jurisdiction." *Ross v Meese*, 818 F.2d 1132, 1135 (4th Cir. 1987); *see also Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022). This is certainly the case for Fourth Amendment violations, such as the unreasonable search at issue in *Ross*, *see id.*, and First Amendment violations, including Free Exercise violations. *See, e.g.*, *Roman Cath. Diocese of Brooklyn*, 592 U.S. at 19 (irreparable injury caused by restrictions on religious service attendance during the COVID-19 pandemic).

The law is not settled as to whether a denial of Second Amendment rights should automatically or presumptively constitute irreparable harm. In a recent Second Amendment challenge to Delaware gun laws, the United States Court of Appeals for the Third Circuit rejected "categorial presumptions" that constitutional violations outside of the First Amendment are irreparable, preferring to "apply their equitable discretion to the facts of each case." *Delaware State Sportsmen v. Delaware*, 108 F.4th 198,

203 (3rd Cir. 2024). The Third Circuit held that Plaintiffs failed to show irreparable harm:

> To satisfy that burden, [plaintiffs] submitted only four declarations from Delaware residents who "wish to obtain these firearms and magazines." Oral Arg. Tr. 5:9–10. They do not even allege that Delaware has tried to enforce the disputed laws against them or to seize the guns or magazines that they already own. Nor do they allege a time-sensitive need for such guns or magazines. This status quo shows no signs of changing. Thus, the challengers have not shown that a preliminary "injunction is required to preserve the status quo" while litigation is pending. *Warner Bros.*, 110 F.2d at 293.

*Id.* at 204–05.

The Second Circuit did not decide the question, but expressed doubt as to whether a presumption was appropriate:

> Plaintiffs argue only that a "violation of constitutional rights per se constitutes irreparable injury." Br. of *NAGR* Appellants at 66. This general assertion is incorrect.
>
> To be sure, we have presumed irreparable harm for alleged deprivations of certain constitutional rights. *Brewer v. W. Irondequoit Cent. Sch. Dist.*, 212 F.3d 738, 744 (2d Cir. 2000) (noting [the Second] Circuit has presumed that the requirement of irreparable harm was met when plaintiffs alleged deprivations of their Fourth and Eighth Amendment rights). But the Supreme Court has never applied this presumption outside the First Amendment context. *See* [*Elrod v. Burns*, 427 U.S. 347, 373 (1976)] ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably

> constitutes irreparable injury.”). And even in that context, our Court has not axiomatically applied the presumption that plaintiffs alleging deprivations of First Amendment rights have satisfied the requirement of irreparable harm. *See, e.g., Latino Officers Ass’n v. Safir,* 170 F.3d 167, 171 (2d Cir. 1999) (concluding that the plaintiffs had not “establish[ed] real and imminent irreparable harm” stemming from the alleged First Amendment violation).
>
> Plaintiffs offer little argument as to why we should extend the presumption of irreparable harm in the context of this case. And the Supreme Court’s recent emphasis on the limits of our equitable powers caution against extending the presumption to new contexts. But we are also reluctant to run afoul of the Supreme Court’s admonishment that the Second Amendment is not a “second-class right,” [*McDonald*, 561 U.S. at 780], by treating this constitutional harm differently than we have treated others in the past. We therefore proceed to the final requirement for this Court to grant Plaintiffs’ requested relief without ruling on the non-dispositive issue of whether Plaintiffs have established irreparable harm.

*Lamont*, 153 F.4th at 248.

There does not appear to be a Fourth Circuit case reaching this question. In this district, however, Chief Judge Russell held in the Second Amendment challenge in *Kipke v. Moore* that:

> The deprivation of a constitutional right “unquestionably constitutes irreparable injury.” *Miranda v. Garland*, 34 F.4th 338, 365 (4th Cir. 2022) (quoting [*Elrod v. Burns*, 427 U.S. 347, 373 (1976)]). Thus, in the context of an alleged constitutional violation, the

> likelihood of irreparable harm necessarily depends on the likelihood of success on the merits of the claim. *See id.* ("Without his alleged constitutional injury, [plaintiff] has failed to show that he will suffer irreparable harm."). Accordingly, because Plaintiffs have shown a likelihood of success on the merits as to their challenges of the firearm restrictions in private property, locations selling alcohol, and within 1,000 feet of public demonstrations, they have also established irreparable harm as to those claims only.

695 F.Supp.3d 638, 662 (D.Md. 2023); *see also Fraser v. ATF*, 689 F.Supp.3d 203, 212–13 (E.D.Va. 2023) (same); *Maryland Shall Issue v*, 680 F.Supp.3d. at 593 (denying preliminary relief on other grounds).

Even if violation of the Second Amendment would not constitute presumptive irreparable harm, however, Plaintiffs are able to demonstrate more traditional irreparable harm:

> To merit the award of a preliminary injunction in his favor, Plaintiff must establish, first, that he is suffering actual and imminent harm, not just the "mere possibility" of harm in the future, and second, that the "harm is truly irreparable," meaning that it cannot be remedied at a later time with money damages. *Torres v. Advanced Enter. Solutions LLC v. Mid–Atl. Prof'ls Inc.,* No.12–cv-3679- PWG, 2013 WL 531215, at *4 (D.Md. Feb. 8, 2013) (citing *Direx Israel, Ltd. v. Breakthrough Med. Corp.,* 952 F.2d 802, 811 (4th Cir.1991)); *see also Sterling Commercial Credit–Mich., LLC v. Phoenix Indus. I, LLC,* 762 F.Supp.2d 8, 14–15 (D.D.C. 2011) ("First, the injury must be both certain and great; it must be actual and

> not theoretical .... Second, the injury must be beyond remediation.”).

*Corral*, WL 2420454 at *2.

A threat to safety is likely an irreparable harm. *See Dominion Energy Transmission, Inc. v. 0.11 Acres of Land, More or Less, in Doddridge Cnty., W. Virginia*, No. 19-cv-182, 2019 WL 4781872, at *6 (N.D.W.Va. Sept. 30, 2019) (“[I]f left unchecked, the slip will threaten the safety of Dominion employees[.]”); *United Steelworkers of America AFL-CIO v. Blaw-Knox Foundry and Mill Machinery Inc.*, 319 F.Supp. 636, 641 (W.D.Pa. 1970)(“[T]o the extent that defendant’s action . . . threatens the health and safety of the employees working upon reduced crews, there is no adequate remedy either at law or in arbitration[.]”).

A substantial burden on religious exercise, even if it does not violate the Constitution, may also constitute irreparable harm. It is rare to find a case involving a burden on religion without a Free Exercise claim, but some federal courts have held that independent of the Free Exercise Clause, “a finding under the [Religious Freedom Restoration Act] that a regulation creates a substantial burden on an individual’s exercise of his or her religion constitutes a finding of irreparable harm.” *Alameen v. Coughlin*, 892 F. Supp. 440, 448 (E.D.N.Y. 1995); *see also Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 609 (8th Cir. 2022). A

burden on religious practice cannot be fully remedied by money damages, and thus can be considered irreparable.

Plaintiffs satisfy the irreparable harm prong.

2. **Balance of Equities and Public Interest**

> The balance of the equities and the public interest "merge when the Government is the opposing party." [*Nken*, 556 U.S. at 435]. To balance the equities, the Court considers "the relative harms to the [plaintiffs and defendants], as well as the interests of the public at large." [*Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*, 501 U.S. 1301, 1305 (1991)] (Scalia, J., in chambers) (quoting [*Rostker v. Goldberg*, 448 U.S. 1306, 1308 (1980)] (Brennan, J., in chambers)).

*Am. Fed'n of Tchrs. v. Bessent*, 765 F. Supp. 3d 482, 504–05 (D.Md. 2025). As noted at the outset, the State's Attorney for Montgomery County has voluntarily put criminal prosecution on hold while this and the other cases are being litigated, and only civil enforcement is possible at present. Thus, Defendants are not pushing for full enforcement while the constitutionality of the law is resolved. Only licensed firearm owners are affected by the restrictions—others are subject to much more stringent laws. While the government always has an interest in enforcing its "duly enacted" laws, particularly those relating to safety, this law has essentially been on hold for several years already. The mild harm by this limited injunction does not outweigh the other factors.

**IV. Type of Relief and Bond**

For the foregoing reasons, Plaintiffs are entitled to some sort of preliminary relief. They filed a motion for both a temporary restraining order and a preliminary injunction. Different procedures apply, depending on the type of relief being granted. *See Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 423 (4th Cir. 1999) (describing the differences in procedure and application of the two forms of relief). Here, notice was provided and a hearing was held. No party requested discovery or suggested that any discovery was needed on the issues presented in the motion. Accordingly, it is not necessary to grant temporary relief in order for the court to consider the request for a preliminary injunction. The court will grant a preliminary injunction.

Pursuant to Fed.R.Civ.P. 65(c), the court may grant this relief only "if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined and restrained." Fed.R.Civ.P. 65. The parties do not discuss this requirement in their papers. While the court must consider the issue, it is also permissible to waive the security requirement:

> The district court retains the discretion to set the bond amount as it sees fit or waive

> the security requirement. *Hoechst Diafoil*, 174 F.3d at 411; *Moltan Co. v. Eagle–Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995). However, the district court must expressly address the issue of security before allowing any waiver and cannot "disregard the bond requirement altogether." *Hoechst Diafoil*, 174 F.3d at 421.

*Pashby v. Delia*, 709 F.3d 307, 332 (4th Cir. 2013), *abrogated on other grounds by Stinnie v. Holcomb*, 37 F.4th 977 (4th Cir. 2022)).

> But "it is well-established that 'the amount of security required by the rule is a matter within the discretion of the trial court . . .[, and] the court may elect to require no security at all.'" *BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs.*, 425 F.3d 964, 971 (11th Cir. 2005) (alteration in original) (quoting *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. Unit B 1981)). Moreover, "[w]aiving the bond requirement is particularly appropriate where a plaintiff alleges the infringement of a fundamental constitutional right." *Curling v. Raffensperger*, 491 F.Supp.3d 1289, 1326 n.25 (N.D.Ga. 2020) (quoting *Complete Angler, LLC v. City of Clearwater*, 607 F.Supp.2d 1326, 1335 (M.D.Fla. 2009)).

*Honeyfund.com, Inc. v. DeSantis*, 622 F.Supp.3d 1159, 1186 (N.D.Fla. 2022) (alteration in original), *aff'd sub nom. Honeyfund.com Inc. v. Governor*, 94 F.4th 1272 (11th Cir. 2024). Judge Boardman provided a full discussion of the applicable considerations in *Casa, Inc. v. Trump*, 793 F.Supp.3d 687, 701–02 (2025). Here, too, Plaintiffs have sued to protect fundamental

constitutional rights and the risk of harm to the government is non-existent or remote. The security requirement will be waived.

A separate order will be entered.

/s/

DEBORAH K. CHASANOW
United States District Judge