**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| SILVER SPRING JEWISH CENTER, INC., *et al.*, | : | |
| Plaintiffs, | : | Case No.: 8:26-cv-02963-DKC |
| v. | : | |
| MONTGOMERY COUNTY, MARYLAND, *et al.* | : | |
| Defendants. | : | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO AMEND JUDGMENT OR, IN THE ALTERNATIVE, FOR INJUNCTION PENDING APPEAL**

Defendants, Montgomery County, Maryland (the "County"), Marc Elrich, in his official capacity as County Executive of Montgomery County ("County Executive"), and Darren Francke, in his official capacity as Chief of Police of Montgomery County ("Chief of Police"), by and through undersigned counsel, respectfully request that this Court deny Plaintiffs' Motion to Amend Judgment or, in the Alternative, for Injunction Pending Appeal (ECF 39). Plaintiffs do not demonstrate any clear error of law that can or should be corrected, and otherwise do not demonstrate any ground for this Court to amend its well-reasoned Memorandum Opinion and Order (ECF 35). Plaintiffs cannot meet their burden of demonstrating a clear likelihood of success on the merits of any of their claims, and they are not entitled to the extraordinary relief they seek. The grounds for this Opposition, including supporting legal authority, are set forth in the accompanying Memorandum of Law. Accordingly, the Motion should be denied.

Respectfully submitted,

JOHN P. MARKOVS
COUNTY ATTORNEY

By: /s/ Jeffrey M. Schwaber

Jeffrey M. Schwaber (Bar ID #06095)
jschwaber@steinsperling.com
(301) 354-8110 (facsimile)
Deanna L. Peters (Bar ID #15674)
dpeters@steinsperling.com
(301) 354-8131 (facsimile)
STEIN SPERLING BENNETT
DE JONG DRISCOLL PC
1101 Wootton Parkway, Suite 700
Rockville, Maryland 20852
(301) 340-2020

and

/s/ Erin J. Ashbarry

Erin J. Ashbarry (Bar ID #26298)
Chief, Division of Government Operations
erin.ashbarry@montgomerycountymd.gov
Office of the County Attorney
101 Monroe Street, Third Floor
Rockville, Maryland 20850
Tel: (240) 777-6700
Fax: (240) 777-6705

*Attorneys for Defendants, Montgomery County, Maryland, Marc Elrich, & Darren Francke*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 8th day of October, 2026, a copy of the foregoing was sent to all counsel of record via CM/ECF.

/s/ Jeffrey M. Schwaber

Jeffrey M. Schwaber (Bar ID #06095)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| SILVER SPRING<br>JEWISH CENTER, INC., *et al.*,<br><br>Plaintiffs,<br>v.<br><br>MONTGOMERY COUNTY,<br>MARYLAND, *et al.*<br><br>Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | Case No.: 8:26-cv-02963-DKC |

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO AMEND JUDGMENT OR, IN THE ALTERNATIVE, FOR INJUNCTION PENDING APPEAL**

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ........ **ii**

**I. FACTS** ........ **2**

**II. STANDARDS OF REVIEW** ........ **3**

A. Reconsideration of an Interlocutory Order........ 3

B. Injunction Pending Appeal. ........ 4

**III. APPLICABLE LAW AND ARGUMENT** ........ **5**

A. Neither Reconsideration Nor Injunctive Relief Is Warrnated Based On Plaintiffs' Newly Reframed Second Amendment Challenge To The 100-Yard Rule. ........ 5

1. Plaintiffs made a facial challenge—not an as-applied challenge—in their Injunction Motion. ........ 5

2. To the extent that Rabbi Shapiro made and as-applied challenge to the 100-Yard Rule, this Court did not commit clear legal error in denying it . ........ 7

3. Plaintiffs are not likely to succeed on the merits that Buffer Zones surrounding schools and parks are unconstitutional. ........ 10

B. Neither Reconsideration Nor Injunctive Relief Is Warranted Based On Plaintiffs' Free Exercise Challenge To The 100-Yard Rule. ........ 13

1. The 100-Yard Rule is generally applicable. ........ 14

2. The 100-Yard Rule does not fail strict scrutiny. ........ 20

C. Plaintiffs Fail To Establish The Remaining Prongs Of Injunctive Relief. ........ 23

# TABLE OF AUTHORITIES

**Cases**

*Antonyuk v. Chiumento*, 589 F.4th 271 (2d Cir. 2023) ........ 19

*Cahaly v. Larosa*, 796 F.3d 399 (4th Cir. 2015) ........ 20, 21

*Carlson v. Boston Sci. Corp.*, 856 F.3d 320 (4th Cir. 2017) ........ 3

*Direx Isr., Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802 (4th Cir. 1992) ........ 4

*Fulton v. City of Philadelphia*, 593 U.S. 522 (2021) ........ 17, 21

*Hines v. S.C. Dep't of Corr.*, 148 F.3d 353 (4th Cir. 1998) ........ 21

*Kimberly B. v. Kijakazi*, Civil Action No. TJS-20-2877, 2022 WL 748097, (D. Md. Mar. 11, 2022) ........ 13, 15

*Kipke v. Moore*, 165 F.4th 194 (4th Cir. 2026) ........ 10, 11

*Maryland Shall Issue, Inc. v. Montgomery County, Maryland*, 680 F. Supp. 3d 567 (D. Md. 2023) ........ 10, 13, 17

*Minter v. Wells Fargo Bank, N.A.*, No. CIV.A. WMN-07-3442, 2013 WL 4603006, (D. Md. Aug. 28, 2013) ........ 13

*Nat'l Rifle Ass'n v. Bondi*, 133 F.4th 1108 (11th Cir. 2025) ........ 10

*New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022) ........ 10

*Nken v. Holder*, 556 U.S. 418 (2009) ........ 4

*Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147 (2d Cir. 2003) ........ 3

*Ohio Citizens for Responsible Energy, Inc. v. NRC*, 479 U.S. 1312 (1986) ........ 4

*Pac. Ins. Co. v. Am. Nat. Fire Ins. Co.*, 148 F.3d 396 (4th Cir. 1998) ........ 5

*Protect Our Parks, Inc. v. Buttigieg*, 10 F.4th 758 (7th Cir. 2021) ........ 4

*Respect Me. PAC v. McKee*, 562 U.S. 996 (2010) ........ 4

*Tandon v. Newsom*, 593 U.S. 61 (2021) ........ 17

*U.S. Tobacco Coop. Inc. v. Big S. Wholesale of Virginia, LLC*, 899 F.3d 236 (4th Cir. 2018) ........ 1, 3, 9

*United States v. Hemani*, 608 U.S. 772 (2026) .......... 10

*United States v. McKenzie*, No. 22-6658, 2023 WL 418447, (4th Cir. Jan. 26, 2023) .......... 14

*White Coat Waste Project v. Greater Richmond Transit Co.*, 35 F.4th 179 (4th Cir. 2022) .......... 7

*Williams v. Fontanez*, Civil Action No. GLR-22-1882, 2023 WL 8174323, (D. Md. June 5, 2023) .......... 14

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) .......... 4

*Wolford v. Lopez*, 609 U.S. 185 (2026) .......... 6

*Wolford v. Lopez*, 116 F.4th 959 (9th Cir. 2024) .......... 9, 11

**Statutes**

18 U.S.C. § 922(q)92)(B)(ii) .......... 21

Balt., Md., Code art. 19, § 59-5(b) .......... 21

Balt., Md., Code art. 19, § 59-5(d) .......... 21

Md. Code Ann., Crim. Law, § 4-111 .......... 21, 22

Prince George Cnth., Md., Code § 14-140) .......... 21

**Rules**

Fed. Rule Civ. Proc. 7 .......... 5

Fed. Rule Civ. Proc. 54 .......... 3, 5

Fed. Rule Civ. Proc. 62 .......... 4

Under the guise of a motion to amend, Plaintiffs fault this Court for ruling incorrectly on arguments that Plaintiffs hadn't made. Plaintiffs barely mentioned what they call the "100-Yard Rule" in their Motion for Temporary Restraining Order or Preliminary Injunction (the "Injunction Motion"). They devoted only a paragraph to it in their Second Amendment argument (ECF 5-1 at 11), and mentioned it only once with regard to the First Amendment. *See* ECF 5-1 at 13 (stating that the Rule "prevents" Rabbi Shapiro from carrying a firearm while walking to synagogue.); *see generally id*. (mentioning the walk to the synagogue with respect to Rabbi Shapiro only). Plaintiffs now bring the 100-Yard Rule to the forefront, devoting their entire Motion to new arguments that Plaintiffs failed to raise before.

As to the Second Amendment, Plaintiffs' written Injunction Motion facially challenged Section 57-11(a)'s inclusion, through Section 57-1, of places of worship and 100-yard buffer zones as places of public assembly in which firearms are banned. Having failed that facial challenge because "they must do more than they have" (ECF 35 at 38), Plaintiffs now try to recast their request for preliminary injunctive relief as an as-applied challenge to the 100-Yard Rule. Similarly, Plaintiffs advanced a Free Exercise argument that the 100-Yard Rule shared the same constitutional defects as the in-premises ban on firearms in places of worship. This Court considered that argument and rejected it. Plaintiffs now supply new theories that were available at the time of—but never raised in—their preliminary briefs and then summarily brand this Court's failure to address those theories that weren't before the Court as "clear error."

A court does not err by declining to consider arguments never raised. Plaintiffs' new arguments are not properly before this Court, and in any event, they are not "dead wrong" legal error (*U.S. Tobacco Coop. Inc. v. Big S. Wholesale of Virginia, LLC*, 899 F.3d 236, 258 (4th Cir.

2018)), which must exist before this Court's 72-page, well-reasoned Memorandum Opinion may be disturbed.

## I. FACTS

Upon full briefing by all parties on Plaintiffs' Injunction Motion, this Court held a full hearing—occupying half a day—at which this Court and the parties were prepared for the arguments made in the parties' respective filings.[1] This Court began the hearing with guidance for the parties on what precise topics it needed to hear, and in particular asked the parties to focus arguments "on whatever type of challenge you think I need to address at this stage." Transcript of September 3, 2026 hearing ("Tr.") at 12:16-14:16. Indicating that the Court will find "as many [hours] as I need" fully to hear the parties, this Court also "recognize[d] the urgency of making some of these decisions before" the Jewish high holidays, beginning at sundown just a few days later, on September 11, 2026. Tr. at 14:23-15:10.

At the end of the hearing, this Court took the Injunction Motion under advisement. One week later, on Thursday September 10, 2026, this Court issued a thorough, detailed, and reasoned Memorandum Opinion and Order—comprising 72-pages of analysis of the arguments that the parties made in both their written filings and at oral argument. This Court granted Plaintiffs' Injunction Motion in part, preliminarily enjoining enforcement of Montgomery County Code §§ 57-1 and 57-11(a)(1) against SSJC and Rabbi Shapiro "to the extent that those provisions prohibit Plaintiffs from selling, transferring, possessing, or transporting a handgun in THEIR respective places of worship." ECF 36 at 1-2.

[1] Defendants incorporate by reference the facts stated in their Memorandum of Law in Support of Opposition by Defendants, Montgomery County, Maryland, Marc Elrich, and Marc Yamada to Plaintiffs' Motion for Temporary Restraining Order or Preliminary Injunction. ECF 26-1, at 2-8.

Two weeks later, on September 24, 2026, Plaintiffs filed their instant Motion to Amend Judgment or, in the Alternative, for Injunction Pending Appeal (the "Motion"). ECF 39. Plaintiffs filed their Motion on the last day permitted by the Local Rules (*see* ECF 39-1 at 4). Plaintiffs did not seek any shortening of time for Defendants' response to the Motion.

## II. STANDARDS OF REVIEW

### A. Reconsideration of an Interlocutory Order

Under Federal Rule of Civil Procedure 54(b), a court may, in its discretion, revise an interlocutory order on the basis of: "(1) 'a subsequent trial produc[ing] substantially different evidence'; (2) a change in applicable law; or (3) clear error causing 'manifest injustice.'" *Carlson v. Boston Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017). To qualify as a "clear error causing manifest injustice" as a basis for revision of an interlocutory judgment (*see* ECF 39-1 at 3, citing *Carlson*, 856 F.3d at 325)), a purported error cannot be "just maybe or probably wrong; it must strike us as wrong with the force of a five-week-old, unrefrigerated dead fish. It must be dead wrong.'" *U.S. Tobacco Coop.*, 899 F.3d at 258 (citation omitted).

Notwithstanding any general flexibility of this Court to revise interlocutory orders "as the litigation develops and new facts or arguments come to light," Rule 54(b) discretion "is not limitless." *Id.* "'[W]here litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again.'" *Id.* at 257 (quoting *Official Comm. Of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2003)). Moreover, while Federal Rule of Civil Procedure 54(b) "account[s] for potentially different evidence discovered during litigation," it is not a vessel for presenting evidence that already existed but was lacking from a party's initial submission. *Carlson*, 856 F.3d at 326.

### B. Injunction Pending Appeal

"While an appeal is pending from an interlocutory order … that grants, continues, modifies, refuses, dissolves, or refuses to dissolve or modify an injunction," Federal Rule of Civil Procedure 62(d) generally permits a court to "suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights." A request for an injunction pending appeal "[d]emands a significantly higher justification" than a request for a stay, because unlike a stay, an injunction "does not simply suspend judicial alteration of the status quo but grants judicial intervention…" *Respect Me. PAC v. McKee*, 562 U.S. 996 (2010) (citing *Ohio Citizens for Responsible Energy, Inc. v. NRC*, 479 U.S. 1312, 1313 (1986)).

The "demanding" four-part test for evaluating a request for injunction articulated by the U.S. Supreme Court is: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 433-434 (2009) (citation omitted). The first two factors of this standard are the most critical, and it is not enough to show some "possibility of irreparable injury" or that the chance of success on the merits be "better than negligible." *Id*. at 434-35 (citations omitted); *Protect Our Parks, Inc. v. Buttigieg*, 10 F.4th 758, 763 (7th Cir. 2021) ("the mere possibility of success is not enough; [a plaintiff] must make a "strong" showing on the merits.")

Preliminary injunctions are "extraordinary remed[ies] involving the exercise of very farreaching power." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (preliminary injunction is "an extraordinary remedy"); *Direx Isr., Ltd. v. Breakthrough Med. Corp.,* 952 F.2d 802, 811 (4th Cir. 1992).

## III. APPLICABLE LAW AND ARGUMENT

### A. Neither Reconsideration Nor Injunctive Relief Is Warranted Based On Plaintiffs' Newly Reframed Second Amendment Challenge To The 100-Yard Rule.

#### 1. *Plaintiffs made a facial challenge—not an as-applied challenge—in their Injunction Motion.*

Plaintiffs improperly use Rule 54 to raise a new, *post facto* as-applied challenge to the 100-yard buffer zones ("Buffer Zones") surrounding the sensitive places identified in Section 57-1. While Plaintiffs contend that their "challenge to the 100-yard rule is limited here to an as-applied challenge as to the places Rabbi Shapiro and SSJC members must pass while walking to synagogue" (ECF 39-1 at 6), that is not the challenge they raised in their original Injunction Motion. Tellingly, Plaintiffs cite the allegations in their Complaint—not their Injunction Motion—for that proposition. ECF 39-1 at 6, n.2. *See also* ECF 39-1 at 15-16 (citing paragraphs 41, 42, 43, 55, 74 and 76 of the Complaint to suggest that "Rabbi Shapiro properly raised this as-applied challenge from the outset."). The Complaint in general, however, was not before this Court on Plaintiffs' Injunction Motion. Plaintiffs were required to "state with particularity the grounds for seeking" injunctive relief in their Injunction Motion. Fed. R. Civ. P. 7(b)(1)(B).

Defendants opposed, and this Court prepared for and heard, the arguments for injunctive relief that Plaintiffs made in writing. This Court issued a lengthy, detailed, and reasoned Memorandum Opinion on those arguments. Motions to amend "may not be used [ ] to raise arguments which could have been raised prior to the issuance of the judgment, nor may they be used to argue a case under a novel legal theory that the party had the ability to address in the first instance." *Pac. Ins. Co. v. Am. Nat. Fire Ins. Co.*, 148 F.3d 396, 403 (4th Cir. 1998).

Plaintiffs did not bring an as-applied challenge. Instead, Plaintiffs moved for relief on the premise that "Montgomery County's ban on firearms in places of worship violates the Second

Amendment *on its face* … ." ECF 5-1 at 1 (emphasis added). Plaintiffs devoted only a paragraph of their Injunction Motion to Buffer Zones, and in that lone paragraph they argued that, based on *Wolford v. Lopez*, 609 U.S. 185 (2026), Section 57-11(a)'s 100-Yard Rule comprises "an unjustified obstruction of an individual's right to carry a firearm *at all*." ECF 5-1 at 11 (emphasis added).

That is the sole argument Plaintiffs made at the September 3 hearing. This Court made clear at the beginning of the hearing that "[t]he parties need to focus very clearly on whether it's a facial challenge or an as-applied, and make sure your arguments are focused on whatever type of challenge you think I need to address at this stage." Tr. at 13:18-21. Responding to that inquiry, Plaintiffs' counsel confirmed Plaintiffs' facial challenge at the outset:

> The plaintiffs in the Silver Spring Jewish Center case, unlike the plaintiffs in the Barreto case, challenge only two provisions of Montgomery County law. We challenge the ban on firearms and places of worship, and we … challenge the ban on firearms within a hundred yards of *any* place of public assembly, and that's all.
>
> **And these are facial challenges to the – to the provisions**.

Tr. at 76:21-77:4 (emphasis added). Following the argument made in their papers, Plaintiffs' counsel then argued that the 100-Yard Rule, "much like the statutes struck down in *Wolford* [ ] does, indeed, restrict people from exercising the right that the Court recognized in *Bruen*, the right to carry a firearm as they go about their daily lives," and "makes it essentially impossible … to exercise the right that *Bruen* recognized." Tr. at 82:13-22.[2]

At best, Plaintiffs made passing reference to an as-applied challenge during oral argument. *See* Tr. at 77:6-7 ("[t]he 100-yard rule challenge *may* also be as-applied"); Tr. at 102:11-12 (that *could be* looked at as facial or as-applied") (emphasis added). That argument seemingly was made

---

[2] Plaintiffs do not—because they cannot—suggest that this Court made *any* error in determining that Plaintiffs' "cursory and conclusory" facial challenge of Buffer Zones "fails at this stage" because Plaintiffs "must do more than they have." ECF 35 at 38.

as an afterthought and/or a pivot after hearing this Court's targeted exchange with the *Barreto* Plaintiffs' counsel regarding the *Barreto* Plaintiffs' similar facial argument that the "cumulative effect" of the 100-Yard Rule is that "you cannot walk within anywhere in the county [without] risking entering one of the 100-yard zones." *See, e.g.,* Tr. at 50:7-58:16. Plaintiffs otherwise did not argue an as-applied challenge—including the standard that it now says this Court must apply—at any other point during the hearing. This alone warrants denial of Plaintiffs' current Motion.

2. *To the extent that Rabbi Shapiro made an as-applied challenge to the 100-Yard Rule, this Court did not commit clear legal error in denying it.*

Assuming *arguendo* that this Court believes it necessary to reconsider its ruling as to the 100-Yard Rule, Plaintiffs offer no basis on which this Court may do so for anyone *other* than Rabbi Shapiro. This Court correctly observed in its Memorandum Opinion that an as-applied challenge "is one which depends on the identity or circumstances of the Plaintiff." ECF 35 at 15 (citing *White Coat Waste Project v. Greater Richmond Transit Co.*, 35 F.4th 179, 204 (4th Cir. 2022)). Plaintiffs fail, however, to state, in an affidavit or otherwise, *any* of the "particular circumstances" (*id.* at 16) they contend apply to any Member of SSJC other than Rabbi Shapiro. Plaintiffs generically posit that "SSJC members' walking routes, like Rabbi Shapiro's, pass within 100 yards of *a* place of public assembly" (ECF 39-1 at 16), but do not say *which* Members, or *which* place—or places—of public assembly. Nor do Plaintiffs posit, for anyone other than Rabbi Shapiro, that any other SSJC Members must walk *at all* to synagogue on Sabbath and/or Jewish holidays, let alone that "the *only* path" (ECF 1, ¶ 41) to synagogue requires that theoretical congregant to walk past any place(s) of public assembly.[3] Indeed, the only cited paragraphs of the Complaint—

---

[3] Plaintiffs expect this Court to assume that each unidentified SSJC Member holds precisely the same "sincerely held religious beliefs" as Rabbi Shapiro, and that among those beliefs is one requiring them to "walk to the synagogue for communal prayer." ECF 5-2, ¶ 11. No SSJC Member other than Rabbi Shapiro provided a Declaration to that effect.

notably, again, *not* the Injunction Motion—that mention SSJC Members other than Rabbi Shapiro (*see* ECF 39-1 at 15-16) at best relate to Plaintiffs' facial challenge to the Buffer Zones restrictions. *See, e.g.,* ECF 1, ¶ 77. With no facts before it, this Court has no basis to consider any "particular circumstances" on which unidentified SSJC Members may claim an as-applied challenge.

As to Rabbi Shapiro, Plaintiffs suggest that this Court erred by "employ[ing] a pre-*Bruen* framework that required a party raising an as-applied Second Amendment challenge to 'establish … that his [particular prohibitor] is insufficient to justify the challenged regulation of Second Amendment rights.'" ECF 39-1 at 7-8. Plaintiffs' argument ignores the context of this Court's legally correct determination that "Rabbi Shapiro's current as-applied challenge fails." ECF 35 at 43. This Court began by noting that "it is not clear that [Rabbi Shapiro] has properly asserted an as-applied challenge." *Id*. at 42. Specifically, Rabbi Shapiro did not "*identify* the particular reason he is prohibited that he claims is insufficient." *Id*. (emphasis added). Thus, Rabbi Shapiro failed even to mount an as-applied challenge to any Buffer Zones because, on the argument made before the Court on the Injunction Motion, "he is like any other licensed gun carrier." *Id*. In other words, there is no "particular circumstance" presented by Rabbi Shapiro on which any as-applied challenge conceivably could be made. Having failed to assert an as-applied challenge at all, there was no improper burden shifting here, because Rabbi Shapiro's unarticulated as-applied "challenge" never even got that far. Plaintiffs' discussion about burdens (ECF 39-1 at 6-8)—correct or not—is a red herring.[4]

[4] The interplay between the *Bruen* two-step analysis and the burdens on facial and as-applied challenges is far from clear. Plaintiffs posit that the post-*Bruen* "burden allocation does not shift depending on whether a challenge is facial or as-applied, or on whether the plaintiff seeks preliminary or permanent relief." ECF 39-1 at 6. Plaintiffs' argument, however, cannot be reconciled with a plaintiff's uncontroverted burden in raising a facial challenge, which is to "show that there is no set of circumstances in which the law can be applied constitutionally." ECF 35 at 16. Taking Plaintiffs' current argument to its logical conclusion, both facial and as-applied challenges would simply collapse into the two-step *Bruen* analysis, where there would be no facial

Far from being "dead wrong" (*U.S. Tobacco Coop.*, 899 F.3d at 258) and requiring amendment, this Court's approach is consistent with the Ninth Circuit's rejection "as illogical" of a similar argument made in *Wolford v. Lopez*, 116 F.4th 959 (9th Cir. 2024), upon which Plaintiffs relied in their Injunction Motion. *See* ECF 5-1 at 8, 10. There, the Ninth Circuit rejected the argument that sensitive place bans are invalid because "there is no national historical tradition of banning the carry of firearms by those who have concealed-carry permits." *Wolford*, 116 F.4th at 981. The Court reasoned as follows:

> The issue in this case concerns categories of property, not categories of people. If a particular place is a "sensitive place" such that firearms may be banned, then firearms may be banned—for <u>everyone</u>, including permit holders—consistent with the Second Amendment. The Nation <u>also</u> has a tradition of requiring concealed-carry permits, as *Bruen* recognized, and that tradition is an <u>additional</u> permissible restraint on the carry of firearms. But just because a person has qualified for a concealed-carry permit does not give that person the right to carry at a banned location. Persons in California or Hawaii need a permit to carry a concealed weapon; that Plaintiffs have permits does not affect the constitutional analysis as to whether those States may ban the carry of firearms at specific locations like schools and government buildings.

*Id*. (citations omitted, cleaned up, underline in original). Here, and as more fully explained below, United States Supreme Court and Fourth Circuit precedent establish that bans are constitutional under the Second Amendment in schools and parks, as sensitive places. It would be nonsensical to require Defendants to then take an additional step to "show a historical tradition of restricting permit holders from carrying a firearm near any of the relevant places of public assembly" (ECF 39-1 at 6), when no legal authority requires Defendants to do so.

---

challenge burden whatsoever on a plaintiff. Plaintiffs, however, cite no authority for such a proposition, and correspondingly do not suggest that a post-*Bruen* plaintiff does not bear an affirmative burden in a facial challenge. By extension, their current argument on an as-applied challenge also must be rejected.

3. *Plaintiffs are not likely to succeed on the merits that Buffer Zones surrounding schools and parks are unconstitutional.*[5]

Plaintiffs' suggestion that "Defendants cannot carry their burden with respect to the 100-yard-Rule's application" (ECF 39-1 at 9) defies United States Supreme Court and Fourth Circuit precedent that schools and parks—and by association, the Buffer Zones surrounding them—are "'sensitive places' where arms carrying could be prohibited consistent with the Second Amendment." *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 30 (2022).

*Bruen* itself "assume[d] it settled" that schools are among "'sensitive places where arms carrying could be prohibited consistent with the Second Amendment.'" 597 U.S. at 30. Citing *Kipke v. Moore*, 165 F.4th 194 (4th Cir. 2026), this Court correctly observed that "[t]he Fourth Circuit has 'adopted the Supreme Court's dicta as to schools' and determined that schools are sensitive places." ECF 35 at 40. Plaintiffs "do not challenge the County's ban with respect to school grounds." ECF 39-1 at 14. Similarly, in *Kipke*, the Fourth Circuit "join[ed] the reasoning of the Second and Ninth Circuits" to hold that a prohibition "on carrying guns in urban public

[5] For the reasons stated in their Opposition to Plaintiffs' Motion for Temporary Restraining Order or Preliminary Injunction, Defendants maintain that the historical analogues cited therein are sufficient to justify the inclusion of places of worship as a place of public assembly at which firearms may be banned, consistent with the sensitive places doctrine. *See* ECF 26-1 at 23-25. Defendants respectfully disagree with this Court's assessment of the impact of the Eleventh Circuit's decision in *Nat'l Rifle Ass'n v. Bondi*, 133 F.4th 1108 (11th Cir. 2025) on Judge Chuang's acceptance of the same analogues to decide that a ban of firearms in places of worship likely is constitutional. *See Maryland Shall Issue, Inc. v. Montgomery County, Maryland*, 680 F. Supp. 3d 567, 584-85 (D. Md. 2023). Among other things, despite the Eleventh Circuit's "reli[ance] on sources from the Founding era to interpret the Bill of Rights, including the Second Amendment" (*Bondi*, 133 F.4th at 1116), the United States Supreme Court to date has not decided "'whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868' or when the Bill of Rights was ratified in 1791." *United States v. Hemani*, 608 U.S. 772, 783, n.3 (2026), nor has it precluded reliance on Reconstruction Era analogues. Nonetheless, Defendants respect this Court's decision as a preliminary, interlocutory determination, and will present their analogues and argument thereon during the ultimate adjudication of the claims here on their merits. Without waiving those arguments, Defendants therefore do not oppose Plaintiffs' request for preliminary injunctive relief as to the Buffer Zone specifically surrounding SSJC.

parks is constitutional." 165 F.4th at 214. Notably, courts—including the Fourth Circuit—that have examined the issue have determined that "'as soon as modern parks arose, municipalities and states enacted laws prohibiting the carrying of firearms into parks.'" *Id*. (citing *Wolford*, 116 F.4th at 982).

Moreover, the Fourth Circuit has held that the zone around a sensitive place is "analogous to" the sensitive place itself and therefore is "considered sensitive for the same reasons [the sensitive place is] considered sensitive." *Kipke*, 165 F.4th at 212. Given the weight of these authorities, there is no need to further examine historical analogues specific to buffer zones. Indeed, on that basis, this Court was correct to determine that the Buffer Zones around schools comprise "[o]ne likely constitutional application under Section 57-11(a)." ECF 35 at 40.

Even assuming, *arguendo*, some separate buffer zone analysis is required, there are ample historical analogues to satisfy any arguable burden Defendants have on a preliminary injunction:

Maryland prohibited guns within one mile of polling places, recognized by *Bruen* as a sensitive area, on election days in Calvert County (1886 and 1888) and in Kent, Queen Anne's, and Montgomery Counties (1874). *See* 1886 Md. Laws 315, ch. 189, § 1 (Ex. 1); John Prentiss Poe, Maryland Code: Public Local Laws, Adopted by the General Assembly of Maryland, March 14, 1888, at 604 § 71 (1888) (Ex. 2); 1874 Md. Laws 366, ch. 250, § 1 (Ex. 3). Louisiana in 1870 similarly prohibited guns on within "one-half mile of any place of registration" for elections. *See* 1870 La. Acts 159-160, no. 100, § 73 (Ex. 4).

To protect water fowl, Somerset County in 1837 banned guns in or within 50 yards of any water fowl blind on Smith Island. *See* 1837 Md. Acts Ch. 100, An Act for the Preservation of Wild Fowl in the Waters of Smith's Island and its Vicinity, in Somerset County, §§ 1-2 (Ex. 5).

Many localities (Philadelphia; St. Paul; Pittsburgh; Reading, Pennsylvania; Trenton, New Jersey) banned guns within 50 or 100 yards of their parks, squares, or common areas. *See* Pa. – General Assembly, P.L. 1083, No. 1020, A Supplement to An Act appropriating ground for public purposes in the city of Philadelphia § 21.2 (1867) (prohibiting the carry of firearms or shooting at birds in the park or "within 50 yards thereof") (Ex. 6); Acts of Assembly Relating to Fairmount Park (Philadelphia, PA) § 21(II) (1870) (prohibiting the carry of fire-arms or shooting birds in the Fairmount Park in Philadelphia, or "within fifty yards thereof") (Ex. 7); Annual Reports of the City Officers and City Boards of the City of Saint Paul, for the Fiscal Year Ending December 31, 1888, at 689 (prohibiting the carry of firearms of shooting birds in any park or "within fifty yards thereof") (Ex. 8); A Digest of the Acts of Assembly Relating to and the General Ordinances of the City of Pittsburgh, from 1804 to Jan. 1, 1897, Ordinances–Executive Departments, Bureau of Parks (1893) (prohibiting firearms "within the limits of parks or within one hundred yards thereof") (Ex. 9); A Digest of the Laws and Ordinances for the Government of the Municipal Corporation of the City of Reading, Pa., Park Rules and Regulations, 240 (1897) (prohibiting carry of firearms "in the common, or within fifty yards thereof") (Ex. 10); City of Trenton, N.J., Charter and Ordinances 390, An Ordinance providing for the government and protection of public parks and squares of the city of Trenton (1903) (prohibiting the carry firearms or shooting birds "in said park or squares, or within fifty yards thereof") (Ex. 11).

New Mexico, when it was still a Territory,[6] prohibited the unlawful brandishing of a weapon within a "settlement," defined to mean "any point within three hundred yards of any

[6] *See* Andrew Willinger, *Territorial Gun Regulation and the "Lost" History of the Federal Second Amendment*, Duke Center for Firearms Law Blog (August 8, 2022) https://firearmslaw.duke.edu/2022/08/territorial-gun regulation-and-the-lost-history-of-thefederal-second-amendment/ (arguing the Second Amendment has always applied in territories, and historical territorial laws should be given weight despite *Bruen* court's discount of same).

inhabited house." *See* 1887 N.M. Laws 56, An Act to Prohibit the Unlawful Carrying and Use of Deadly Weapons, ch. 30, § 4; An Act to Prohibit the Unlawful Carrying and Use of Deadly Weapons, Feb. 18, 1887, reprinted in Acts of the Legislative Assembly of the Territory of New Mexico, Twenty-Seventh Session 55 (1887) (Ex. 12).

The concealed carry of weapons could not occur within two miles of a university, college, or school in Mississippi in 1892. R. H. Thompson, *The Annotated Code of the General Statute Laws of the State of Mississippi* 327, § 1030 (1892) (Ex. 13). And Connecticut in 1859 banned the sale of liquor "within one mile of any military parade-ground, muster-field, or encampment." *See* 1859 Conn. Acts 62, An Act in Addition to and in Alteration of "An Act For Forming And Conducting The Military Force," chap. 82, § 5 (Ex. 14).

These historical laws are sufficient because they "further presumptively valid restrictions on the right to self-defense in the area immediately adjacent to such locations for purposes of public safety and [ ] allow the activity at issue, such as voting or the education of children, to occur without concern for violence or other interruption. They are therefore 'comparably justified' to Section 57-11's 100-yard buffer zone." *Maryland Shall Issue*, 680 F. Supp. 3d at 590.

### B. Neither Reconsideration Nor Injunctive Relief Is Warranted Based On Plaintiffs' Free Exercise Challenge To The 100-Yard Rule.

Similar to their Second Amendment argument, the "errors" Plaintiffs would have this Court review in its First Amendment analysis are nothing more than new arguments never presented in their Injunction Motion. Plaintiffs may not use the Motion in such fashion. *See, e.g.*, *Kimberly B. v. Kijakazi*, Civil Action No. TJS-20-2877, 2022 WL 748097, at *1 (D. Md. Mar. 11, 2022) (quotation marks and citation omitted) (A motion for reconsideration "may not be used … to raise arguments[,] or present evidence that could have been raised prior to the entry of judgment."); *see also Minter v. Wells Fargo Bank, N.A.*, No. CIV.A. WMN-07-3442, 2013 WL 4603006, at *3 (D.

Md. Aug. 28, 2013), *aff'd*, 762 F.3d 339, 2014 WL 3827671 (4th Cir. 2014) ("Rule 59 is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a second bite at the apple.") (internal citation and quotations omitted); *United States v. McKenzie*, No. 22-6658, 2023 WL 418447, at *1 (4th Cir. Jan. 26, 2023) ("[M]otions for reconsideration may not be used to revisit issues already addressed or advance arguments that could have been raised earlier.").

Stripped of the new contentions, Plaintiffs' Free Exercise arguments are reduced to nothing more than their disagreement with the Court's conclusion that, whatever burden it may place on religious exercise, the 100-Yard Rule is neutral and generally applicable. To constitute error of the nature warranting reconsideration, there must be more than "mere disagreement." *Williams v. Fontanez*, Civil Action No. GLR-22-1882, 2023 WL 8174323, at *1 (D. Md. June 5, 2023) (internal citation and quotations omitted). Plaintiffs' new arguments therefore are not properly before this Court. In any event, they supply no basis for reconsideration of this Court's ruling on the propriety of the 100-Yard Rule.

1. *The 100-Yard Rule is generally applicable.*[7]

Plaintiffs first fault the Court for failing to "consider relevant comparators" in finding the 100-Yard Rule generally applicable. ECF 39-1 at 1. Specifically, Plaintiffs insist that this Court

---

[7] Defendants do not concede that § 57-11(a) burdens Plaintiffs' religious exercise. In opposing the Injunction Motion, Defendants argued that Bill 23-26E "prevents no one from praying, attending synagogue, or observing any particular tenet of Jewish law or religious practice, including an obligation to defend oneself and one's community"; that it "regulates only the instrumentality Plaintiffs wish to use for doing so"; and that Plaintiffs had "failed to tether" the carrying of firearms "to any religious command." ECF 26-1 at 15. This Court read that argument as challenging "not . . . the sincerity of SSJC and Rabbi Shapiro's beliefs regarding armed worship but their truth," and found a burden. ECF 35 at 48; *see id.* at 45–48. Defendants respectfully maintain that their argument never questioned the truth of any tenet of Jewish law. It asked whether Plaintiffs' professed obligation of self-defense in fact requires them to carry a firearm, and that question goes to sincerity, not truth. In deference to the Court's preliminary ruling, Defendants do not relitigate the issue here, but simply preserve it for further inquiry on the merits.

should have asked whether the transportation exception in § 57-11(b)(6)(B) undermines the County's interest in preventing gun violence "in a similar way that allowing Rabbi Shapiro or SSJC's members to walk past certain locations with a firearm on their way to synagogue would." ECF 39-1 at 18–19. That premise is false, because this Court did not overlook the vehicle exception, but rather expressly addressed it:

> Because Rabbi Shapiro must walk to the synagogue on certain days, and thus cannot avail himself of the provisions in Section 57-10—which allows vehicle transportation of firearms even within 100 yards of a place of assembly and is a part of the Code that Plaintiffs do not challenge—he contends that the buffer zones for other places of public assembly suffer from the same constitutional infirmities as the ban on firearm possession within a place of worship. That does not necessarily follow.

ECF 35 at 55. The Court thus identified the vehicle carve-out, recognized the inference Plaintiffs sought to draw from it, and affirmatively declined to make that leap. That the Court cited § 57-10 while Plaintiffs now cite § 57-11(b)(6) (*see* ECF 39-1 at 19), changes nothing; the carve-out language is the same. And the Court correctly observed that Plaintiffs did not challenge that provision—a challenge they now attempt indirectly and belatedly to mount, by recasting an unchallenged exception as a Free Exercise comparator.

What Plaintiffs actually seek is to stretch their "wide range of secular activities" (ECF 5-1 at 15) argument in a new direction. For the first time, they compare motorists using the transportation exception with pedestrians like themselves on days they may not use vehicles. *See* ECF 39-1 at 19. To the extent this Court did not run a full analysis treating motorists as the comparable secular class, that is not a proper ground for reconsideration, because Plaintiffs never offered motorists as a comparator. *See Kimberly B.*, 2022 WL 748097, at *1 (a motion for reconsideration "may not be used … to raise arguments[,] . . . that could have been raised [initially]") (quotation marks and citation omitted).

Plaintiffs' own filings confirm the point. In the Injunction Motion, Plaintiffs identified the relevant comparators as "private property owners generally, including but not limited to secular clubs and the proprietors of secular businesses." ECF 5-1 at 15. In their Reply, they added more locations. *See* ECF 29 at 11 ("Because EB23-26 treats most comparable secular entities—*e.g.*, restaurants, fraternal lodges, and stores—better than houses of worship, it is neither generally applicable nor neutral.").[8] Nowhere in either filing did Plaintiffs suggest that motorists traveling under the vehicle exception are comparable to pedestrians walking to synagogue. A comparison Plaintiffs never proposed is not one the Court erred in declining to draw.

Nor does the comparison succeed on the merits.[9] Plaintiffs contend that "[t]he vehicle exception undermines Montgomery County's asserted interest in preventing gun violence more than permitting congregants to walk with their firearms would." ECF 39-1 at 19. In their telling, a vehicle occupant "is only a few feet from where a pedestrian on the sidewalk would be"; "an assailant with a gun hidden in their car is less visible than an individual peacefully walking on the street"; and "the assailant in a car has an easier time escaping after committing an act of violence, making it more likely that an assault takes place from a car than from the sidewalk." *Id.* at 19. From this, Plaintiffs conclude that the County "permits secular conduct that is far more likely to

---

[8] Each of these comparators targeted the in-premises ban on firearms in places of worship, not the 100-Yard Rule. This Court analyzed them exactly that way: it considered Plaintiffs' "private property owners generally" and Reply comparators arguments in addressing the places-of-worship ban, and accepted the fraternal-lodge comparator because private owners, unlike places of worship, may "decide for themselves whether to allow firearms on the premises." ECF 35 at 50–52. None of the comparators clearly addressed the 100-Yard Rule, and none certainly involved driving or walking. Plaintiffs' motorist comparison is newly presented here, and thus not properly before the Court on reconsideration.

[9] The Rule is also neutral, and this Court so held. *See* ECF 35 at 55 ("The claim regarding all buffer zones, however, fails at this stage . . . A different provision is at work—one that applies to all designated places of public assembly. The 100-yard restriction is a neutral and generally applied provision and only a rational basis must be shown."). Plaintiffs take no issue with that holding. *See* ECF 39-1 at 18–20 (challenging only general applicability of the Rule).

enable gun violence than Plaintiffs' religious exercise of walking to synagogue ever would." *Id.* at 19–20.

The governing test refutes that conclusion. As Plaintiffs acknowledge, "[w]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." ECF 39-1 at 18 (quoting *Tandon v. Newsom*, 593 U.S. 61, 62 (2021)). The pertinent interests here are those this Court and Judge Chuang have already identified: "prevent[ing] gun violence" and "address[ing] possible gun violence in or near places of public assembly." *See* ECF 35 at 37 (quoting *Maryland Shall Issue*, 680 F. Supp. 3d at 587); *see also id*. at 50 ("The latter half of this statement arguably frames the amendments to Section 57-1 as 'a solution to prevent gun violence.'"). Plaintiffs have accepted this framing. *See* ECF 39-1 at 18. The question, then, is whether driving through a buffer zone undermines the County's interest in preventing gun violence near places of public assembly "in a similar way" as walking through it. *Fulton v. City of Philadelphia*, 593 U.S. 522, 534 (2021). It does not.

Plaintiffs' hypothetical about individuals in vehicles (ECF 39-1 at 19) answers the wrong question. The secular conduct the exception permits is lawful carriage, not an assault launched from a car. A criminal bent on violence is not exercising the vehicle exception, and the risk he poses has no bearing on whether the exempted activity undermines the County's interest in a way similar to pedestrian carry. Plaintiffs' remaining point—that a motorist travels "the exact same streets" and sits "only a few feet" from the sidewalk, ECF 39-1 at 19—rests on location, not risk. But comparability under *Tandon* is judged against the risk each activity poses to the government's interest, not against where each activity occurs on a map. *See Tandon*, 593 U.S. at 62 ("Comparability is concerned with the risks various activities pose[.]").

Measured against the County's interests, the two activities—driving and walking within the buffer zones—differ in three material respects. The most immediate difference lies in how readily the firearm can be used: Clause (A) of the exception covers a firearm "locked in a container." A secured firearm inside a passing vehicle cannot readily be drawn or used at the sensitive place, which is not the case for a pedestrian's holstered handgun. *See* § 57-11(b)(6)(A); *see also* § 57-10(1)-(2).[10] Additionally, the time each carrier spends in the protected zone differs sharply. A vehicle on a public roadway passes through a 100-yard zone in moments, whereas a pedestrian moves through the same zone at walking pace and can stop, wait, or linger beside the school, park, or place of worship the Buffer Zones protect. Because exposure is a function of time, the pedestrian remains in the protected area far longer. And that prolonged presence occurs in the very space the Buffer Zones exist to protect. The 100-Yard Rule protects places where people gather on foot: children arriving at school, families in parks, congregants walking to services. An armed pedestrian shares the sidewalks, crosswalks, and entrances those people use; a vehicle occupant moving through the County does not. The 100-Yard Rule targets armed presence among the protected population, and pedestrian carry produces that presence in a way vehicle transit does not. Vehicle transit does not undermine either the County's interest or its province to ensure public safety and to seek to prevent gun violence near places of public assembly "in a similar way" as pedestrian carry. The vehicle exemption therefore is not a comparable secular activity and does not disturb the Court's holding that the Rule is generally applicable.

Plaintiffs next contend that the 100-Yard Rule permits firearms to be transported within 100 yards of locations that are not defined as places of public assembly but "bear similar

---

[10] That difference is strongest as to Clause (A); because Clause (B) permits a permit holder to carry a handgun on his person while in the vehicle, the accessibility point does not reach that clause with the same force, and the County does not claim otherwise. The remaining two differences, however, apply to both clauses.

characteristics to covered locations," such as fraternal lodges, and that this "means the law is not generally applicable." ECF 39-1 at 20. This argument suffers the same procedural defect as the first. Plaintiffs invoked the comparable secular entities' argument in their Preliminary Injunction Motion only against the in-premises ban on places of worship.[11] Now, for the first time they impermissibly seek to expand it. *See supra* at 15. Analyzed substantively, the argument also fails on its own terms. This Court accepted the fraternal-lodge comparator for the in-premises ban because, under Chapter 57, private property owners, including those of fraternal lodges, "have the latitude to 'to decide for themselves whether to allow firearms on the premises while denying the same autonomy to places of worship.'" ECF 35 at 52 (quoting *Antonyuk v. Chiumento*, 89 F.4th 271, 350 (2d Cir. 2023), *cert. granted, judgment vacated sub nom. Antonyuk v. James*, 144 S. Ct. 2709, 219 L. Ed. 2d 1315 (2024), *and reinstated in part by Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024)). The defect this Court identified, in other words, was a disparity in owner autonomy: Chapter 57 let a lodge decide whether to permit firearms on its own premises and denied a synagogue that same choice over its own premises. *See id*. That disparity has no counterpart under the 100-Yard Rule: it reaches public and private property that lies beyond the premises of every place of public assembly, regardless of religion or absence thereof. Thus, the operative line is between places of public assembly and undesignated places, not between religious and secular conduct. This presents no Free Exercise problem. Plaintiffs identify no secular pedestrian who may carry within 100 yards of a covered place while Rabbi Shapiro or SSJC's congregants may

---

[11] *See* ECF 5-1 at 15 ("Here the Ban is not generally applicable: it specifically targets **carrying firearms in places of religious worship** while allowing the possession of firearms by people engaged in a wide range of secular activities… the County does treat comparable secular activities more favorably: private property owners generally, including but not limited to secular clubs and the proprietors of secular businesses, may allow any person licensed **to carry a firearm to do so on their premises**) (emphasis added); *see generally* ECF 29 at 11 (cabining general applicability argument to "EB23-26['s] treat[ment] of most comparable secular entities, *e.g*., restaurants, fraternal lodges, and stores—better than houses of worship[.]").

not. Their real objection is to which locations are defined as places of public assembly. Those locations, however, extend well beyond places of worship to a broad range of sensitive places, and the Rule applies to every one of them alike. ECF 35 at 55.

2. *The 100-Yard Rule does not fail strict scrutiny.*

This Court determined that "[t]he 100-yard restriction is a neutral and generally applied provision and only a rational basis must be shown." ECF 35 at 55. Applying that standard, the Court found that Rabbi Shapiro "has not even attempted to show that rational basis is lacking," and noted Plaintiffs' concession that the County's interest "in protecting people from violence" is "a compelling interest." *Id.* at 56 (quoting ECF 5 at 20). Plaintiffs still offer no argument as to how the Rule fails rational basis review, or how a rule that limits carrying firearms within 100 yards of parks, schools, libraries, government buildings, polling places, courthouses, and places of worship is not rationally related to preventing gun violence near those places.

Plaintiffs again here make new arguments not raised previously. Specifically, Plaintiffs take issue with tailoring, arguing that the Rule is "underinclusive" because it "leav[es] appreciable damage to [the County's] interest unprohibited," *id.* (quoting *Cahaly v. Larosa*, 796 F.3d 399, 405 (4th Cir. 2015)), and that "less restrictive alternatives abound." ECF 39-1 at 22. None of these arguments were advanced in Plaintiffs' injunction filings. Their sole tailoring argument below concerned places of worship (*see* ECF 5-1 at 16), while their Reply baldly asserted only that the County had made "no attempt to meet [its] burden under strict scrutiny." ECF 35 at 53 (quoting ECF 29 at 11).

Even assuming, *arguendo*, this Court deems it necessary further to address these arguments, they supply no basis to revisit this Court's rational basis holding. Pertaining to underinclusivity, Plaintiffs identify two categories of "unprohibited conduct": carrying "within

100 yards of defined places of public assembly if they are in a car," and carrying, "whether walking or driving," within 100 yards of "other locations that bear materially identical characteristics and risks for violence as defined places of public assembly." ECF 39-1 at 21. Both, they allege, "pose at least the same risk of gun violence as permitting peaceable pedestrians to walk past another church on their way to synagogue." *Id.* That argument conflates two distinct inquiries. Underinclusiveness is a tailoring concept that is relevant only once strict scrutiny applies. *See, e.g.*, *Cahaly*, 796 F.3d at 405 (evaluating whether statute was underinclusive only after determining that strict scrutiny applied). By contrast, the concept of general applicability is concerned only with whether the law "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." ECF 35 at 48 (quoting *Fulton*, 593 U.S. at 534). A law may leave some risks unregulated and remain generally applicable, so long as it leaves them unregulated for religious and secular actors alike. "If the law makes no distinction between action based on religious conviction and action based on secular views, it is a generally applicable law[.]" *Hines v. S.C. Dep't of Corr.*, 148 F.3d 353, 357 (4th Cir. 1998). The 100-Yard Rule draws no such distinction. Every exemption and omission Plaintiffs identify is available to religious and secular actors on identical terms. *See supra* at Section III.B.1.

Plaintiffs' "alternatives" argument fares no better. Plaintiffs contend that "less restrictive alternatives abound," pointing to Maryland's criminal sensitive-places statute, which "does not have a buffer zone requirement"; buffer-zone ordinances in Baltimore and Prince George's County with exemptions "for permit holders" or "for unloaded firearms"; and the federal Gun-Free School Zones Act's exemption for state-licensed carriers. ECF 39-1 at 22 (citing Md. Code Ann., Crim. Law § 4-111; Balt., Md., Code art. 19, § 59-5(b), (d); Prince George Cnty., Md., Code § 14-140; 18 U.S.C. § 922(q)(2)(B)(ii)). From the existence of those regimes, Plaintiffs infer that the County

"could satisfy its security concerns through a means less restrictive" and "must, at a minimum, offer persuasive reasons why it believes that it must take a different course." *Id.* at 22–23. But by Plaintiffs' own formulation, the County must adopt a less restrictive alternative only if that alternative "would serve the Government's purpose." *Id.* at 22. The purpose here is specific: "address[ing] possible gun violence [ ] near places of public assembly." ECF 35 at 37. An alternative that does not serve that defined government purpose is not a less restrictive means of achieving it; it is an abandonment of it.

Examined under that lens, each of Plaintiffs' alternatives fail. *First*, by Plaintiffs' own description, § 4-111 "does not have a buffer zone requirement." ECF 39-1 at 22. A statute that regulates only the designated areas themselves does nothing to address gun violence *near* them, which is the precise risk the 100-Yard Rule targets. A law that does not reach the 100-yard zone cannot serve an interest defined by that zone. *Second*, the County already accommodates firearms that are secured and cannot readily be used: it exempts any firearm "locked in a container" in a motor vehicle. § 57-11(b)(6)(A). Prince George's County's exemption for unloaded firearms reflects a neighboring jurisdiction's different judgment about where to draw that line. It does not show that the County's line fails to serve its interest, much less that the County could protect schools, parks, and places of worship equally well by permitting pedestrians to carry firearms beside them. *Third*, the federal exemption for state licensees belongs to a statute that restricts firearms within 1,000 feet of schools. ECF 39-1 at 13–14; 22. Congress's judgment about the reach of a federal prohibition covering more than three times the Rule's radius says nothing about whether a 100-yard local buffer around a defined set of County locations is more restrictive than necessary to serve the County's interest. Finally, Plaintiffs' premise that other jurisdictions'

regimes oblige the County to justify its own, ECF 39-1 at 22–23, has force only under strict scrutiny, and strict scrutiny does not apply. The Court need look no further.

**C. Plaintiffs Fail To Establish The Remaining Prongs Of Injunctive Relief.**

Defendants fully briefed the remaining prongs of injunctive relief—lack of irreparable harm, the balance of the equities, and the public interest—in their Opposition to Plaintiffs' Injunction Motion. *See* ECF 26-1 at 27-29. Those same arguments—which Defendants incorporate by this express reference—weigh against imposition of any broader injunction pending appeal.

The Preliminary Injunction issued by this Court only strengthens those arguments. It not only already decided that Plaintiffs are not likely to succeed on the merits of their challenge to the 100-Yard Rule, it also vastly reduces—if not eliminates—any arguable irreparable harm that Plaintiffs suggest they continue to suffer. Plaintiffs' delay in filing their current Motion—along with their failure to seek any expediting of its consideration—shows the lack of emergency in the issue they now raise. Further injunctive relief—pending appeal or otherwise—should be denied.

Respectfully submitted,

JOHN P. MARKOVS
COUNTY ATTORNEY

By: /s/ Jeffrey M. Schwaber

Jeffrey M. Schwaber (Bar ID #06095)
jschwaber@steinsperling.com
(301) 354-8110 (facsimile)
Deanna L. Peters (Bar ID #15674)
dpeters@steinsperling.com
(301) 354-8131 (facsimile)
STEIN SPERLING BENNETT
DE JONG DRISCOLL PC
1101 Wootton Parkway, Suite 700
Rockville, Maryland 20852
(301) 340-2020

and

/s/ Erin J. Ashbarry

Erin J. Ashbarry (Bar ID #26298)
Chief, Division of Government Operations
erin.ashbarry@montgomerycountymd.gov
Office of the County Attorney
101 Monroe Street, Third Floor
Rockville, Maryland 20850
Tel: (240) 777-6700
Fax: (240) 777-6705

*Attorneys for Defendants, Montgomery County, Maryland, Marc Elrich, & Darren Francke*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 8th day of October, 2026, a copy of the foregoing was sent to all counsel of record via CM/ECF.

/s/ Jeffrey M. Schwaber

Jeffrey M. Schwaber (Bar ID #06095)

# EXHIBIT 1

G. L. Copeland; and also to issue his warrant upon the Treasurer for the sum of sixty dollars, payable to the order of Abram Zarks; and also to issue his warrant upon the Treasurer for the sum of sixty dollars, payable to the order of C. E. Gordon; the said sums of money having been paid for State license erroneously issued to said persons by the Clerk of the Circuit Court of Anne Arundel county.

Sec. 2. *And be it enacted*, That this act shall take effect from the date of its passage. Effective.

Approved April 7, 1886.

---

## CHAPTER 189.

AN ACT to prevent the carrying of guns, pistols, dirk-knives, razors, billies or bludgeons by any person in Calvert county, on the days of election in said county, within one mile of the polls.

Section 1. *Be it enacted by the General Assembly of Maryland*, That from and after the passage of this act, it shall not be lawful for any person in Calvert county to carry, on the days of election and primary election, within three hundred yards of the polls, secretly, or otherwise, any gun, pistol, dirk, dirk-knife, razor, billy or bludgeon, and any person violating the provisions of this act, shall be deemed guilty of a misdemeanor, and on conviction thereof by the Circuit Court of Calvert county having criminal jurisdiction thereof, or before any Justice of the Peace in said county, shall be fined not less than ten nor more than fifty dollars for each offence, and on refusal or failure to pay said fine, shall be committed to the Jail of the county until the same is paid. Unlawful to carry weapons to the polls.

Sec. 2. *And be it enacted*, That the fines collected under this act shall be paid by the offi-

Fines go to schools.

cer collecting the same, to the School Commissioners of the county in which the offence was committed, for School purposes.

Misdemeanor.

Penalty.

SEC. 3. *And be it enacted,* That any Constable of said county, or the Sheriff thereof, who shall refuse to arrest any person violating any provision of this act, upon information of such offence, shall be deemed guilty of a misdemeanor, and on conviction thereof before the Circuit Court for Calvert county, as the case may be, shall be fined not less than fifty nor more than one hundred dollars, and shall, in the discretion of the Court, be discharged from office.

Effective.

SEC. 4. *And be it enacted,* That this act shall take effect from the date of its passage.

Approved April 7, 1886.

---

## CHAPTER 190.

AN ACT to repeal section three of the acts of eighteen hundred and eighty-four, chapter sixteen, entitled an act for the protection of birds in Prince George's and Anne Arundel counties, and to re-enact the same with amendments, and to add new sections thereto.

Repealed and re-enacted.

SECTION 1. *Be it enacted by the General Assembly of Maryland,* That section three of chapter sixteen of the acts of eighteen hundred and eighty-four, entitled an act for the protection of birds in Prince George's and Anne Arundel counties, be and the same is hereby repealed and re-enacted so as to read as follows, and that new sections be added thereto.

SEC. 3. *And be it enacted,* That it shall not be lawful for any person or persons in said counties to shoot, kill or catch or in any way to

# EXHIBIT 3

dred and forty-five, chapter three hundred and ten, the Maryland Tract Society was incorporated with a provision that the said act should inure for thirty years from the date of its passage, and it is therefore necessary that the corporate franchises, granted by the said act, should be renewed and extended in order to promote and continue the beneficent purposes of said corporation; therefore—

Renewed and extended

SECTION 1. *Be it enacted by the General Assembly of Maryland*, That the corporate franchises granted by the said act of Assembly, entitled "an act to incorporate the Maryland Tract Society," passed at December session, eighteen hundred and forty-five, chapter three hundred and ten, be and the same are hereby renewed and extended without any limitation as to the duration of said corporation; provided, however, that the said General Assembly reserves to itself the right at any time to amend, alter or repeal this act.

In force

SEC. 2 *And be it enacted*, That this act shall take effect from the date of its passage.

Approved April 11th, 1874.

## CHAPTER 250.

AN ACT to prevent the carrying of guns, pistols, dirks, dirk-knives, razors, billies or bludgeons, by any person in Kent, Queen Anne's or Montgomery counties, on the day of election in said counties.

Not lawful to carry

SECTION 1 *Be it enacted by the General Assembly of Maryland*, That from and after the passage of this act, it shall not be lawful for any person in Kent, Queen Anne's or Montgomery counties, to carry, on the days of election, secretly or otherwise, any gun, pistol, dirk, dirk-knife, razor, billy or bludgeon; and any person violating the provisions of this act shall be deemed guilty of a misdemeanor, and on conviction thereof, before any justice of the peace in either

of said counties, shall be fined not less than five nor more than twenty dollars, and on refusal to pay said fine shall be committed by such justice of the peace to the jail of the county, until the same is paid.

SEC. 2. *And be it enacted*, That the fines collected under this act shall be paid by the officer collecting the same, to the school commissioners of the county where such offence shall have been committed, for school purposes. Fines

SEC. 3. *And be it enacted*, That any constable of either of said counties, or the sheriff thereof, who shall refuse to arrest any person violating any provision of this act, upon information of such offence, shall be deemed guilty of a misdemeanor, and on conviction thereof, before the Circuit Court for such county, shall be fined not less than twenty nor more than fifty dollars, and shall forthwith be discharged from office. Discharged.

Approved, April 6th, 1874.

## CHAPTER 251.

AN ACT for the relief of the Cambridge and Chesapeake Railroad Company.

SECTION 1. *Be it enacted by the General Assembly of Maryland*, That the Cambridge and Chespeake Railroad Company, be and it is hereby authorized and empowered, to demand and receive for the transportation of passengers, goods, produce, merchandise or property of any description, upon said railroad, such sum or sums of money, as the President and Directors of said Company shall from time to time deem reasonable and proper. To demand and receive

SEC. 2. *And be it enacted*, That upon every subscription to the capital stock of said company there shall be paid, at the time of making the subscription, the sum of one dollar on every share subscribed, and Subscriptions to capital stock

# EXHIBIT 4

No. 100.] AN ACT

To regulate the conduct and to maintain the freedom and purity of elections; to prescribe the mode of making, and designate the officers who shall make the returns thereof; to prevent fraud, violence, intimidation, riot, tumult, bribery or corruption at elections or at any registration or revision of registration; to limit the powers and duties of the sheriffs of the parishes of Orleans and Jefferson; to prescribe the powers and duties of the Board and officers of the Metropolitan Police in reference to elections; to prescribe the mode of entering on the rolls of the Senate and House of Representatives the names of members; to empower the Governor to preserve peace and order, to enforce the laws; to limit the powers and duties of the Mayors of the cities of New Orleans and Jefferson with regard to elections; to prohibit District or Parish Judges from issuing certain writs to Commissioners of Election; to make an appropriation for the expenses of the next revision of the registration and of the next election; and to enforce article one hundred and three of the constitution.

SECTION 1. *Be it enacted by the Senate and House of Representatives of the State of Louisiana, in General Assembly convened,* That all elections for State, parish and judicial officers, members of the General Assembly, and for members of Congress shall be held on the first Monday in November, and said elections shall be styled the general elections. *Time of holding elections.*

They shall be held in the manner and form, and subject to the regulations hereinafter prescribed, and no other.

SEC. 2. *Be it further enacted, etc.,* That elections for Representatives in the General Assembly shall be held on the first Monday of November, one thousand eight hundred and seventy, and every two (2) years thereafter; and all elections to supply the place of Senators in the General Assembly, whose terms of service shall have expired, shall be held at the same time as herein provided for the election of Representatives. *Elections for representatives in the General Assembly.* *Elections for State senators.*

SEC. 3. *Be it further enacted, etc.,* That all elections shall be held in each parish at the several election polls or voting places to be established as is hereinafter prescribed. *When held.*

SEC. 4. *Be it further enacted, etc.,* That all elections shall be completed in one day, and the polls shall be kept open at each poll or voting place, from the hour of six in the morning until six o'clock in the afternoon. *When completed—polls open.*

SEC. 5. *Be it further enacted, etc.,* That each parish in this State, except the parishes of Orleans and Jefferson, is hereby fixed as an election precinct, and the supervisor of registration in each of said parishes shall direct what number of polls or voting places shall be established in each precinct, fix the places of holding the election, and appoint commissioners of election for each poll or voting place. In the city of New Orleans, each ward shall constitute a precinct, and in the remaining part of the parish of Orleans, the supervisor of registration for the said parish shall fix both the precincts and voting places in each precinct, and in the parish of Jefferson, the supervisor of registration shall fix both the precincts and the voting places in each precinct; in the parishes of Orleans and Jefferson the supervisor of registration of each parish shall appoint commissioners of election therefor, as in the other parishes. Any duly registered voter may vote at any poll or voting place within his precinct. *Election precincts.* *Voting places.*

SEC. 6. *Be it further enacted, etc.,* That the elections at each poll or voting place shall be presided over by three commissioners of election, residents of the parish, who shall be able to read and write, to be appointed by the supervisor of registration for the parish, *Commissioners of election.*

mechanic any part of the wages due to such laborer, employe, tenant or mechanic, on account of any vote which such laborer, employe, tenant or mechanic has given or purposes to give, shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine of not less than five hundred dollars, one half of which shall go to the school fund of the parish in which the offense was committed, and by imprisonment in the parish prison for not less than three months.

SEC. 69. *Be it further enacted, etc.*, That any person who shall molest, disturb, interfere with, or threaten with violence, any commissioner of election or person in charge of the ballot boxes, while in charge of the same, between the time of the close of the polls and the time that said ballot boxes are delivered to the supervisor of registration, shall be deemed guilty of a felony, and upon conviction thereof shall be punished by a fine of not less than five hundred dollars, or by imprisonment in the penitentiary not less than one year, or both, at the discretion of the court. Interference with commissioners, etc.

SEC. 70. *Be it further enacted, etc.*, That any person not authorized by this law to receive or count the ballots at an election, who shall, during or after any election, and before the votes have been counted by the supervisors of registration, disturb, displace, conceal, destroy, handle or touch any ballot, after the same has been received from the voter by a commissioner of election, shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof, be punished by a fine of not less than one hundred dollars, or by imprisonment for not less than six months, or both, at the discretion of the court. Disturbing the counting of ballots.

SEC. 71. *Be it further enacted, etc.*, That any person not authorized by this law to take charge of the ballot boxes at the close of the election who shall take, receive, conceal, displace or [in] any manner handle or disturb any ballot box at any time between the hour of the closing of the polls and the transmission of the ballot box to the supervisor of registration, or during such transmission, or at any time prior to the counting of the votes by the supervisor of registration, shall be deemed guilty of a felony, and upon conviction thereof shall be punished by a fine of not less than five hundred dollars, or by imprisonment in the penitentiary not less than one year, or both, at the discretion of the court. Interference with ballot boxes.

SEC. 72. *Be it further enacted, etc.*, That if any person shall by bribery, menace, willful falsehood, or other corrupt means, directly or indirectly attempt to influence any elector of this State in the giving his vote or ballot, or to induce him to withhold the same, or disturb or hinder him in the free exercise of the right of suffrage at any election in this State, he shall, on conviction thereof, be deemed guilty of a misdemeanor, and be fined not more than five hundred dollars, and be imprisoned in the parish prison for a term not exceeding six months, and shall also be ineligible to any office in the State for the term of two years. Interference with free exercise of right of suffrage.

SEC. 73. *Be it further enacted, etc.*, That it shall be unlawful for any person to carry any gun, pistol, bowie knife or other dangerous weapon, concealed or unconcealed, on any day of election during the hours the polls are open, or on any day of registration or revision of registration, within a distance of one-half mile of any place of registration or revision of registration; any person violating the provisions of this section shall be deemed guilty of a misdemeanor, and on conviction shall be punished by a fine of not less than one hundred dol- Weapons.

lars, and by imprisonment in the parish jail for not less than one month; provided, that the provisions of this section shall not apply to any commissioner or officer of the election or supervisor or assistant supervisor of registration, police officer or other person authorized to preserve the peace on days of registration or election.

Liquors.

SEC. 74. *Be it further enacted, etc.*, That no person shall give, sell or barter any spirituous or intoxicating liquors to any person on the day of election, and any person found guilty of violating the provisions of this section shall be fined in a sum of not less than one hundred dollars, nor more than three hundred dollars, which shall go to the school fund.

Corruptly voting.

SEC. 75. *Be it further enacted, etc.*, That whoever, knowing that he is not a qualified elector, shall vote or attempt to vote at any election, shall be fined in a sum not to exceed one hundred dollars, to be recovered by prosecution before any court of competent jurisdiction.

Double vote.

SEC. 76. *Be it further enacted, etc.*, That whoever shall knowingly give or vote two or more ballots folded as one at any election, shall be fined in a sum not to exceed one hundred dollars, to be recovered by prosecution before any court of competent jurisdiction.

Bribery to influence voters.

SEC. 77. *Be it further enacted, etc.*, That whoever, by bribery or by a promise to give employment or higher wages to any person, attempts to influence any voter at any election, shall be deemed guilty of a misdemeanor, and upon conviction thereof, shall be punished by a fine of not less than one hundred dollars, and by imprisonment in the parish prison for not less than three months.

Obtaining illegal voting.

SEC. 78. *Be it further enacted, etc.*, That whoever willfully aids or abets any one, not legally qualified, to vote or attempt to vote at any election, shall be fined in a sum of not less than fifty dollars, to be recovered by prosecution before any court of competent jurisdiction.

Disorderly houses.

SEC. 79. *Be it further enacted, etc.*, That whoever is disorderly at any poll or voting place during an election, shall be fined in a sum not less than twenty dollars, to be recovered by prosecution before any court of competent jurisdiction.

Meetings of citizens.

SEC. 80. *Be it further enacted, etc.*, That whoever shall molest, interrupt or disturb any meeting of citizens assembled to transact or discuss political matters, shall be fined in a sum not less than fifty dollars, to be recovered by prosecution before any court of competent jurisdiction.

Any sheriff, constable or police officer present at the violation of this section shall forthwith arrest the offender or offenders, and convey him or them, as soon as practicable, before the proper court.

Imprisonment.

SEC. 81. *Be it further enacted, etc.*, That the court imposing any fine, as directed in sections seventy-four, seventy-five, seventy-six, seventy-seven, seventy-eight, seventy-nine and eighty of this act, shall commit the person so fined to the parish prison until the fine is paid; *Provided*, That said imprisonment shall not exceed six months.

Perjury.

SEC. 82. *Be it further enacted, etc.*, That in cases where any oath or affirmation shall be administered by any supervisor of registration, assistant supervisor of registration or commissioner of election, in the performance of his duty as prescribed by law, any person swearing or affirming falsely in the premises shall be deemed guilty of perjury, and subjected to the penalties provided by the law for perjury.

Duty of Governor to insure peace.

SEC. 83. *Be it further enacted, etc.*, That the Governor shall take all necessary steps to secure a fair, free and peaceable election; and shall, on the days of election, have paramount charge and con-

trol of the peace and order of the State, over all peace and police officers, and shall have the command and direction in chief of all police officers, by whomsoever appointed, and of all sheriffs and constables in their capacity as officers of the peace.

SEC. 84. *Be it further enacted, etc.* That to defray the expenses of the next revision of registration, and of the next general election, there is hereby appropriated out of any funds in the treasury not otherwise appropriated, the sum of fifty thousand dollars ($50,000), or so much thereof as may be necessary. Expenses

SEC. 85. *Be it further enacted, etc.*, That all laws or parts of laws contrary to the provisions of this act, and all laws relating to the same subject matter are hereby repealed, and that this act shall take effect from and after its passage. Repeal.

(Signed) MORTIMER CARR,
Speaker of the House of Representatives.

(Signed) OSCAR J. DUNN,
Lieutenant Governor and President of the Senate.

Approved March 16, 1870.

(Signed) H. C. WARMOTH,
Governor of the State of Louisiana.

A true copy:

GEO. E. BOVEE,
Secretary of State.

---

[No. 101.] **AN ACT**

To define and regulate the cost of the Clerks, Sheriffs, Recorders and Notaries Public throughout the State of Louisiana, and providing forfeitures and penalties for overcharging or failing to perform their duties, and the mode of collecting their fees.

SECTION 1. *Be it enacted by the Senate and House of Representatives of the State of Louisiana, in General Assembly convened,* That the clerks of the district courts throughout the State shall be entitled to demand and receive the following fees of office, and no more; and they shall not be entitled to charge any other fees of office than those specially set forth therein, for any services as clerks which they may be required to render: Fees of clerks.

For indorsing, registering and filing petition, for all, ten cents.

For indorsing, registering and filing answer, for all, ten cents.

For issuing citation, with copy of same, with certificate and seal on each, fifty cents, one charge for both.

For issuing attachment, with copy of same, with certificates and seals on both, one dollar, one charge for both.

For issuing *fieri facias*, with seal, fifty cents.

For issuing writ of seizure and sale, with seal, one dollar.

For issuing writ of sequestration, with copy of same, with certificates and seals, one dollar, one charge for both.

For issuing writ of *certiorari*, with copy of same, with certificates and seals, one dollar, one charge for both.

# EXHIBIT 5

CHAP. 100. this State, and that a hearing was had at March term, eighteen hundred and thirty-four, when allegations preferred by his creditors were sustained; that an appeal was taken from the decision, bond with security filed, which bond was lost or mislaid; that said Schleigh is in fact actually insolvent:—Therefore,

Insolvent

*Be it enacted by the General Assembly of Maryland,* That Daniel H. Schleigh, of Washington county, is hereby empowered to apply for and obtain the benefit of the insolvent laws of this State, as if allegations never had been sustained against him, by his complying with all the provisions of the insolvent laws of this State.

---

## CHAPTER 100.

Passed Feb. 28, 1838.

*An act for the preservation of Wild Fowl in the waters of Smith's Island and its vicinity, in Somerset county.*

Prohibition in the limits

SECTION 1. *Be it enacted by the General Assembly of Maryland,* That from and after the first day of May next, it shall not be lawful for any person or persons, by day or night, to navigate or paddle any open skiff, canoe or open boat of any description, on board of which open skiff, canoe or open boat aforesaid may be any offensive weapon, gun, musket, fowling piece or pistol, within the region usually known as included from Hearn's Straits, in Somerset county, to the upper side of Holland's Straits, within fifty yards of any blind for shooting fowl, with intent to shoot or molest any wild fowl or fowls within the region aforesaid.

Penalty for violating

SEC. 2. *And be it enacted,* That the discovering or finding of any offensive weapon, gun, musket, fowling piece or pistol in any open skiff, canoe or open boat as aforesaid, within fifty yards of any blind for shooting fowl, shall, in all cases within the region aforesaid, be deemed prima facie evidence of intent to shoot or molest said wild fowls, and shall subject the offender in each and every case, to a penalty of ten dollars, to be recovered before the district court of Somerset county, by action of debt, in the name of the State, or

qui tam action, one-half of which penalty shall be for the benefit of the informer, and the remaining half shall be paid over to the commissioners of Somerset county, for the benefit of said county. CHAP. 101.

SEC. 3. *And be it enacted*, That the informer shall be deemed a competent witness in each and every prosecution under this act. Witness

---

## CHAPTER 101.

*An act entitled, an act to Incorporate the Carroll Academy and House of Public Worship.* Passed Feb. 26, 1838

SECTION 1. *Be it enacted by the General Assembly of Maryland*, That William Shriver, Peter E. Myers, James Hierd, William Burgoon and Joseph Keefer, be appointed trustees for a school erected in Carroll county, district number three, called "the Carroll Academy and House of Public Worship," and their successors to be appointed, as hereinafter directed, shall forever hereafter be, and they are hereby erected and established, and declared to be one body politic and corporate, with perpetual succession, in deed and in law, by the name, and style and title of the Trustees of "The Carroll Academy and House of Public Worship;" by which name and style the said trustees and their successors shall be capable in law and in equity to hold property, the value of which shall, at no time, exceed the sum of one thousand dollars for the said Academy and House of Public Worship. Persons incorporated. Style. Corporate powers.

SEC. 2. *And be it enacted*, That the said house shall be open and free for all Christian denominations to worship in; *provided*, no meeting for public worship shall interfere with school hours, unless by consent of a majority of the trustees. House of Worship

SEC. 3. *And be it enacted*, That if a vacancy occur in the board of trustees, the same shall be filled by the remaining trustees, until the next annual election of the same, Case of vacancy

SEC. 4. *And be it enacted*, That on the first day of January in every year, an election shall be held by the qualified voters at the academy; which said election Annual election

# EXHIBIT 6

**PUBLIC GROUNDS APPROPRIATED**

**Act of Apr. 14, 1868, P.L. 1083, No. 1020 Cl. 11**

A SUPPLEMENT

To an act, entitled "An Act appropriating ground for public purposes in the city of Philadelphia," approved the twenty-sixth day of March, Anno Domini one thousand eight hundred and sixty-seven.

Section 1. Boundaries of Park

The boundaries of the Fairmount Park in the City of Philadelphia shall be the following, to wit: Beginning at a point in the north-easterly line of property owned and occupied by the Reading Railroad Company, near the City Bridge over the river Schuylkill at the falls, where said north-easterly line would be intersected by the land dividing the property of H. Duhring from that of F. Stoever and T. Johnson, if the same were extended from thence in a south-westerly direction upon said dividing line, and its prolongation to the middle of the Ford Road, from thence by a line passing through the southeast corner of Forty-ninth and Lebanon Streets to George's Run; thence along the several courses of said run to a point fourteen hundred and eighty-seven and a half feet from the middle of the Pennsylvania Railroad, measured at right angles thereto; thence by a straight line through the northeast corner of Forty-Third and Hancock Streets, to the northerly side of Girard Avenue near Fortieth Street; thence by the said northerly line of Girard Avenue to the easterly side of the Junction Railroad as now used; thence by the said easterly side of the Junction Railroad and the Pennsylvania Railroad to the north side of Haverford Street; thence by the northerly side of said Haverford Street to the westerly side of Bridgewater Street; thence by said Bridgewater Street to the north line of Bridge Street; thence by said Bridge Street to the west abutment of the Suspension Bridge; hence by the northwesterly side of the Suspension Bridge and Callowhill Street to the angle in said street, on the southwesterly side of Fairmount Basin; thence by the northerly side of Callowhill and Biddle Streets to the westerly side of Twenty-fifth Street; thence by the said Twenty-fifth Street to the southwesterly side of Pennsylvania Avenue; thence by the southwesterly side of Pennsylvania Avenue to the west side of Twenty-third Street; thence along the westerly side of Twenty-third Street to the southwesterly line of Ridge Avenue; thence along the said Ridge Avenue to the southwesterly line of South Laurel Hill Cemetery (north of Huntingdon Street); thence by and along said property line to such a distance from the shore line of the River Schuylkill as will permit the location of a carriage road one hundred feet wide upon its margin; thence along said river shore and its several courses as may be most practicable, at the same distance as above specified (provided said distance shall not exceed one hundred and fifty feet), to a point opposite the intersection of the Ridge Turnpike and School Lane; thence northwardly to a point on the southwesterly side of said Turnpike Road opposite to the southeasterly side of said School Lane; thence by the southwesterly side of the Ridge Turnpike Road and its several courses to the southeasterly side of the Wissahickon Creek; thence by the several courses of the said southeasterly side of Wissahickon Creek to the Schuylkill River; thence across the watercourse of said river to the northeasterly line of the Reading Railroad Company's property as now occupied and in use, at the city boundary line; thence along said northeasterly line, as now occupied and used by said railroad company, to the place

of beginning, excepting, nevertheless, thereout the several water-works and their appurtenances, which are included within these boundaries, and such uses of the premises immediately adjacent to the same, and such other portions of the ground as are described in this section, as the City of Philadelphia may from time to time require for the purposes of its Water Department. 1868, April 14, P.L. 1083, Sec. 1; 1869, April 21, P.L. 1194, Sec. 8.

Section 2. Robert's Hollow Drive

There shall be laid out and constructed a road of easy and practicable grades, extending from the intersection of the northerly line of the park by Belmont Avenue on the westerly side of the River Schuylkill, to the head of Robert's Hollow, and thence along said hollow and the River Schuylkill to the foot of City Avenue, laid out with the ground contiguous thereto for ornamentation, of such width and so constructed as the Commissioners of Fairmount Park, appointed under authority of the act of the General Assembly of the Commonwealth, may determine. And such road and its contiguous ground are hereby declared to be a part of the aforesaid park; and the said park commissioners are hereby authorized and required to ascertain, by a proper survey, the limits thereof, which survey they shall file in the Survey Department of the City of Philadelphia.

It shall also be the duty of said park commissioners to appropriate the shores of the Wissahickon Creek, on both sides of the same from its mouth to the Paul's Mill Road, and of such width as may embrace the road now passing along the same; and may also protect the purity of the water of said creek, and by passing along the crest of the heights which are on either side of said creek, may preserve the beauty of its scenery. The said park commissioners are hereby authorized and required to cause a proper survey to be made of said grounds upon the Wissahickon, and to file said survey in the Survey Department of the City of Philadelphia, and the grounds and creek hereby appropriated are declared to be a part of Fairmount Park. 1868, April 14, P.L. 1083, Sec. 2.

Section 3. Title to Ground

The title to and ownership of the ground within said boundaries shall be vested in the City of Philadelphia, excepting therefrom so much as shall be required by the Schuylkill Navigation Company, the Philadelphia and Reading, the Junction and connecting railroad companies for the execution of their franchises, as now provided by law. 1868, April 14, P.L. 1083, Sec. 3.

Section 4. Release of Ground not Embraced in Boundaries

So much of the ground as was embraced in the act to which this is a supplement, approved the twenty-sixth day of March, one thousand eight hundred and sixty-seven, (Act of 1867, March 26, P.L. 547) and is not included in the above boundaries, is hereby released from all claim of title by the said city, with the same effect as if it had never been included. 1868, April 14, P.L. 1083, Sec. 4.

Section 5. Grounds Subject to Control of Commissioners; Comepnsation

All the grounds taken within the boundaries of the Fairmount Park by the first section of this act shall be subject to all the powers and control given, by the act (Act of 1867, March 26, P.L. 547) to which this is a supplement, to the City of Philadelphia and the park commissioners designated by or appointed under said act; and the owners of all ground taken for the park, and others interested therein, shall be

compensated as in said act is directed and provided. 1868, April 14, P.L. 1083, Sec. 5.

Section 6. Vacation and Opening of Roads and Streets

The said commissioners shall have power and authority, from time to time, to vacate any street or road within the boundaries of the park (excepting Girard Avenue), and to open for public use such other roads, avenues and streets therein as they deem necessary. 1868, April 14, P.L. 1083, Sec. 6.

Section 8. Footways on Boundary Streets

The jurisdiction of the commissioners of the park shall extend to the breadth of the footway next the park, in all avenues or streets which shall bound upon the park, and they shall direct the manner in which such footways shall be laid out, curbed, paved, planted and ornamented; which footways shall not be less than twenty feet in width on any avenue or street of the width of one hundred feet, and of like proportion upon any street or avenue of a greater or less width, unless otherwise directed by the commissioners. 1868, April 14, P.L. 1083, Sec. 8.

Section 9. Compensation for Buildings; Removal of Buildings, etc.; Taking Possession

The said park commissioners or jury, who shall assess the compensation to the owners for the ground taken, shall ascertain and make compensation for buildings as well as the ground taken; but all buildings and machinery and fixtures not required by the Park Commission shall be removed by the owners thereof whenever payment of the compensation awarded them shall be made or tendered to them, and upon such payment or tender the park commissioners shall forthwith take possession of the premises.

If any owner or lessee of ground taken cannot be found, notice of the taking and valuation of his land shall be given by advertisement in two daily papers published in Philadelphia six times, and in the Legal Intelligencer twice, and the amount awarded in such case to the owner or lessee shall remain in the City Treasury until such owner shall produce the decree of the court having jurisdiction in the premises, ordering the said moneys to be paid to him or his legal representatives. 1868, April 14, P.L. 1083, Sec. 9.

Section 10. Rrports of Commissioners and Jury; Duration of Jury's Powers; Appointment for One or More Cases; Payment of Valuation

The said commissioners and jury may make partial or special reports from time to time to the court as they may be ready to do so, and the court may act upon such reports separately, and the powers of the jury shall continue, unless limited by the court or they be required by the court to make report, until they shall have reported on all the cases on which they have been appointed, although a term or terms of the courts shall have intervened; and jurors, not to exceed six in number, may be appointed upon one or more cases according to the order of the court made; and whenever any report of the said commissioners or of the jury shall have been confirmed by the court, the valuation made shall be forthwith payable by the City of Philadelphia. 1868, April 14, P.L. 1083, Sec. 10.

Section 11. Loans for Purposes of Park

The City of Philadelphia shall be authorized and required to raise by loans, from time to time, such sums of money as shall be necessary to make compensation for all grounds heretofore taken or to be taken for said Fairmount Park, and for the laying out and construction thereof for public use; for the permanent care and improvement thereof, and for all culverts and other means for preserving the Schuylkill water pure for

the use of the citizens of said city, and shall annually assess taxes for keeping in repair and good order the said park; and shall also provide for the payment of the interest on all said loans, and the usual sinking fund for the redemption thereof. 1868, April 14, P.L. 1083, Sec. 11.

Section 12. Officers and Employees

The said park commissioners shall, from time to time, appoint such officers, agents, and subordinates as they may deem necessary, for the purposes of this act and the act (Act of 1867, March 26, P.L. 547) to which this a supplement; and they shall prescribe the duties and the compensation to be paid them. 1868, April 14, P.L. 1083, Sec. 12.

Section 13. Acquisition and Sale of Lands

It shall be lawful for said park commissioners to acquire title to the whole of any tract of land, part of which shall fall within the boundaries mentioned in the first section of this act, and to take conveyance thereof in the name of the City of Philadelphia; and such part thereof as shall lie beyond or without the said park limits, again to sell and convey in absolute fee-simple to any purchaser or purchasers thereof, by deeds to be signed by the mayor, under the seal of the city, to be affixed by direction of councils, either for cash, or part cash and part to be secured by bond and mortgage to the city, paying all cash into the City Treasury. Provided, That the proceeds of such sales shall be paid into the Sinking Fund for the redemption of the loan created under the provisions of this act: Provided also, That no commissioner, nor any officer under the Park Commission, shall in anywise be directly interested in any such sale of lands by the commissioners as aforesaid; and if any commissioner or officer aforesaid shall act in violation of this proviso, he shall, if a commissioner, be subject to expulsion; if an officer, to be discharged by a majority of the votes of the Board of Park Commissioners, after an opportunity afforded of explanation and defense. 1868, April 14, P.L. 1083, Sec. 13; 1870, Jan. 27, P.L. 93, Sec. 2.

Section 14. Annual Report

The said board of commissioners shall annually hereafter, in the month of December, make to the Mayor of the City of Philadelphia a report of their proceedings, and a statement of their expenditures for the preceding year. 1868, April 14, P.L. 1083, Sec. 14.

Section 15. Leases of Houses and Buildings

The said park commissioners shall have exclusive power to lease from year to year all houses and buildings within the park limits, which may be let without prejudice to the interests and purposes of the park by leases to be signed by their president and secretary, and to collect the rents and pay them into the City Treasury. 1868, April 14, P.L. 1083, Sec. 15.

Section 16. Club Houses and Zoological and Other Buildings

All houses and buildings now built or to be built on any part of the park grounds, by or for boat or skating clubs, or zoological or other purposes, shall be taken to have rights subordinate to the public purposes intended to be subserved by acquiring and laying out the park, and shall be subject to the regulations of said park commissioners under licenses, which shall be approved by the commission and signed by the president and secretary, and will subject them to their supervision and to removal or surrender to the city whensoever the said commissioners may require. 1868, April 14, P.L. 1083, Sec. 16.

Section 17. Acceptance of Devises, Bequests and Donations

The said park commissioners shall have power to accept, in the name and behalf of the City of Philadelphia devises,

bequests and donations of lands, moneys, objects of art and natural history, maps and books, or other things, upon such trusts as may be prescribed by the testator or donor: Provided, Such trusts be satisfactory to the commission and compatible with the purposes of said park. 1868, April 14, P.L. 1083, Sec. 17.

Section 18. Creation of Debts and Obligations

None of the park commissioners nor any person employed by them shall have power to create any debt or obligation to bind said Board of Commissioners, except by the express authority of the said commissioners at a meeting duly convened. 1868, April 14, P.L. 1083, Sec. 18.

Section 19. Government and Management of Park; Improvements; Repressing Disorders

The said park commissioners shall have the power to govern, manage, lay out, plant and ornament the said Fairmount Park, and to maintain the same in good order and repair, and to construct all proper bridges, buildings, railways and other improvements, therein, and to repress all disorders therein under the provisions hereinafter contained. 1868, April 14, P.L. 1083, Sec. 19.

Section 20. Licensing of Passenger Railways

The said park commissioners shall have authority to license the laying down and the use for a term of years from time to time of such passenger railways as they may think will comport with the use and enjoyment of the said park by the public, upon such terms as said commissioners may agree, all emoluments from which shall be paid into the City Treasury. 1868, April 14, P.L. 1083, Sec. 20.

Section 21. Park to be Under Regulations Specified and Such Others as may be Established

The said park shall be under the following rules and regulations, and such others as the park commissioners may from time to time ordain:

1. No person shall turn cattle, goats, swine, horses, or other animals, loose into the park.

2. No person shall carry fire-arms, or shoot birds, in the park, or within fifty yards thereof, or throw stones or other missiles therein.

3. No one shall cut, break, or in anywise injure or deface the trees, shrubs, plants, turf, or any of the buildings, fences, structures, or statuary, or foul any fountains or springs within the park.

4. No person shall drive or ride therein at a rate exceeding seven miles an hour.

5. No one shall ride or drive therein upon any other than upon the avenues and roads.

6. No coach or vehicle, used for hire, shall stand upon any part of the park for the purpose of hire, nor except in waiting for persons taken by it into the park, unless in either case at points designated by the commission.

7. No wagon, or vehicle of burden or traffic, shall pass through the park except upon such road or avenue as shall be designated by the park commissioners for burden transportation.

8. No street railroad car shall come within the lines of the park without the license of the Park Commission.

9. No person shall expose any article for sale within the park without the previous license of the Park Commission.

10. No person shall take ice from the Schuylkill within the park without the license of the said commission first had, upon such terms as they may think proper.

11. No threatening, abusive, insulting or indecent language shall be allowed in the park.

12. No gaming shall be allowed therein, nor any obscene or indecent act therein.

13. No person shall go in to bathe within the park.

14. No person shall fish, or disturb the water-fowl in the pool, or any pond, or birds in any part of the park, nor discharge any fireworks therein, nor affix any bills or notices therein.

15. No person shall have any musical, theatrical or other entertainment therein without the license of the park commissioners.

16. No person shall enter or leave the park except by such gates or avenues as may be for such purposes arranged.

17. No gathering or meeting of any kind, assembled through advertisements, shall be permitted in the park without the previous permission of the commission; nor shall any gathering or meeting for political purposes in the park be permitted under any circumstances.

18. No intoxicating liquors shall be allowed to be sold within said park. 1868, April 14, P.L. 1083, Sec. 21.

Section 22. Compensation for Licenses

If said park commissioners should license the taking of ice in said park, or the entry of any street railroad car therein, or articles for sale, or musical entertainments, it may be with such compensation as they may think proper, to be paid into the City Treasury.

Any person who shall violate any of said rules and regulations, and any others which shall be ordained by the said park commissioners, for the government of said park, not inconsistent with this act, or the laws and Constitutions of this State and the United States---the power to ordain which rules and regulations is hereby expressly given to said commissioners---shall be guilty of a misdemeanor, and shall pay such fine as may be prescribed by said park commissioners, not to exceed five dollars for each and every violation thereof, to be recovered before any alderman of said city, as debts of that amount are recoverable, which fines shall be paid into the City Treasury.

Any person violating any of said rules and regulations shall be further liable to the full extent of any damage by him or her committed, in trespass or other action; and any tenant or licensed party who shall violate the said rules, or any of them, or consent to or permit the same to be violated on his, or her, or their premises, shall forfeit his, or her, or their lease or license, and shall be liable to be forthwith removed by a vote of the Park Commission; and every lease and license shall contain a clause making it cause of forfeiture thereof for the lessee or party licensed to violate or permit or suffer any violation of said rules and regulations or any of them.

It shall be the duty of the police appointed to duty in the park, without warrant, forthwith to arrest any offender against the preceding rules and regulations, whom they may detect in the commission of such offence, and to take the persons so arrested forth with before a magistrate having competent jurisdiction. 1868, April 14, P.L. 1083, Sec. 22.

Section 23. Disposition and Use of Moneys Received

All rents, license charges and fees, all fines, proceeds of all sales, except of lands purchased, and profits of whatsoever kind, to be collected, received, or howsoever realized, shall be paid into the City Treasury as a fund to be exclusively appropriated by councils for park purposes, under the direction

of said commission: Provided, That moneys or property given or bequeathed to the park commissioners upon specified trusts shall be received and receipted for by their treasurer, and held and applied according to the trusts specified. 1868, April 14, P.L. 1083, Sec. 23.

Section 24. Widening and Straightening Approaches

The councils of the City of Philadelphia be and they are hereby authorized to widen and straighten any street laid upon the public plans of said city, as they may think requisite to improve the approaches to Fairmount Park. 1868, April 14, P.L. 1083, Sec. 24.

Section 26. Proceedings to Assess Damages

The damages for ground and property taken for the purpose of this act shall be ascertained, adjusted and assessed in like manner as is prescribed by the act (Act of 1867, March 26, P.L. 547) to which this is a supplement. 1868, April 14, P.L. 1083, Sec. 26.

Section 27. Park Police

The said park commissioners shall employ, equip, and pay a park force, adequate to maintain good order therein and in all houses thereupon; which force shall be subject to the orders of the mayor upon any emergency; and so far as said force shall consist of others than the hands employed to labor in the park, it shall be appointed and controlled as the other police of the city. 1868, April 14, P.L. 1083, Sec. 27.

Section 28. Solicitor

There shall be appointed by the commissioners of Fairmount Park, a solicitor, whose duty it shall be under their direction to attend to the assessment of damages, and to such other business of a legal nature connected with the park as the commissioners may require; he shall receive during the present year and hereafter, until otherwise ordered by councils, the same compensation as is now provided for the assistant solicitor named in the said twenty-eighth section. (Act of 1868, April 14, P.L. 1083, Sec. 28, repealed.) 1870, Jan. 27, P.L. 93, Sec. 5.

# EXHIBIT 12

in the third degree shall be punished by imprisonment for not less than three nor more than twenty-one years, in the territorial penitentiary.

Intent of repeal.

Sec. 5. It is the true intent of this act to repeal said sections 687, 688, 689, 695, 699, 700, 702 and 703, referred to in the first section of this act, only so far as the same apply to offenses committed after the passage of this act, but the said sections are to be held and remain in force and apply to all acts done and offenses committed prior to the passage of this act, and all pending prosecutions and those hereafter instituted for acts done prior to the passage of this act shall be commenced and carried on and punishment be had under the said sections 687, 688, 689, 695, 699, 700, 702 and 703, which said sections are hereby continued in force only for that purpose.

Sec. 6. This act shall be in force from and after its passage.

Approved February 24, 1887.

## CHAPTER XXX.

### CRIMES-WEAPONS.

An Act to prohibit the unlawful carrying and use of deadly weapons.

*Be it enacted by the Legislative Assembly of the Territory of New Mexico:*

Carrying any deadly weapon.

Section 1. That any person who shall hereafter carry a deadly weapon, either concealed or otherwise, on or about the settlements of this territory, except it be in his or her residence, or on his or her landed estate, and in the lawful defense of his or her person, family or property, the same being then and there threatened with danger, or except such carrying be done by legal authority, upon conviction thereof shall be punished by a fine of not less than fifty dollars, nor more than three hundred, or by imprisonment not less than sixty days, nor more than six months, or by both such fine and imprisonment, in the discretion of the court or jury trying the same.

Threatening any person.

SEC. 2. Any person who shall draw a deadly weapon on another, or who shall handle a deadly weapon in a threatening manner, at or towards another, in any part of this territory, except it be in the lawful defense of himself, his family or his property, or under legal authority, upon conviction thereof, shall be fined in any sum not less than one hundred dollars, nor more than five hundred dollars, or by imprisonment at hard labor in the county jail or territorial penitentiary not less than three months nor more than eighteen months, or by both such fine and imprisonment, in the discretion of the court or jury trying the same.

Assault with deadly weapon.

SEC. 3. Any person who shall unlawfully assault or strike at another with a deadly weapon, upon conviction thereof shall be punished by a fine not exceeding one thousand dollars, or by imprisonment at hard labor in the county jail or territorial penitentiary, not exceeding three years, in the discretion of the court or jury trying the same.

Flourishing deadly weapon.

SEC. 4. Any person who shall unlawfully draw, flourish or discharge a rifle, gun or pistol within the limits of any settlement in this territory, or within any saloon, store, public hall, dance hall or hotel, in this territory, except the same be done by lawful authority, or in the lawful defense of himself, his family or his property, upon conviction thereof shall be punished by a fine of not more than one thousand dollars, or by imprisonment for a term of not more than three years, or by both such fine and imprisonment, in the discretion of the court or jury trying the same. The word "settlement," as used in this act, shall be construed to mean any point within three hundred yards of any inhabited house, in the territory of New Mexico.

Insulting person while armed.

SEC. 5. Any person being armed with a deadly weapon, who shall, by words, or in any other manner, insult or assault another, upon conviction thereof, shall be punished by a fine of not less than one hundred dollars, nor more than three hundred dollars, or by imprisonment at hard labor in the county jail or territorial penitentiary for not less than three months, nor more than one year, or by both such fine and imprisonment, in the discretion of the court or jury trying the same.

Jurisdiction of offenses.

SEC. 6. Justices of the peace, as well as the district courts shall have concurrent jurisdiction of all offenses committed under the first section of this act; but of offenses committed under the remaining sections hereof, justices of the peace shall not have jurisdiction except as committing magistrates, and it is made the duty of the justices of the peace of the several counties of the territory before whom any person is brought or arraigned for the violation of any

of the above sections, other than section one of this act, if reasonable grounds exist to believe such person guilty, to bind such person over in a good and sufficient bond to the district court of such county, and in default of such bond to commit to jail as in other felonies.

What accused must prove.

SEC. 7. It shall not be necessary, in the trial of any cause arising under the provisions of this act to prove that the person charged was not, at the time of violating the said provisions, in the lawful defense of himself, his family or property, or acting by lawful authority, but the accused must prove that he was, at such time, within the exception claimed.

Deadly weapon, definition of.

SEC. 8. Deadly weapons, within the meaning of this act, shall be construed to mean all kinds and classes of pistols, whether the same be a revolver, repeater, derringer, or any kind or class of pistol or gun; any and all kinds of daggers, bowie knives, poniards, butcher knives, dirk knives, and all such weapons with which dangerous cuts can be given, or with which dangerous thrusts can be inflicted, including sword canes, and any kind of sharp pointed canes; as also slung shots, bludgeons or any other deadly weapons with which dangerous wounds can be inflicted.

Travelers may carry arms.

SEC. 9. Persons traveling may carry arms for their own protection while actually prosecuting their journey and may pass through settlements on their road without disarming; but if such travelers shall stop at any settlement for a longer time than fifteen minutes they shall remove all arms from their person or persons, and not resume the same until upon eve of departure.

Officers may carry arms when.

SEC. 10. Sheriffs and constables of the various counties, and marshals and police of cities and towns, in this territory, and their lawfully appointed deputies, may carry weapons, in the legal discharge of the duties of their respective offices, when the same may be necessary, but it shall be for the court or the jury to decide from the evidence whether such carrying of weapons was necessary or not, and for an improper carrying or using deadly weapons by an officer, he shall be punished as other persons are punished, for the violation of the preceding sections of this act.

Duty of hotel and saloon keepers, &c.

SEC. 11. Every keeper of hotel, boarding house, bar room, drinking saloon or place where liquor is sold, or dance hall, in this territory, shall keep conspicuously posted up a copy of this act, in both the English and Spanish languages, and it is hereby made the duty of every such keeper of a hotel, boarding house, bar room, drinking saloon or place where liquor is sold, or dance hall, or the person in charge of the same, who shall become cognizant of any violations

of the provisions of this act, in, upon or about their premises, to immediately and at once direct the attention of such violator to the provisions of this act, and upon a failure of such keeper of a hotel, boarding house, bar room, drinking saloon, or place where liquor is sold, or dance hall, or the person in charge thereof, to so do, he or they shall be liable to pay a fine of not less than $5, nor more than $50.

Duty of judges.

SEC. 12. It shall be the duty of the judges of the several district courts of this territory, at the charging of the grand jury of the several counties, to direct the attention of the said grand juries to the provisions of this act, and require that they make diligent inquiry as to any violation of the same.

Duty of county commissioners.

SEC. 13. The boards of county commissioners of the several counties of this territory are hereby directed and required to have printed in both English and Spanish a sufficient number of copies of this act for the use of and to be furnished to all persons applying for the same; and it is made the duty of the several sheriffs and collectors of said counties to furnish to each person with a license a copy of this act, in both English and Spanish.

SEC. 14. All fines and penalties accruing from the violation of the provisions of this act shall be paid into the county treasury of the county in which such violation occurs to the credit and for the benefit of the school fund of said county.

SEC. 15. This act shall have full force and effect from and after the first day of March, 1887.

Approved February 18, 1887.

# EXHIBIT 13

# THE ANNOTATED CODE

—OF THE—

# GENERAL STATUTE LAWS

—OF—

# THE STATE OF MISSISSIPPI,

—PREPARED BY—

R. H. THOMPSON, GEORGE G. DILLARD,
and R. B. CAMPBELL,

—AND—

Reported to and amended and adopted by the Legislature at its Regular Session in 1892.

PUBLISHED BY AUTHORITY OF THE LEGISLATURE.

NASHVILLE, TENN.:
MARSHALL & BRUCE, LAW PUBLISHERS.
1892.

years to have or to own, or to carry concealed, in whole or in part, any weapon the carrying of which concealed is prohibited, shall be guilty of a misdemeanor, and, on conviction, shall be fined not less than twenty dollars nor more than two hundred dollars, or may be imprisoned not more than sixty days in the county jail, or both.

**1030** (2988). **The same; college students not to have, etc.**—A student of any university, college, or school, who shall carry, bring, receive, own, or have on the campus, college or school grounds, or within two miles thereof, any weapon the carrying of which concealed is prohibited, or a teacher, instructor, or professor who shall knowingly suffer or permit any such weapon to be carried, or so brought, received, owned, or had by a student or pupil, shall be guilty of a misdemeanor, and, on conviction, be fined not exceeding three hundred dollars or imprisoned in the county jail not exceeding three months, or both.

**1031** (2804). **The same; exhibiting in rude, angry, or threatening manner, etc.**—If any person, having or carrying any dirk, dirk-knife, sword, sword-cane, or any deadly weapon, or other weapon the carrying of which concealed is prohibited, shall, in the presence of three or more persons, exhibit the same in a rude, angry, or threatening manner, not in necessary self-defense, or shall in any manner unlawfully use the same in any fight or quarrel, the person so offending, upon conviction thereof, shall be fined in a sum not exceeding five hundred dollars or be imprisoned in the county jail not exceeding three months, or both. In prosecutions under this section it shall not be necessary for the affidavit or indictment to aver, nor for the state to prove on the trial, that any gun, pistol, or other fire-arm was charged, loaded, or in condition to be discharged.

The omission of the word "manner," after the words "rude, angry, and threatening," in an indictment, is a formal defect, and may be amended as such. In such indictment it is unnecessary to aver that the defendant was "carrying" the weapon. Gamblin v. State, 45 Miss., 658.

**1032** (2769). **Disturbance of family; noises and offensive conduct.**—A person who willfully disturbs the peace of any family or person by an explosion of gunpowder or other explosive substance, or by loud or unusual noise, or by any tumultuous or offensive conduct, shall be punished by fine and imprisonment, or either; the fine not to exceed one hundred dollars, and the imprisonment not to exceed six months in the county jail.

What constitutes the offensive conduct, or the nature or character of the offensive conduct, should be stated in the affidavit or indictment. Finch v. State, 64 Miss., 461.

This section and the next one are intended to protect the peace of families. An affidavit or indictment averring the disturbance merely of an individual, charges no offense under either section. Brooks v. State 67 Miss., 577.

**1033** (2770). **The same; using abusive, etc., language, etc.**—Any person who enters the dwelling-house of another, or the yard or curtilage thereof, or upon the public highway, or any other place near such premises, and in the presence or hearing of the family of the possessor or occupant thereof, or of any member thereof, or of any female, makes use of abusive, profane, vulgar, or indecent language, or is guilty of any indecent exposure of his person at such place, shall be punished for a misdemeanor.

Place is material. An indictment charging the use of abusive language in a yard, is not sustained by proof of its use near the yard. Quin v. State, 65 Miss., 479.

**1034** (2767). **Disturbance of worship; proceedings and penalty.**—If any person shall willfully disturb any congregation of persons lawfully assembled for reli-

# EXHIBIT 14

# PUBLIC ACTS,

## PASSED BY THE GENERAL ASSEMBLY

OF THE

# State of Connecticut,

**MAY SESSION, 1859.**



STATE OF CONNECTICUT,

OFFICE OF THE SECRETARY OF STATE, JUNE, 1859.

HARTFORD:
DAY & CLARK, STATE PRINTERS.
1859.

shall be forever precluded from claiming and showing that said taxes have not been paid, but it shall be taken as conclusively proved that said taxes have been paid. *Provided, however,* that in all cases where the selectmen of any town in this state have heretofore returned to the town clerk a list of the names of persons whose state or town taxes have been by them abated, and have neglected to subscribe their names thereto, the same shall not, by reason of such neglect, be thereby invalidated, and may be proved by any other proper evidence.

Omission of signatures of selectmen not to invalidate lists of abatements heretofore made.

SEC. 4. Any collector of taxes knowingly and designedly making a false certificate, and any selectman of any town knowingly and designedly making a false list of persons whose taxes shall be abated under this act, shall pay a fine not exceeding two hundred dollars; said offence to be a crime, and to be prosecuted and proceeded with like other criminal offences.

Penalty for making false certificate or list.

SEC. 5. The fifth section of the act to which this is an addition, and all acts and parts of acts inconsistent herewith, are hereby repealed.

Approved, June 24th, 1859.

---

## CHAPTER LXXXII.

An Act in addition to and in alteration of "An Act for forming and conducting the Military Force."

*Be it enacted by the Senate and House of Representatives in General Assembly convened:*

SEC. 1. There shall be one parade annually, sometime in the month of May, for one day only, by company; also one parade annually, for one day only, by regiment or brigade, in the month of August or September, as the commanding officer of the division shall direct, with the approval of the commander-in-chief.

Parades.

SEC. 2. Chaplains, surgeons, paymasters, engineers and sergeant-majors, may appear on horseback only on days of general review; on all other occasions, they shall appear on foot.

What officers may appear on horseback, on days of general review, only.

SEC. 3. Every company that shall comply with the provisions of the military laws, shall be allowed, out of

Allowance for rent of armory and drill-room.

the state treasury, the sum of seventy-five dollars per annum, as rent for armory and drill-room, upon a certificate from the adjutant-general that such company is justly entitled to receive the same.

Allowance to governor's guards.

SEC. 4. Any company of governor's guards which shall do duty in accordance with the provisions of law, shall be allowed seventy-five dollars per annum for armory rent.

Temporary erections for sale of liquors or gaming, near parade ground, may be abated as nuisances.

SEC. 5. If any booth, shed, tent, or other temporary erection, within one mile of any military parade-ground, muster-field or encampment, shall be used and occupied for the sale of spirituous or intoxicating liquor, or for the purpose of gambling, the officer commanding said parade-ground, muster-field or encampment, the sheriff or deputy-sheriff of the county, or any justice of the peace, selectman, or constable of the town in which such booth, shed, tent, or other temporary erection is situated, upon having notice or knowledge that the same is so used or occupied, shall notify the owner or occupant thereof to vacate and close the same immediately; and, if said owner or occupant shall refuse or neglect so to do, said commanding officer, sheriff, deputy-sheriff, justice of the peace, selectman or constable, may forthwith abate such booth, shed, tent, or other such temporary erection, as a nuisance, and may pull down or otherwise destroy the same, with the assistance of any force, civil or military.

Board of officers may be appointed to prepare system of regulations.

SEC. 6. The commander-in-chief is hereby authorized to appoint a board of officers to prepare a system of general regulations for the government of the militia, for which services no compensation shall be claimed or allowed.

Quarter-master-general to inspect armories, gun houses, &c., annually.

SEC. 7. It shall be the duty of the quarter-master-general, annually, to inspect the armories and gun-houses of the several companies, and also the rooms occupied by the regimental bands; and, on or before the first day of November, to make to the adjutant-general a full report of the condition of the same, and what companies are entitled to the allowance for armory rent; for which services he shall be allowed the sum of nine cents for every mile of necessary travel.

Compensation.

Companies may adopt and enforce regulations, and by laws.

SEC. 8. Each company may adopt, by a vote of two-thirds of its members, rules, regulations and by-laws for the government of its members, not inconsistent with the militia laws; and such rules, regulations and by-laws

shall be binding, and may be enforced by process of law; and any member who shall violate any such rule, regulation or by-law, may be expelled from his company by a major vote of the same, provided that such vote is approved by the commander of the regiment.

SEC. 9. Assessors of persons liable to pay the commutation tax, as provided in section nine of the act approved June 28, 1856, shall be allowed the sum of one cent for each person so assessed; and each collector of commutation taxes shall be allowed the sum of two cents for each tax actually collected and paid into the town treasury by him; and, if any assessor or collector shall refuse or neglect to perform the duty required by said act, he shall forfeit to the state not less than fifty nor more than one hundred dollars.

*Compensation of assessors and collectors of commutation tax.*

*Penalty for neglect.*

SEC. 10. Second lieutenants of companies are hereby required to attend the officers' drill, established by act approved June 29, 1855, and to comply with all laws relative thereto.

*Second lieutenants required to attend officers' drill.*

SEC. 11. This act shall take effect from and after its passage; and section twenty-eight, of the act approved July 1, 1854,—section one, of the act approved June 28, 1856,—section one, section nine, of the act approved June 25, 1857,—and all other acts or parts of acts, inconsistent herewith, are hereby repealed. Section three, of the act approved June 29th, 1855, is hereby re-enacted.

*To take effect from passage.*

*Repeal.*

*Re-enactment of provision of 1855, for officers' drill.*

Approved, June 24th, 1859.

---

## CHAPTER LXXXIII.

### An Act concerning Communities and Corporations.

*Be it enacted by the Senate and House of Representatives in General Assembly convened:*

The secretaries or clerks of all stock fire and fire and marine insurance companies who are by law required to make returns to the comptroller, in the month of January of each year, shall, at the time of making said return, pay the expense of making the record of the same.

*Insurance companies to pay expense of recording returns to comptroller.*

Approved, June 24th, 1859.