**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

**SILVER SPRING JEWISH CENTER, INC.**
1401 Arcola Avenue
Silver Spring, MD 20902
Montgomery County; and

**RABBI J. MENASHE SHAPIRO**
805 Whittington Terrace
Silver Spring, MD 20901
Montgomery County,

*Plaintiffs*,

**v.**

**MONTGOMERY COUNTY, MARYLAND**,
a body politic and corporate;
101 Monroe Street, Third Floor
Rockville, MD 20850,

**MARC ELRICH**, in his official capacity as
County Executive of Montgomery County;
101 Monroe Street, Second Floor
Rockville, MD 20850

**MARC R. YAMADA**, in his official capacity
as Chief of Police of Montgomery County,
100 Edison Park Drive, Third Floor
Gaithersburg, MD 20878,

**JOHN MCCARTHY**, in his official capacity
as State's Attorney for Montgomery County,
50 Maryland Ave.
5th Floor, North Tower
Rockville, MD 20850

*Defendants.*

**No. 8:26-cv-02962**

**COMPLAINT FOR DECLARATORY AND AND INJUNCTIVE RELIEF**

1. This lawsuit challenges Montgomery County, Maryland's attempt to prevent parishioners from defending themselves while engaged in communal prayer. This prohibition violates the First, Second, and Fourteenth Amendments of the U.S. Constitution.

2. On July 27, 2026, Montgomery County Executive Marc Elrich signed Expedited Bill 23-26 ("EB23-26"), which, among other things, prohibits the carrying of firearms, even by duly licensed permit holders, inside and within 100 yards of so-called "places of public assembly," defined to include, among other things, any "place of worship."

3. More restrictive than the Hawaii statute the United States Supreme Court recently held unconstitutional in *Wolford v. Lopez*, Montgomery County's ban prohibits licensed, arms-bearing parishioners from houses of worship, *even with the permission of the house of worship*. *See Wolford v. Lopez*, 146 S.Ct. 2032 (2026); *see also Kipke v. Moore*, 165 F.4th 194, 219 (4th Cir. 2026), *petition for cert. filed*, No. 25-1206 (U.S. Apr. 22, 2026). As an expedited bill, EB23-26 purports to have taken effect immediately.

4. This ban could not come at a worse time for Montgomery County's Jewish community. Just a short time after the firebombing in Boulder, the arson attack on Pennsylvania Governor Josh Shapiro's residence, and—close to home—the shooting at the Capital Jewish Museum, Montgomery County seeks to deprive Jews of their ability to defend themselves at their most Jewish moment: praying in

synagogues. Jewish law requires Jews to defend themselves when necessary. Montgomery County would rather declare open season.

5. Luckily, the Constitution protects religious rights and the right to self-defense. Residents of Montgomery County have a constitutionally protected right to exercise their faith, including faiths, like Plaintiffs', whose religious codes require providing for their own and communal self-defense, including by bearing arms when necessary. In violation of clear, binding Supreme Court precedent, Montgomery County's law, which singles out houses of worship to their detriment, is not neutral and generally applicable and cannot survive the strict scrutiny to which the First Amendment subjects such intrusions on the free exercise of religion and religious autonomy.

6. The Second Amendment violation is also clear. EB23-26 forbids conduct that falls squarely within the "plain text" of the Second Amendment, rendering it presumptively unconstitutional. Of course, some presumptions can be rebutted. But EB23-26, which flies in the face of hundreds of years of American practice, lacks the historical analogue necessary to rebut the Second Amendment's protection.

7. For the reasons set forth below, Plaintiffs seek a declaration that EB23-26 is unconstitutional and an injunction preventing Defendants and their employees from enforcing its prohibition of firearms in places of worship and within 100 yards of places of assembly.

## THE PARTIES

8. Plaintiff Silver Spring Jewish Center, Inc. ("SSJC"), a Maryland religious corporation, is an Orthodox Jewish synagogue located in Montgomery County, Maryland. SSJC brings its claims on its own behalf and on behalf of its members. The injuries SSJC seeks to remedy are directly germane to SSJC's religious mission, and it is unnecessary for SSJC's members to participate as parties in this litigation because SSJC seeks only declaratory and injunctive relief on their behalf.

9. Plaintiff Rabbi J. Menashe Shapiro is an ordained, Orthodox Jewish rabbi and a resident of Montgomery County, Maryland.

10. Defendant Montgomery County is a "charter county" of the State of Maryland that "may … be sued[.]" MD. CODE, LOCAL GOV'T § 9-201(2). As a "charter county," Montgomery County may adopt ordinances, resolutions, or bylaws to exercise its powers. § 9–201(6). Despite lacking the "power" to violate the U.S. Constitution, Montgomery County purported to use its power to pass EB23-26.

11. Defendant Marc Elrich is the County Executive of Montgomery County. As County Executive, Defendant Elrich is "vested" with the "executive power" and is charged with "faithfully execut[ing] the laws." Montgomery County, Md., Charter art. II, § 201. Among his specific powers is the authority to "approve" or veto legislation. *Id.* § 208. Defendant Elrich approved EB23-26 despite its constitutional flaws. Defendant Elrich is sued in his official capacity only.

12. Defendant Marc R. Yamada is the Chief of Police of Montgomery County. *Chief of Police*, MONTGOMERY CNTY., https://www.montgomerycountymd.gov/montgomery-county-police-department/chief-police (last visited July 23, 2026). As Chief of Police, Defendant Yamada is "responsible for administering the [Police] Department[.]" *Id*. The Montgomery County Department of Police enforces the laws of Montgomery County. *Our Mission*, MONTGOMERY CNTY., https://www.montgomerycountymd.gov/montgomery-county-police-department/about-us (last visited July 23, 2026). Defendant Yamada and the police officers who report to him are responsible for enforcing EB23-26. Defendant Yamada is sued in his official capacity only.

13. Defendant John McCarthy is the State's Attorney for Montgomery County. *Meet State's Attorney John McCarthy*, MONTGOMERY CNTY., https://www.montgomerycountymd.gov/states-attorneys-office/about-us/meet-states-attorney-john-mccarthy (last visited July 23, 2026). As State's Attorney, Defendant McCarthy is obligated to "prosecute and defend on the part of [Maryland]" all criminal cases in Montgomery County. *See* MD. CODE, CRIM. PROC. § 15-102. Defendant McCarthy is responsible for prosecuting all cases related to EB23-26. Defendant McCarthy is sued in his official capacity only.

## JURISDICTION, VENUE, AND DIVISION

14. This Court has subject-matter jurisdiction over all claims for relief pursuant to 28 U.S.C. §§ 1331, 1343, 2201, and 2202, and 42 U.S.C. § 1983, because

this action seeks to redress the Defendants' deprivation, under color of state law, of rights protected by the U.S. Constitution.

15. Venue lies in this Court under 28 U.S.C. § 1391 because the events and omissions giving rise to the action are harming Plaintiffs in this District.

16. The Southern Division is proper under D. Md. L. R. 501.4(a)(i) and (b)(i).

## FACTS

### Montgomery County's New Firearms Ban

17. On July 21, 2026, the Montgomery County Council voted to amend the Montgomery County Code to impose new restrictions on the possession and carrying of firearms in Expedited Bill No. 23-26. Montgomery County Executive Marc Elrich then signed the bill on July 27, 2026.

18. Because it was an "expedited bill," the new law purported to take effect immediately upon Elrich's signing.

19. Among other provisions, the new legislation commands that a person "must not … sell, transfer, possess, or transport a … handgun, rifle, or shotgun, or ammunition or major component for these firearms" "[i]n or within 100 yards of a place of public assembly." Montgomery County Code § 57-11(a)(1).

20. The new legislation defines "place of public assembly" to include any "place of worship." *Id.* § 57-1.[1]

[1] Other "places of public assembly" under the law include parks, schools, libraries, recreational facilities, hospitals, community health centers, long-term care facilities, multipurpose exhibition facilities, childcare facilities, government buildings, polling places, courthouses, legislative assemblies, and "gathering[s] of individuals to collectively express their constitutional right to protest or assemble."

21. Thus, the new law forbids, among other things, the possession and carrying of firearms at any place of worship and within 100 yards of any place of public assembly in Montgomery County.

22. Hereafter, these provisions' prohibition of firearms in places of worship, and within 100 yards of any place of assembly, are referred to as "the Ban."

**Plaintiffs' Injuries**

23. The Ban injures Plaintiff SSJC's members and Plaintiff Shapiro by preventing them from possessing firearms for self-defense in their place of worship, and by preventing them from fulfilling their religious obligations with respect to self-defense. It also injures Plaintiff SSJC by disrupting its security plan designed, in part, to comply with the religious law rulings of its leadership.

24. Especially since the events of October 7, 2023, antisemitic incidents have threatened SSJC's normal operations. For example, in October of 2024, a visibly Jewish member of the synagogue was attacked just outside the building. More recently, in the early morning hours of June 9, 2026, an unknown individual attempted (unsuccessfully) to gain entry to the synagogue.

25. To ensure the synagogue's safety, SSJC has implemented a comprehensive security plan. This includes upgrades to its infrastructure and security protocol training for members of the synagogue.

26. A central feature of this plan is the synagogue's armed security team (the "Security Team"). Although the synagogue never prohibited members from

carrying firearms in the building, it organized the Security Team in the wake of the October 7 attacks.

27. For both practical and *halachic* (Jewish Law) reasons, SSJC relies primarily on volunteer members of the synagogue for its Security Team.

28. Practically, the Security Team, as members of the synagogue, are naturally familiar with the layout of the synagogue and are known to the other members. The synagogue's rabbi believes that, in the event of an incident, Security Team members are better equipped to respond than hired security or even the police.

29. SSJC's Security Team is highly qualified and trains extensively. Many Security Team members are former members of the military, and every member has undergone the extensive process required by the State of Maryland to be licensed to carry a firearm. As a group, the Security Team trains together at least quarterly, and members of the group train individually on a biweekly basis.

30. *Halachically*, reliance on volunteer members of the community, rather than outsourcing the religious obligation to others, is preferred under Jewish law. *See* BABYLONIAN TALMUD, TRACTATE KIDDUSHIN 41a; *see also, e.g.*, SHULCHAN ARUCH, ORACH CHAYIM 250:1.

31. Talmudic and later religious sources command Jews to proactively provide their own security and the security of other Jews. *See* SHULCHAN ARUCH, CHOSHEN MISHPAT 425:1.

32. It is the belief of observant Jews generally, and Plaintiffs' sincerely held religious beliefs specifically, that the entire corpus of Jewish law is binding. *See* MAIMONIDES, THE THIRTEEN PRINCIPLES OF JEWISH FAITH (c. 1168) (listing "the belief in the immutability of the Torah" as a foundational belief).

33. Therefore, laws such as the Ban that prevent Jews from defending themselves—including outsourcing self-defense obligations to hired guards—burden the expression of their faith. Accordingly, such laws burden Plaintiffs' sincere beliefs and practices.

34. The Ban makes it impossible for SSJC to continue to implement its security plan and to use its volunteer Security Team, as the Ban forbids even members who are licensed to carry a firearm from doing so in the synagogue.

35. Even if it would want to, it would be prohibitively expensive for SSJC to hire an armed guard—as the EB26-23 allows, Montgomery County Code § 57-11(b)—for the entirety of its operations. There are usually people in the synagogue from 6:00 a.m. until 11:00 p.m. each day. SSJC conducts six prayer services each weekday and three considerably longer services during the Sabbath and Jewish holidays. The earliest of these services starts at 6:50 a.m., and the latest finishes at approximately 9:45 p.m. Outside of formal prayer times, its sanctuary is open for the study of Jewish texts.

36. But for the Ban, SSJC would continue to use its armed Security Team to ensure the synagogue's safety.

37. Like SSJC, Plaintiff J. Menashe Shapiro, an ordained, Orthodox rabbi, holds the sincere religious belief that Jewish law requires him to carry a firearm for personal, family, and communal protection.

38. Rabbi Shapiro also believes that this requirement, like other requirements of Jewish law, is to be performed personally, and not by others.

39. For that purpose, he holds a Wear and Carry permit issued by the Maryland State Police.

40. On the Sabbath and Jewish holidays, Rabbi Shapiro's sincerely held religious beliefs require that he walk to the synagogue for communal prayer. Thrice-daily communal prayer is required under Jewish law and by Rabbi Shapiro's sincerely held religious beliefs. *See Grand v. City of Univ. Heights*, 159 F.4th 507, 509 (6th Cir. 2025), *cert. granted* No. 25-965, 2026 WL 187301 (U.S. June 30, 2026).

41. The only path between his home and his synagogue requires him to walk within 100 yards of two public schools, two private schools, two parks, and three other houses of worship—each one a "place of public assembly" subject to the Ban.

42. Under the Ban, he may not carry a firearm as he passes by those locations—which means he cannot carry a firearm while walking to his synagogue.

43. But for the Ban, Rabbi Shapiro would carry his firearm to and inside the synagogues he regularly attends in Montgomery County.

44. Thus, the Ban prevents Rabbi Shapiro from fulfilling what he sincerely believes to be his obligations under Jewish law.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### First and Fourteenth Amendments — Free Exercise Clause
### (42 U.S.C. § 1983)

45. Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

46. The Free Exercise Clause of the First Amendment, made applicable to the states through the Fourteenth Amendment, prohibits any state or local government from abridging "the free exercise" of religion. U.S. CONST. amend. I.

47. The Supreme Court has interpreted the Free Exercise Clause to prohibit any governmental laws or policies that substantially burden a sincerely held religious belief unless the laws or policies are both neutral and generally applicable or narrowly tailored to a compelling government interest. *Mahmoud v. Taylor*, 606 U.S. 522, 564 (2025). A law that targets religious conduct for distinctive treatment will survive strict scrutiny "only in rare cases." *Carson ex rel. O.C. v. Makin*, 596 U.S. 767, 781 (2022).

48. The Supreme Court has explained that "government regulations are not neutral and generally applicable ... whenever they treat *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 593 U.S. 61, 62 (2021). A regulation that is either non-neutral or not generally applicable does not survive if the government can achieve its interests in a manner that does not burden religion. *Fulton v. City of Phila.*, 593 U.S. 522, 541 (2021).

49. Plaintiffs have a sincere religious belief that Jews must be prepared to defend themselves and other Jews, and that they should perform this responsibility personally rather than outsource it to others.

50. Plaintiff Shapiro has a sincere religious belief that he personally has a moral and religious duty to bring a concealed firearm to synagogue.

51. The Ban substantially burdens Plaintiffs' right to the free exercise of religion by prohibiting, with force of criminal prosecution, them from fulfilling these religious obligations.

52. EB23-26 is not a neutral or generally applicable law.

53. It is not neutral because its singles out "places of worship" for a ban on firearms.

54. It is not generally applicable because it restricts the rights of attendees of houses of worship more than the rights of those at comparable secular organizations, such as retail stores or restaurants. While other private organizations can—and indeed, must be allowed to—establish their own policies permitting or disallowing visitors to carry firearms, the Ban prevents houses of worship from doing the same. Moreover, the Ban unlawfully demands religious worshipers to forego their right to communal worship or their right to self-defense.

55. The Ban's prohibition of firearms within 100 yards of places of assembly also burdens Plaintiffs' free exercise of their religious beliefs because it makes it impossible for SSJC's members and Plaintiff Shapiro to walk to the synagogue, as their beliefs require at particular times, while exercising their right

to bear arms and thus also makes it impossible for them to exercise that right at the synagogue.

56. Because the Ban is neither neutral nor generally applicable, it is subject to strict scrutiny, which it fails.

57. The Ban is not narrowly tailored to serve a compelling governmental interest. The fact that the Ban does not apply to many similar secular places where people gather indicates that it is not narrowly tailored. The fact that all other counties in Maryland permit licensed permit holders to carry in houses of worship also suggests that the Ban is not the least restricted means of advancing whatever interest (such as violence prevention) that the County believes the Ban serves. *Cf. Holt v. Hobbs*, 574 U.S. 352, 368 (2015). Montgomery County could take less restrictive measures to achieve any permissible interests the county might have, rather than enforce a blanket ban on licensed parishioners.

58. For these reasons, the Ban plainly violates Plaintiffs' right to the free exercise of religion under the First Amendment.

59. Through their enforcement of the Ban, Defendants, under color of state law, have deprived and are depriving Plaintiffs of their First Amendment right to free exercise of religion.

60. Defendants are liable to Plaintiffs for this deprivation of their rights under 42 U.S.C. § 1983, and Plaintiffs are entitled to declaratory and injunctive relief against the continued deprivation of their rights.

## SECOND CAUSE OF ACTION
### First and Fourteenth Amendments — Establishment Clause
### (42 U.S.C. § 1983)

61. Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

62. The Establishment Clause of the First Amendment, made applicable to the states through the Fourteenth Amendment, forbids "law[s] respecting an establishment of religion." U.S. CONST. amend. I.

63. The Establishment Clause protects the right of religious institutions "'to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.'" *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 591 U.S. 732, 737 (2020) (quoting *Kedroff v. Saint Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952)). The Ban unconstitutionally intrudes on matters closely linked with SSJC's right to determine how best to conduct its own affairs by telling religious institutions what items worshippers may "possess" in places of worship and how religious institutions may (and may not) protect worshippers during their worship.

64. The Ban's prohibition on carrying firearms within 100 yard of religious institutions also violates the Establishment Clause, at least to the extent that it tells religious institutions what can and cannot be possessed on peripheral property owned by the house of worship.

65. The Ban concerns matters that are essential to SSJC's central mission.

66. The Establishment Clause "does not mean that religious institutions enjoy a general immunity from secular laws, but it does protect their autonomy with respect to internal management decisions that are essential to the institution's central mission." *Our Lady of Guadalupe*, 591 U.S. at 746. And, as stated above, the Ban does concern matters that are "essential" to the "central mission" of houses of worship. *Id.* at 746. And once government action reaches that zone, the Religion Clauses foreclose it categorically—courts do not weigh the government's interest against the intrusion because "the First Amendment has struck the balance for us." *Hosanna-Tabor Evangelical Lutheran Church and Sch. v. EEOC*, 565 U.S. 171, 196; *see also id.* at 188–90 (rejecting application of the generally-applicable-law framework of *Employment Division, Dep't of Hum. Res. of Ore. v. Smith*, 494 U.S. 872 (1990), for claims implicating church autonomy).

67. In addition, the Ban fails strict scrutiny because it is not narrowly tailored to serve any compelling government interest.

68. The Ban therefore violates the Establishment Clause.

69. Through their enforcement of the Ban, Defendants, under color of state law, have deprived and are depriving Plaintiffs of their rights under the Establishment Clause of the First Amendment of the United States Constitution.

70. Defendants are liable to Plaintiffs for this deprivation of their rights under 42 U.S.C. § 1983, and Plaintiffs are entitled to declaratory and injunctive relief against the continued deprivation of their rights.

**THIRD CAUSE OF ACTION**
**Second and Fourteenth Amendments — Right to Bear Arms**
**(42 U.S.C. § 1983)**

71. Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

72. The Second Amendment, made applicable to the states through the Fourteenth Amendment, protects the right of law-abiding citizens to "keep and bear Arms" for self-defense outside the home. U.S. CONST. amend. II; *Wolford v. Lopez*, 146 S.Ct. 2032, 2041 (2026). Among other specific protections, the right includes Plaintiffs' and other Americans' right to carry firearms "as they go about their daily lives." *Id*. at 2041. The Second Amendment has long been understood to protect vulnerable communities, like the American Jewish community. *See McDonald v. City of Chicago*, 561 U.S. 742, 789–90 (2010).

73. The Ban clearly prohibits conduct that the "plain text" of the Second Amendment protects. *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 24 (2022). Therefore, "the Constitution presumptively protects that conduct"—and, for the Ban to stand—Defendants must "demonstrate[e] that it is consistent with the Nation's historical tradition of firearm regulation." *Id*.

74. Defendants cannot show that the Ban—either its prohibition on firearms in places of worship, or its prohibition on firearms within 100 yards of places of public assembly—is consistent with the Nation's historical tradition of firearm regulation.

75. Therefore, by prohibiting Plaintiff SSJC and other religious institutions from allowing firearms possession within the synagogue, and prohibiting SSJC's members and Plaintiff Shapiro from carrying firearms at synagogue, the Ban violates the Second and Fourteenth Amendments' guarantee of the right to keep and bear arms.

76. Likewise, by prohibiting Plaintiff Shapiro and other individuals from carrying a firearm in the synagogue, and within 100 yards of any place of public assembly, the Ban violates the Second and Fourteenth Amendments' guarantee of the right to keep and bear arms.

77. Through their enforcement of the Ban, Defendants, under color of state law, have deprived and are depriving Plaintiffs of their right to keep and bear arms, in violation of the Second and Fourteenth Amendments to the United States Constitution.

78. Defendants are liable to Plaintiffs for this deprivation of their rights under 42 U.S.C. § 1983, and Plaintiffs are entitled to declaratory and injunctive relief against the continued deprivation of their rights.

**FOURTH CAUSE OF ACTION**
**Fourteenth Amendment — Equal Protection**
**(42 U.S.C. § 1983)**

79. Plaintiffs incorporate by reference the foregoing paragraphs as if fully set forth herein.

80. The Equal Protection Clause of the Fourteenth Amendment forbids state action that discriminates on the basis of religion. U.S. CONST. amend. XIV, § 1;

*Jesus Christ Is The Answer Ministries, Inc. v. Baltimore Cnty.*, 915 F.3d 256, 265 (4th Cir. 2019).

81. A state violates the Equal Protection Clause, in the context of the rights of religious Americans, when laws or policies "discriminate against religion generally." *Morris Cnty. Bd. of Chosen Freeholders v. Freedom From Religion Found.*, 586 U.S. 1213, 1214 (2019) (Kavanaugh, J., respecting denial of certiorari) (citing *Larson v. Valente*, 456 U.S. 228, 244 (1982)).

82. By singling out religious institutions and their attendees like Plaintiffs, and not similarly treating secular groups in similar numbers and similar circumstances, The Ban discriminates against Plaintiffs on the basis of their religious belief and practice. That targeting is "never permissible" and denies Plaintiffs the equal protection of the laws. *See Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993).

83. For the reasons stated set forth above, the Ban cannot survive strict scrutiny. The Ban advances no governmental interest, let alone a compelling one. Even if it did, the Ban is not the least restrictive means of achieving those purported objectives.

84. As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered and will continue to suffer irreparable harm, including the loss of their constitutional rights, entitling them to declaratory and injunctive relief, nominal damages, and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and:

A. Declare that EB23-26's ban on carrying firearms in houses of worship, and within 100 yards of places of public assembly, violates the Free Exercise Clause of the First Amendment;

B. Declare that EB23-26's ban on carrying firearms in houses of worship, and within 100 yards of places of public assembly, violates the Establishment Clause of the First Amendment;

C. Declare that EB23-26's ban on carrying firearms in houses of worship, and within 100 yards of places of public assembly, violates the Second and Fourteenth Amendments' guarantee of the right to keep and bear arms, on its face and as applied to Plaintiffs;

D. Preliminarily and permanently enjoin Defendants from enforcing EB23-36's ban on carrying firearms in houses of worship and within 100 yards of places of public assembly;

E. Award Plaintiffs nominal damages against Defendant Montgomery County, Maryland.

F. Award Plaintiffs their attorney's fees and costs under 42 U.S.C. § 1988 and any other applicable law; and,

G. Award Plaintiffs any and all other and further legal and equitable relief against Defendants as necessary to effectuate the Court's judgment, or as the Court otherwise deems just and proper.

Dated: July 30, 2026

Respectfully Submitted,

/s/ Andrew J. Morris

Andrew J. Morris (#22945)
Jacob Huebert*
New Civil Liberties Alliance
4250 N. Fairfax Drive
Suite 300
Arlington, VA 22203
(202) 869-5210
andrew.morris@ncla.legal
jacob.huebert@ncla.legal
* *Application for pro hac vice admission forthcoming*

Attorneys for Plaintiff Silver Spring Jewish Center, Inc.

/s/ J. Menashe Shapiro

Rabbi J. Menashe Shapiro,
Pro Se Plaintiff
805 Whittington Terrace
Silver Spring, Maryland 20901
T: (216) 645-2094
F: (216) 387-3736
RabbiMenasheShapiro@gmail.com